# In the United States Court of Federal Claims

Nos. 22-573, 22-620, 22-630
(Filed:  3 August 2022)[*]

```
*****************************************
MICHAEL STAPLETON ASSOCIATES,          *
LTD, et al.,                           *
                                       *
              Plaintiffs,              *
                                       *    Preliminary Injunction; Likelihood of
v.                                     *    Success; Mail; USPS; Resolicitation; Bid
                                       *    Protest; Solicitation Ambiguities; Arbitrary
THE UNITED STATES,                     *    and Capricious; APA; Rational Basis.
                                       *
              Defendant,               *
                                       *
*****************************************
```

Daniel J. Strouse, of Cordatis LLP, with whom was Joshua D. Schnell, both of Arlington, VA, for plaintiff American K-9 Detection Services, LLC.

W. Brad English, of Maynard, Cooper & Gale, PC, with whom were Jon D. Levin, Emily J. Chancey, J. Dale Gipson, and Nicholas P. Greer, all of Huntsville, AL, for plaintiff Global K9 Protection Group, LLC.

Ryan C. Bradel, of Ward & Berry PLLC, with whom were P. Tyson Marx and Stephen G. Darby, all of Tysons, VA, for plaintiff Michael Stapleton Associates, Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Jeffrey Bossert Clark, Acting Assistant Attorney General, Brian M. Boynton, Acting Assistant Attorney General, Robert E. Kirschman Jr., Director, Martin F. Hockey Jr., Acting Director, and Reginald T. Blades Jr., Assistant Director, all of Washington, DC, and Shoshana O. Epstein, Attorney, Postal Service, for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge.**

On 26 May 2022, Michael Stapleton Associates, Ltd. ("MSA") filed a motion for a temporary restraining order ("TRO") and preliminary injunction.  Pending before the Court is

---

[*] This opinion was initially filed under seal on 25 July 2022 pursuant to the protective order in this case.  The Court provided the parties the opportunity to submit proposed redactions on or before 1 August 2022.  On 1 and 2 August 2022, the parties confirmed by email they did not have any proposed redactions.  This opinion is now reissued for publication in its original form.

MSA's motion for preliminary injunction.[1]  For the following reasons, the Court denies MSA's motion for preliminary injunction and denies as moot MSA's motion for TRO.

## I.   Background

This case relates to a previous case heard before this Court, *American K-9 Detection Servs., LLC v. United States*, Case No. 20-1614 (Fed. Cl. Aug. 4, 2021), which is a consolidated bid protest filed by disappointed offerors following the United States Postal Service's ("USPS") decision to award a contract for canine explosive detection and alarm resolution services to MSA.  *See* Compl., ECF No. 1, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Nov. 18, 2020); Notice of Directly Related Case, ECF No. 7; Order, ECF No. 59, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Apr. 21, 2021) (consolidating cases).  In that case, the protestors disputed USPS's decision to combine several requirements into one procurement in a way that benefitted MSA, and the protestors further argued MSA had distinct advantages due to purported conflicts of interest. Compl. at 1, ECF No. 1, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Nov. 18, 2020).  After briefing and oral argument, this Court twice remanded the case to USPS to conduct a full Organizational Conflict of Interest ("OCI") investigation.  Compl. at 6; *see* Order, ECF No. 50, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Mar. 8, 2021); Order, ECF No. 107, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Aug. 4, 2021).  After the second remand, the contracting officer ("CO") found MSA had an OCI involving unequal access to information and possibly biased ground rules.  *See* Admin. R. ("AR") at 3665–84 (CO's Report Following Second Remand), ECF No. 125-5, *American K-9 Detection Servs., LLC, v. United States*, Case No. 20-1614 (Fed. Cl. Oct. 22, 2021).  USPS took corrective action on 18 February 2022 to mitigate the OCI by shortening MSA's contract by one year and cancelling all renewal options for the contract.  *Id.* at 3682–83.  USPS also issued two new solicitations—one for Third-Party Canine Mail Screening ("Canine Screening") services and one for Mail Screening Alarm Resolution ("Alarm Resolution") services.  *See* AR at 6806–6962 (Canine Screening Solicitation), ECF No. 48-4; AR at 5877–5986 (Alarm Resolution Solicitation), ECF No. 44-5.

MSA filed a business disagreement with the CO on 16 March 2022 arguing the services should remain bundled and alleging the 2022 solicitations contained patent ambiguities.  *See* AR at 6525–34 (MSA's Initial Disagreement), ECF No. 44-13.  The CO denied MSA's disagreement, stating USPS learned "that a single award to one supplier was unnecessary," and "separating the services would allow more companies to compete . . . [and] this increased competition would better serve the Postal Service's objective of obtaining best value."  AR at 6535 (CO Baker's Decision Letter to MSA ("CO Decision Letter")), ECF No. 44-13.  The CO also found MSA's allegations of patent ambiguities in the solicitations were unfounded.  *Id.* at 6537.  MSA appealed the denial to the Supplier Disagreement Resolution Official ("SDRO"), who upheld the CO's decision.  *See* AR at 6597–6605 (SDRO Decision Letter to MSA ("SDRO Decision Letter")), ECF No. 44-12.

---

[1] MSA also filed a motion for a temporary restraining order on 26 May 2022, but MSA agreed the motion was moot after the joint status conference on 14 June 2022; thus, the Court dismisses as moot MSA's motion for TRO.

Offerors Global K-9 Protection Group, LLC ("GK9") and American K-9 Detection Services, LLC ("AMK9") also submitted business disagreements; they argued USPS's corrective actions were insufficient since MSA was still allowed to compete despite allegedly having an unfair advantage.  *See* AR at 6326–43 (AMK9's Initial Business Disagreement), ECF No. 44-10; AR 6344–50 (GK9's Initial Business Disagreement), ECF No. 44-10.  The CO initially denied AMK9's and GK9's business disagreements, *see* AR at 6395–6402 (CO's Decision Regarding AMK9's Business Disagreement), ECF No. 44-10; AR at 6403–11 (CO's Decision Regarding GK9's Business Disagreement), ECF No. 44-10; but, upon appeal to the SDRO the agency denied AMK9's and GK9's business disagreements in part and sustained them in part.  *See* AR at 6606–20 (SDRO's Decision Regarding AMK9's Business Disagreement), ECF No. 44-12; AR at 6630–48 (SDRO's Decision Regarding GK9's Business Disagreement), ECF No. 44-12.  The agency therefore amended the solicitations to mitigate MSA's advantage as an incumbent but declined to exclude MSA from competing for awards under the 2022 solicitations.  AR at 6619 (SDRO's Decision Regarding AMK9's Business Disagreement); AR at 6646–47 (SDRO's Decision Regarding GK9's Business Disagreement).

## II.    Procedural Posture of MSA's Motion for Preliminary Injunction

MSA filed this bid protest on 25 May 2022 and moved for preliminary injunction and TRO the same day.  *See* Compl., ECF No. 1; Pl.'s Mot. TRO & Prelim. Inj., ECF No. 2.  GK9 then filed its complaint and motion for preliminary injunction on 6 June 2022.  *See* Compl., ECF No. 1, *Global K-9 Detection Servs., LLC v. United States*, Case No. 22-620 (Fed. Cl. June 6, 2022); Pl.'s Mot. Prelim. Inj., ECF No. 15, *Global K-9 Detection Servs., LLC v. United States*, Case No. 22-620 (Fed. Cl. June 6, 2022), ECF No. 5.  USPS responded to MSA's motion on 8 June 2022.  *See* Def.'s Resp. Mot. TRO & Prelim. Inj.  GK9 then filed a motion to withdraw its motion for preliminary injunction, ECF No. 38, after the parties agreed to an expedited briefing schedule on the parties' motions for judgment on the administrative record ("MJAR").  *See* Mot. Withdraw Mot. for Prelim. Inj. Without Prejudice, ECF No. 38.

The Court held a status conference on 13 June 2022, in which the parties agreed to consolidate case numbers 22-620 and 22-630 with 22-573.  *See* Order, ECF No. 17.  The Court then consolidated the cases under RCFC 42(a)(2), making this the lead case.  *See* Order, ECF No. 19.  The interested parties filed a joint status report ("JSR") on 14 June 2022, in which USPS agreed to delay its award date for the 2022 solicitations until after 1 August 2022; thus mooting MSA's motion for TRO.  *See* Joint Status Report, at 3–4, ECF No. 20 (noting the parties' agreement MSA's motion for TRO is moot).  The next day, MSA filed a reply to USPS's response to MSA's motion for preliminary injunction as well as a supplemental motion for preliminary injunction.  *See* Pl.'s Reply, ECF No. 24; Pl.'s Suppl. Mot. Prelim. Inj., ECF No. 22.  USPS filed its response to MSA's supplemental motion for preliminary injunction on 21 June 2022, *see* Def.'s Resp. Pl.'s Suppl. Mot. Prelim. Inj., ECF No. 39, and MSA replied in support of its motion on 28 June 2022, *see* Pl. MSA's Reply, ECF No. 45.  The Court then held oral argument on 29 June 2022.  *See* Order, ECF No. 40.

## III.    Legal Standard for Preliminary Injunctions

### A.    Jurisdiction

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), provides this Court jurisdiction over "action[s] by an interested party objecting to a solicitation by a federal agency for bids . . . ." 28 U.S.C. § 1491(b)(1); Administrative Dispute Resolution Act of 1996, Pub. L. No. 104–320, § 12, 110 Stat. 3870, 3874–76. The Federal Circuit applied the ADRA to bid protests involving USPS actions in *Emery Worldwide Airlines, Inc. v. United States*. 264 F.3d 1071, 1085 (Fed. Cir. 2001). The term "interested party" means "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). In the preaward bid protest context, an offeror must show it will suffer "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (citation omitted).

### B.    Preliminary Injunction Factors

To obtain a preliminary injunction, the plaintiff bears the burden of establishing entitlement to extraordinary relief based on the following factors: (1) the plaintiff has shown a likelihood of success on the merits; (2) the plaintiff will suffer irreparable harm absent an immediate injunction; (3) the balance of hardships weighs in favor of the relief the plaintiff seeks; and (4) granting the injunction serves the public interest. *See PGBA LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). "No one factor, taken individually is necessarily dispositive." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). A weak showing on one factor, therefore, "may be overborne by the strength of the others," and the "absence of an adequate showing with regard to any one factor may be sufficient to justify denial." *Id.* Although no single factor is dispositive in every case, "a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *FMC Corp.*, 3 F.3d at 427 (Fed. Cir. 1993); *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).

The Court evaluates the first of the four factors under the framework laid out in § 706 of the Administrative Procedure Act ("APA"); thus, a party challenging an agency's decision in a bid protest is not likely to succeed on the merits unless the plaintiff has shown the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (cleaned up). To show an agency's action is arbitrary and capricious, the plaintiff must demonstrate "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Garufi*, 238 F.3d at 1332. The rational basis test requires the Court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United*

*States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).  Since this standard is "highly deferential," the Court will not "substitute [its] judgment" for the agency's so long as the agency's decision was reasonable.  *Id.* at 998–99 (citation omitted); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might . . .  have reached a different conclusion . . . .").

The second factor, irreparable harm, requires the Court to determine whether the plaintiff has an "adequate remedy at law" if an injunction is not granted.  *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78 (2007) (quoting *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004)) (finding plaintiff suffered irreparable harm because it could not be made whole for lost profits through money damages).  Typically, "the mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages."  *Id.*; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") (citations omitted); *Centech Group, Inc. v. United States*, 554 F.3d 1029 (Fed. Cir. 2009); *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl. Ct. 277, 287 (1983) (finding plaintiff would suffer irreparable harm and granting injunctive relief because "an action at law would be unavailing because [plaintiff] could [not] recoup its . . . loss of anticipated profits."); 11A Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2022) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief.").

In a bid protest where remedies for monetary damages are limited to bid preparation and proposal costs, lost anticipated profits may be an irreparable harm.  *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011) (holding lost profits "constitute irreparable injury" because "the lost potential profits of bid protesters cannot be recovered in an action at law."); *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 317 (2004); *Overstreet Elec. Co, Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000).  "[I]t is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury."  *MORI Assocs., Inc.*, 102 Fed. Cl. at 552.  This court also found the "lost opportunity to compete in a fair competitive bidding process" may be an irreparable harm.  *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743–44 (2000); *see also Netstar-1 Gov't Consulting, Inc. v. United States*, 98 Fed. Cl. 729, 735 (2011).

The third factor, the balance of hardships, requires the Court to consider "the harm that injunctive relief would impose on the government."  *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005) (citing *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744. (2000).  While "the government often argues hardship from the impact of delay in the procurement process . . . only in an exceptional case would such delay alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."  *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005) (citation omitted).  On the other hand, "[i]n exercising jurisdiction over procurement cases, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3); *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005) (citing 28 U.S.C. § 1491(b)(3)).

The fourth factor is whether an injunction would serve the public interest. This factor requires the Court to weigh the public's interest in the subject procurement moving forward without delay with its interest in "honest, open, and fair competition in the procurement process." *PGBA LLC v. United States*, 57 Fed. Cl. 655, 663 (2003).

## IV.    Whether MSA is likely to Succeed on the Merits

MSA asserts the 2022 solicitations were arbitrary and capricious and lacked a rational basis. *See* Pl.'s Mot. TRO & Prelim. Inj. at 21, 29; Am. Compl. at 23–24, ECF No. 16. Specifically, MSA alleges:  (1) the decision to unbundle the contracts for Canine Screening from the Alarm Resolution was arbitrary; (2) the 2022 solicitations contained patent ambiguities as to how the two potential awardees would interact; (3) the decision to decrease the look-back period from thirty-six months to twenty-four months was arbitrary; and (4) the decision to consider past cargo screening experience to be equivalent to past mail screening experience was arbitrary. Pl.'s Mot. TRO & Prelim. Inj. at 21, 29; Am. Compl. at 6–7.

### A.    Whether MSA is Likely to Succeed on the Basis the Government's Decision to Unbundle the Services was Arbitrary and Capricious

The Court must evaluate whether USPS's decision to unbundle the solicitations for Canine Screening services from the Alarm Resolution services in the 2022 solicitations was arbitrary and capricious. Pl.'s Mot. TRO & Prelim. Inj. at 21. MSA does not allege any violation of regulation or law, so the Court will only evaluate whether the decision lacked a rational basis. *See Garufi*, 238 F.3d at 1332; Pl.'s Mot. TRO & Prelim. Inj. at 21.

As an initial matter, USPS contends its decision to separate the solicitations does not represent a significant departure from its previous position. Pl.'s Mot. TRO & Prelim. Inj. at 22; Def.'s Resp. Pl.'s Mot. TRO & Prelim. Inj. at 16. USPS supports its argument by demonstrating its stated preference for a single service provider in 2020 was just that—a preference. Def.'s Resp. Mot. TRO & Prelim. Inj. at 16, ECF No. 15. The 2020 solicitation did not require a single service provider to perform both services; instead, it allowed multiple awardees to provide the two services. AR at 77 (Solicitation Instructions and Evaluation Criteria), ECF No. 23-2, *American K-9 v. United States*, Case No. 20-1614 (Fed. Cl. Dec. 8, 2020). While the 2020 solicitation stated a preference for a single provider for both services, the solicitation also allowed for subcontracting. *Id.* This demonstrates USPS contemplated allowing multiple service providers to participate in the program under the 2020 solicitation. *Id.* The effect of carrying out separate solicitations is to achieve one of several possible outcomes USPS contemplated in the 2020 solicitation, and the change in preference is not a significant departure from prior practice. *See* AR at 6879 (3PK9 Solicitation & Evaluation Criteria), ECF No. 48-4; Tr. at 19:8–21, ECF No. 47.

USPS based its decision to separate the Canine Screening and Alarm Resolution services into two separate solicitations on findings from discussions involving key personnel who had experience with the program under the 2020 contract. *See* AR at 6592 (Email from CO Baker to SDRO Fazekas & CO Jacobs ("Baker Email")), ECF No. 44-12.  According to a 16 March 2022

internal email involving the CO and the SDRO, the "[n]ames and titles of the personnel who participated in 'lessons learned' discussions in preparation for the 2022 Solicitations" included the following:

- Claudia Angel, USPIS, Assistant Inspector in Charge;
- Jason McCurry, Director Commercial Air Operations;
- Linda Flynn, Inspection Service Program Specialist;
- Troy Blair, Aviation Mail Security Specialist;
- Vincent Desiderior, Hazardous Materials Program Specialist.

*Id.* The CO also discussed the team's "lessons learned" with Senior Director Commercial Products and Services Portfolio Karen Pompanella and Executive Manager Employee Financial and Tactical CMC David McIntosh. *Id.* Although the record does not include contemporaneous minutes from the discussion involving these individuals, the CO memorialized the agency's findings in an email chain with other agency personnel. *Id.*

The email explains "the lessons learned were documented by the team and sent to the CO. The intent is to improve the [statement of work and program]." *Id.* The team's findings include the following:

- "The COs came to recognize, through familiarity [with] the [Canine Screening and Alarm Resolution services] and a greater understanding of the [services] that multiple suppliers potentially could be used."
- "Now, we have a greater comfort level and understanding that it is possible to use multiple sources because the program has been up and running for a while."
- "It still continues to make sense to use one supplier for the [Alarm Resolution] services."

AR at 6592 (Baker Email). Four days before sending the email memorializing the team's discussions, the CO and the SDRO Mr. Steve Fazekas also discussed the teams' conclusions. *Id.* at 6593. They memorialized their discussion as follows:

- The preference for a single provider in the 2020 solicitation was due to the agency's concern "deviating from the approach used . . . during the pilot (i.e., combining the services) would entail some level of additional risk due to [USPS's] lack of prior experience with implementing and managing a program of this type. Granted, a similar argument could be made for using the same supplier, but those risks were mitigated to some degree by the Safety Act certifications that the potential suppliers are required to have."
- "Given the relative ease with which the current program was rolled out, and the experience gained while implementing and managing the current contract, the consensus in 2022 was that the Postal Service has the expertise needed to implement and manage multiple contracts for these services (e.g., separate suppliers for K9 and alarm services and potentially multiple suppliers for the K9 services). This was discussed within the purchase team and with others . . . on multiple occasions."
- "Because any supplier the Postal Service selects must meet the requirements of the Safety Act, the primary resource used for market research was the website created by DHS. This site was used in 2020 and 2022 to identify potential offers. Some of the firms [USPS] invited in 2020 are no longer listed, while others that weren't listed in 2020 were invited to participate in 2022. The amount of turnover observed seemed reasonable and consistent with other competitive markets. One change that wasn't

observed was a significant increase in the number of suppliers that are certified to provide both services."

*Id*.  At oral argument, the government explained this email chain memorializes USPS's internal discussions and deliberations regarding the decision to carry out separate procurements for the Canine Screening and Alarm Resolution services.  Tr. at 18:13–22:4.  To summarize, the agency held discussions involving key stakeholders who observed "the relative ease" with which MSA performed the 2020 contract; this observation led the agency to conclude it "ha[d] the expertise needed to implement and manage multiple contracts for [Canine Screening and Alarm Resolution] services . . . ."  AR at 6593 (Baker Email).

MSA argues USPS's decision to carry out two separate solicitations for these services, like the Army Corps' decision to arbitrarily change solicitation criteria in *Redland Genstar, Inc. v. United States*, lacks a rational basis.  39 Fed. Cl. 220, 231 (1997); Pl.'s Mot. TRO & Prelim. Inj. at 23.  In *Redland*, the Army Corps issued two memoranda endorsing a particular standard for stone it sought to acquire.  *See Redland,* 39 Fed. Cl. at 231.  Then, with no explanation for the change, the Army Corps issued a solicitation with a significantly more stringent standard.  *Id*. Unlike the Army Corps' decision in *Redland*, USPS's decision here is supported with "recollections of the conversation" showing the key stakeholders' rationale.  AR at 6592–93 (Baker Email).  MSA acknowledges USPS, unlike the Army Corps' in *Redland*, at least attempted to explain its reasoning.  Tr. at 53:1–6 (in response to the Court's statement, "Well, here, the Government, at least attempted to provide an express[] rationale," MSA stated "Yes, Your Honor.  It seems that they made an attempt.").

MSA argues USPS's explanation of its decision process and rationale, however, is not sufficient because it does not detail specific reasons to support its conclusion.  Pl.'s Mot. TRO & Prelim. Inj. at 22–23 (citing *Redland*, 39 Fed. Cl. at 231, 234).  In *Redland*, the court concluded the agency must provide "expressed reasons for judgment" for the court to defer to the agency's expertise.  39 Fed. Cl. at 231.  *Redland*, however, is distinguishable on this point because the changing solicitation criterion in that case related to technical specifications for a tangible product (i.e., changing the quality standards an offeror's stone must meet to be eligible for a government contract) while the change here regarded a subjective evaluation of how many contractors could effectively collaborate to carry out the program.  *See Redland*, 39 Fed. Cl. at 229; AR at 6593 (Baker Email).  In USPS's decision-making process, the CO spoke with multiple stakeholders who had more than a year of experience with the operation, and concluded USPS had "the expertise needed to implement and manage multiple contracts for these services." AR at 6593.  To USPS, this was a question of subjective ability, not technical specifications.  *See Redland*, 39 Fed. Cl. at 229, 232–33; AR at 6593.  USPS provided a general description of its rationale in line with the subjective nature of this question.  AR at 6593.

Federal Circuit precedent, moreover, does not require USPS to document the particular facts it relies upon in every decision.  *See Garufi*, 238 F.3d at 1332 (citation omitted).  In *Garufi*, the Federal Circuit reluctantly ordered a deposition of a CO to determine why the CO, without any explanation, found an offeror linked to the Italian Mafia to be "responsible," which included finding the contractor had "a satisfactory record of integrity and business ethics."  238 F.3d at 1329, 1340.  The *Garufi* court, nonetheless, emphasized "[c]ontracting officers are not obligated by the APA to provide written explanations for their actions."  238 F.3d at 1332 (citation

omitted).  As the *Garufi* court explained:  "[d]ecisions by contracting officers are not
adjudicatory decisions to be made on the record after a hearing."  *Id.*  Since every government
solicitation is different, what is necessary to provide a rational basis for a change regarding
technical requirements may not be necessary for the evaluation of subjective services.  *See id.*
Unlike *Garufi* where the CO did not provide an explanation for his decision, the admittedly post-
hoc description of the stakeholder meeting USPS provided still demonstrates the agency
followed a rational decision-making process by relying on its stakeholders' experience with the
program.  *See* 238 F.3d at 1340; Tr. at 59:22–60:5; AR at 6592–93 (Baker Email).

      In addition to its description of the meeting, USPS also argues its rationale for separating
the Canine Screening and Alarm Resolution solicitations is based on its stakeholders'
observation the two teams did not interact under the 2020 contract.  *See* AR at 6537 (CO
Decision Letter).  USPS held internal deliberations with at least eight key stakeholders with
knowledge of the program to review "lessons learned" over the previous year, and the agency
memorialized the conclusions in an email chain from the CO to other agency personnel.  *See* AR
at 6593 (Baker Email).  The SDRO discussed these "lessons learned" separately with the CO
several days before documenting the key stakeholders' conclusions in the email chain described
above.  *See* AR at 6593 (Baker Email).  USPS determined neither the Alarm Resolution service
provider's employees nor the Canine Screening team handled the x-ray technology in the 2020
contract; instead, airline employees operated the technology from the beginning of the pilot
program.  AR at 6537 (CO Decision Letter).  This observation led the stakeholders to conclude
"different suppliers could successfully perform [Canine Screening] and Alarm Resolution
services independently and without significant risk to operations, oversight, and error reduction,"
AR at 6600–01 (SDRO Decision).  The Court would have preferred contemporaneous
documentation of USPS's fact findings and its reasoning for unbundling the services,
nonetheless, USPS has articulated a "rational connection between the facts found and the choice
made."  *Bowman Trasnp., Inc.*, 419 U.S. at 285 (citation omitted).  USPS rationally concluded
the Canine Screening teams and Alarm Resolution team do not interact and the agency could
"with relative ease" unbundle the services to increase competition.  *See Dell Fed. Sys., LP*, 906
F.3d at 992; AR at 6537 (CO Decision Letter); AR at 6593 (Baker Email).

      Since USPS observed the Canine Screening and Alarm Resolution teams worked
independently, the agency decided to increase competition by separating the solicitations.  AR at
6535 (CO Decision Letter).  Although MSA contends increased competition is not a rational
basis, *see* Pl.'s Mot. TRO & Prelim. Inj. at 25, procurement officials "ha[ve] broad discretion to
determine what particular method of procurement will be in the best interests of the United
States in a particular situation."  *Tyler Constr. Group v. United States*, 570 F.3d 1329, 1334 (Fed.
Cir. 2009).  In this case, USPS exercised its discretion in determining increased competition for
the solicitations would lead to better value for the agency.  AR at 6600–01 (SDRO Decision).
USPS's market research supports this conclusion.  AR at 5851 (Supply Management
Competitive Purchase Plan), ECF No. 44-5 (identifying fourteen potential suppliers for Alarm
Resolution services); AR at 6677 (Supply Management Competitive Purchase Plan), ECF
No. 48-2 (identifying six potential suppliers for Canine Screening services); Tr. at 50:8–51:8.
The agency's decision to carry out separate solicitations therefore expanded the pool of offerors
and increased competition since several potential offerors only offer one of the two services but
not both.  *Id.*; AR at 6535 (CO Decision letter); AR at 6600–01 (SDRO Decision).  Thus, once

again USPS's decision in this case differs from the Corps' arbitrary and anticompetitive decision in *Redland*, *see* 39 Fed. Cl. at 231; and MSA acknowledges this, Tr. at 53:7–11 ("THE COURT: . . . [I]n *Redland*, the Court emphasized the Army Corp's decision to change technical requirements which restricted competition, opposite here[?]  [MSA]:  That's correct, Your Honor.  That is a significant distinction in Redland." ).

The Court will not substitute its judgment for that of an agency when the agency's decision is reasonable.  *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1381 (Fed. Cir. 2011) (citation omitted).  Since USPS provided a reasonable explanation sufficiently detailed to follow its reasoning, the Court finds MSA is unlikely to demonstrate USPS's decision to carry out separate solicitations for Canine Screening and Alarm Resolution services was arbitrary and capricious.  *See Turner Constr. Co.*, 645 F.3d at 1381; AR at 6535, 6537 (CO Decision Letter); AR at 6600–01 (SDRO Decision Letter).

**B.      Whether MSA is Likely to Succeed on the Merits on the Basis the 2022 Solicitations Contained Patent Ambiguities**

MSA contends it is likely to succeed in proving the 2022 solicitations contain patent ambiguities.  Pl.'s Mot. TRO & Prelim. Inj. at 29.  MSA cites a Federal Circuit decision, *E.L. Hamm & Assocs.*, for defining a patent ambiguity as "an obvious omission, inconsistency or discrepancy of significance."  379 F.3d at 1339.  Neither MSA nor the government, however, cites any case law setting forth the standard for reviewing ambiguities in a preaward solicitation. *See* Pl.'s Mot. TRO & Prelim. Inj. at 29–31; Def.'s Resp. Mot. TRO & Prelim. Inj. at 18–20. The Court therefore reviews MSA's likelihood of success concerning the alleged ambiguities through the same lens it reviews other agency actions; that is, the Court reviews the solicitations to determine whether they are so ambiguous as to render them arbitrary and capricious.  5 U.S.C. § 706; *Garufi*, 238 F.3d at 1332.

The 2022 solicitations require the Canine Screening service provider to "[c]ollaborate with USPS, USPIS, and the Alarm Resolution provider prior to launch in creating a [Canine Screening] script and playbook to be used in the event of an alert," and "to cooperate fully with USPS/USPIS employees, agents, contractors, suppliers, and airline/ground handler personnel in furtherance of effective screening, detection, alarm resolution and audit processes."  AR at 5241 (3PK9 SOW).  MSA argues these instructions are ambiguous because they require the service providers to interact but do not provide "expected protocols or chain of command" for those interactions.  Pl.'s Mot. TRO & Prelim. Inj. at 29.  MSA admits, however, its concerns only touch on interactions involving "ancillary work" (e.g., writing the playbook or conducting joint exercises) rather than daily operations.  Tr. at 73:17–21.  The Court is not convinced an experienced contractor such as MSA would be unable to coordinate with another contractor on ancillary work without more specific instructions.  MSA, after all, "was involved" in writing the original playbook, so it is unlikely MSA would not know how to create a new one with the help of another service provider.  Tr. at 75:6–8, 69:20–21 ("We do have experience creating a playbook.").  The government need not spell out exactly how two contractors should collaborate on the playbook and joint exercises because the contractors themselves—as hired experts—are best equipped to divide the work and create a final product.

MSA next alleges the solicitation is ambiguous because it does not specify a chain of command if a dispute arises between the two contractors.  Pl.'s Mot. TRO & Prelim. Inj. at 30; Tr. at 70:5–6.  This argument also fails because the Statement of Work implies USPS is in charge, and if the awardees reach an impasse, they can ask the government to resolve it.  Tr. at 78:8–20; AR at 5241 at 12 (3PK9 SOW) (requiring the contractor to "[c]ollaborate with *USPS*, *USPIS* and alarm resolution provider prior to launch in creating a [Canine Screening] script and playbook to be used in the event of an alert") (emphasis added).  MSA finally argues this ambiguity could lead to the exposure of proprietary information and technology.  Tr. at 81:7–82:14.  MSA fails to cite any legal authority, however, requiring greater detail from the government on this point.  Tr. at 82:13–14 ("I don't know if there is any case that says what level of detail is required.").  MSA is thus unlikely to demonstrate the existence of any ambiguities "of significance" in the 2022 solicitations.  *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004).  Upon review of the alleged ambiguities in the solicitations, the Court finds MSA is unlikely to succeed in proving the 2022 solicitations are so ambiguous as to be arbitrary and capricious.  5 U.S.C. § 706; *Garufi*, 238 F.3d at 1332.

### C.      Whether MSA is Likely to Succeed in Showing Reducing the Look-Back Period was Arbitrary and Capricious

MSA asserts USPS's decision to reduce the minimum look-back period for past performance from thirty-six months to twenty-four months is arbitrary and capricious because this was a change in technical criteria, and USPS's goal of increasing competition does not provide a rational basis.  AR at 6647 (SDRO Decision Letter to GK9 ("SDRO GK9 Decision")); Am. Compl. at ¶ 97–100; Pl.'s Suppl. Mot. Prelim. Inj. at 8–10; Tr. at 94:9–10.  Notably, the reduction does not *exclude* all TSA audit results prior to twenty-four months before an offer.  Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 8, ECF No. 39 ("The change to the criteria did not remove past performance beyond 24 months from evaluation entirely, but rather did not penalize offerors who could not demonstrate more than 24 months of past performance, which may be more difficult for other offerors to demonstrate . . . due to MSA's incumbent status.").  USPS's motivation for the change was not only to increase competition, but to mitigate MSA's unfair advantage it gained by performing the 2020 contract for a year.  Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 6.

MSA also contends a more rational strategy for mitigating MSA's advantage would have been to exclude MSA's experience it gained under the 2020 contract.  Tr. at 89:7–11 ("[I]f anything, . . . potentially you could say . . . MSA doesn't get to use its audit test records from the time that it was performing the 2020 contract.  That would make more sense.").  MSA argued this in the related *American K-9* case too.  MSA Reply in Support of Def. Mot. Dismiss at 10, ECF No. 143, *American K-9 v. United States*, Case No. 20-1614 (Fed. Cl. Jan. 28, 2022) ("There is a simple way to mitigate this ostensible advantage [i.e., MSA's experience performing under the 2020 contract]—preclude MSA from using its work on the instant contract as a past performance in a future solicitation.").  The government agrees it could have excluded MSA's experience under the 2020 contract when considering past performance but chose a "less severe measure instead."  Tr. at 94:12–15.  While the parties seem to agree MSA's proposed method would have been more rational than the one USPS selected, the agency is "not legally required to address every option"; it must only "provide a reasonable corrective action and adequately

explain its reasoning for doing so." *Dell Fed. Sys., LP v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018) (citation omitted).

MSA still asserts USPS must give a technical justification for this reduction, but USPS never provided a technical justification for implementing the original thirty-six month look-back period in the first place. Tr. at 87:8–16 (When asked what was the reason for the thirty-six month period, USPS responded: "It was just a requirement . . . I don't know if [there was] a specific reason they picked 36 as opposed to 24 in the first place."). The agency need only provide a "rational connection between the facts found and the choice made." *Bowman Trasnp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). USPS argues its decision to reduce the look-back period was a rational step toward mitigating an incumbency advantage MSA obtained due to an OCI. Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 6; Tr. at 94:4–9. USPS awarded the 2020 contract to MSA in November 2020, and since proposals for the 2022 solicitations were due in April 2022, MSA accrued more than twelve months of past performance under the 2020 contract. *See* AR at 6968 (Amendment to Canine Screening Solicitation), ECF No. 48-5 (setting due date for proposals to 5 April 2022); AR at 5968 (Amendment to Alarm Clearing Solicitation), ECF No. 44-5 (setting due date for proposals to 12 April 2022). The reduction in the look-back period, therefore, is roughly proportional to the period of MSA's incumbency. Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 8. MSA is therefore unlikely to prove USPS lacks a rational basis for reducing the look-back period from thirty-six months to twenty-four months to mitigate MSA's purported incumbency advantage and promote fair competition. *Dell Fed. Sys.*, 906 F.3d at 998; *Bowman*, 419 U.S. at 285.

### D. Whether MSA is Likely to Show USPS was Arbitrary and Capricious in Choosing to Evaluate Cargo Screening Experience and Mail Screening Experience Equally

MSA contends USPS's decision to evaluate past performance for cargo screening as equivalent to past performance for mail screening lacked a rational basis. Pl. MSA's Suppl. Mot. Prelim. Inj. at 10–11; Am. Compl. at 26–27. MSA supports this contention by asserting "mail screening requires a quicker pace with more items to be screened than a cargo screening operation." Am. Compl. at 27; Pl.'s Suppl. Mot. Prelim. Inj. at 11. MSA provides no evidence to support these differences, however. USPS explains the primary distinction between mail and cargo is not the pace of the work, but the name of the organization transporting the material. Tr. at 101:23–102:10 ("[USPS]: . . . If [a] box is shipped by USPS, it's called mail . . . If the same box is shipped by FedEx, that box is called cargo. THE COURT: And if a letter envelope is shipped by FedEx, it's called cargo as well? [USPS]: That's my understanding, yes."). Thus, USPS is the only organization that ships mail; and since MSA is the only offeror with experience performing services for USPS, MSA is the only contractor with experience screening mail. Tr. at 103:23–24 ("[USPS]: . . . [N]o one can call something mail unless it's shipped by the Postal Service. THE COURT: That's the definition of mail. USPS: That's the definition."). The Canine Screening program originated with the Transportation Security Administration which not only screened mail, but other cargo as well. Tr. at 99:1–6 (The "[canine] screening program was originally an outgrowth of the TSA cargo screening program . . . ."). Since a contractor screening either mail or cargo has experience screening small items such as letter envelopes and larger items such as boxes, considering past performance screening mail to be equivalent to

screening cargo is rational.  Tr. at 101:23–102:10.  Considering the mail program's origin and that the same items can be categorized as both mail and cargo (i.e., packages, boxes, and letter-sized envelopes), a reasonable method of mitigating MSA's unfair advantage regarding mail-screening experience would be to evaluate other offerors' cargo-screening experience equivalently.  Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 9.  If the agency's decision is reasonable, the Court will not "substitute [its] judgment." *Dell Fed. Sys.*, 906 F.3d at 999.  MSA is therefore unlikely to prove USPS's decision to evaluate cargo screening experience and mail screening experience equivalently was arbitrary and capricious.  *See id*.

### E.      Summary of MSA's Likelihood of Success

"Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d, 1343, 1350 (Fed. Cir. 2001).  MSA fails to show it is likely to succeed on the merits; therefore, on this factor alone the Court may deny MSA's motion for a preliminary injunction.  *See id.*  Accordingly, the Court finds MSA is not entitled to a preliminary injunction.  *See id.*

## V.      Whether the Other Three Factors Weigh in Favor of Granting MSA's Motion for a Preliminary Injunction

Since MSA has not shown it is likely to succeed on the merits, *supra* § IV, the Court denies MSA's motion for a preliminary injunction.  *Altana Pharma AG v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) ("[A] movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction.") (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d, 1343, 1350 (Fed. Cir. 2001).  Even so, a brief analysis of the remaining factors reinforces the conclusion MSA is not entitled to a preliminary injunction.

MSA claims it will suffer three types of irreparable harm absent injunctive relief:  (1) lost profits from the airports MSA services under the 2020 contract; (2) lost profits from the new airports MSA could potentially service under the 2022 contracts; and (3) a competitive disadvantage due to another awardee becoming embedded in the contract before MSA has potentially won its preaward bid protest.  Pl.'s Reply Supp. Suppl. Mot. Prelim. Inj. at 10; Tr. at 108:1–9; 110:5–10.

The Court evaluates the three harms MSA alleges through the lens of the schedule the parties agreed to during and after oral argument on this motion.  Tr. at 115:11–116:10; Order at 1, ECF No. 50.  USPS plans to begin performance under the 2022 solicitations one site per week starting 1 October 2022, and if MSA loses the 2022 solicitations, MSA will continue operating its current sites until they are transitioned to the new service provider.  Tr. at 106:6–12.  Briefing on the parties' MJARs is scheduled to be complete in August, and the Court intends to hold oral argument and issue an order shortly thereafter.  *See* Order, ECF No. 50.

Since MSA will continue providing services in the near term, it is unlikely to suffer significant lost profits, if any, before the Court decides the case on the merits.  Tr. at 11:8–21

("[MSA]:  So if the decision comes before the rollout would start . . . there's really no change to operations other than the new contractor getting up to speed, which, you know, I guess we'd lose out on the merits.").  MSA further acknowledges its lost profits would be minimal if the Court rules on the MJARs early in the rollout.  Tr. at 108:1–2 ("[MSA]: In terms of lost profits, . . . [i]t would be minimal.").  MSA, moreover, is not entitled to profits from contracts it has not won, and it is possible USPS will award some or all the 2022 contracts to MSA.  Finally, MSA's motion for a preliminary injunction came before the parties agreed to complete briefing on their MJARs in August and before USPS clarified it plans to begin services under the 2022 contracts in October.  The risk of another awardee becoming "embedded" in the 2022 contracts is not significant because the Court intends to issue an order on the merits either before USPS begins rolling out the 2022 contracts or shortly thereafter.  Mem. Op. & Order at 2, ECF No. 27, *Xerox Corp. v. United States*, Case No. 21-1807 (Fed. Cl. Sep. 17, 2021) (finding incumbent contractor unlikely to suffer irreparable harm in absence of injunctive relief because performance under new contract would be delayed and briefing on merits expedited).  Accordingly, the Court finds MSA has not shown it is likely to suffer irreparable harm absent a preliminary injunction.  *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 211 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

USPS, on the other hand, has demonstrated an injunction would harm the government.  *See* Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 10–11.  An injunction would delay the rollout schedule for the 2022 solicitations, adversely affecting the regulatory onboarding and training processes for any new awardees and preventing USPS from expanding the screening program to new sites.  *Id.*  Although MSA would continue servicing the sites it already has under the 2020 contract, Tr. at 107:4–11, USPS expects "operational and financial gains from the additional sites in the rollout," and an injunction would block these gains.  Def.'s Opp'n Pl.'s Suppl. Mot. Prelim. Inj. at 11.  Finally, the public has an interest in a safe and efficient mail system, and a preliminary injunction would prevent USPS from using the new sites going into the holiday season.  *Id.*  Accordingly, the third and fourth factors, the balance of hardships and the public interest, both weigh against granting an injunction.

## VI.  Conclusion

For the foregoing reasons, the Court **DENIES** MSA's motion for preliminary injunction.  The Court also **GRANTS** GK9's motion to withdraw its motion for preliminary injunction and **DENIES as MOOT** MSA's motion for TRO.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
