# In the United States Court of Federal Claims

Nos. 22-573, 22-620, 22-630
(Filed: 30 November 2022[*])

| | | |
|---|---|---|
| *************************************** | | |
| MICHAEL STAPLETON ASSOCIATES, LTD, | * * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | No. 22-573 |
| | * | |
| THE UNITED STATES, | * | Pre-Award Bid Protest; Organizational Conflict of Interest; Mail; USPS; Resolicitation; Bid Protest; Patent Ambiguities; Injunctive Relief; Arbitrary and Capricious; APA Rational Basis. |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| AMERICAN K-9 DETECTION SERVICES, LLC, | * * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |
| *************************************** | | |
| *************************************** | | |
| GLOBAL K9 PROTECTION SERVICES, LLC, | * * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | No. 22-620 |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| *************************************** | | |
| *************************************** | | |
| AMERICAN K-9 DETECTION SERVICES, LLC, | * * | |

[*] This opinion was originally filed under seal on 23 November 2022 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 30 November 2022. The USPS, MSA, and GK9 proposed redactions on 30 November 2022. The Court accepts the parties' proposed redactions and reissues the order, with a few minor, non-substantive corrections and redacted language replaced as follows: "[XXXXX]."

| | | |
|---|---|---|
| Plaintiff, | * * * | |
| v. | * * | No. 22-630 |
| THE UNITED STATES, | * * | |
| Defendant. | * * * | |

**************************************

*Daniel J. Strouse*, of Cordatis LLP, with whom was *Joshua D. Schnell*, both of Arlington, VA, for plaintiff American K-9 Detection Services, LLC.

*W. Brad English*, of Maynard, Cooper & Gale, PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, *Mary Ann Hanke*, and *Nicholas P. Greer*, all of Huntsville, AL, for plaintiff Global K9 Protection Group, LLC.

*Ryan C. Bradel*, of Ward & Berry PLLC, with whom was *P. Tyson Marx*, both of Tysons, VA, for plaintiff Michael Stapleton Associates, Ltd.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, with whom were *Reginald T. Blades Jr*., Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, and *Shoshana O. Epstein*, Attorney, United States Postal Service, all of Washington, DC, for defendant.

# OPINION AND ORDER

**HOLTE**, **Judge.**

Plaintiffs, Michael Stapleton Associates, Ltd. ("MSA"), Global K9 Protection Group, LLC ("GK9"), and American K-9 Detection Services, LLC ("AMK9"), bring three separate pre-award bid protests, consolidated on 13 June 2022, against the United States Postal Service ("USPS") in which the USPS solicitated a contract for canine explosive detection and alarm resolution services under Solicitation No. 2B-20-A-0087. Pending before the Court are plaintiffs' motions for judgment on the administrative record ("MJAR"), the government's cross-MJAR, MSA's motion for a stay or injunction pending appeal, MSA's motion to expedite consideration of its motion for a stay or injunction pending appeal, and GK9's and AMK9's motions for a status conference.

For the multiple protests and remands related to this solicitation, the Court has formally issued 129 pages of opinions and orders—and USPS has written 117 pages of reports, decisions, and exhibits—documenting the potential for organizational conflicts of interest ("OCIs") and problems with contracting. The Court continues adding to the page count, again addressing the government's actions, the persisting OCIs, and the slew of other motions recently filed. All

plaintiffs ask for injunctive relief: GK9 argues, the "USPS's corrective action is irrational because it failed to adequately consider or evaluate MSA's immitigable . . . OCIs that should have resulted in MSA being disqualified from the competition[,]" GK9's MJAR at 7, ECF No. 53, while AMK9 contends, "MSA stands to potentially receive an award that USPS should prohibit MSA from receiving[,]" AMK9's MJAR at 13, ECF No. 51. MSA previously asked the Court for a temporary restraining order and preliminary injunction; MSA requests the same relief here. Tr. of 21 Oct. 2022 OA on Cross-MJARs ("Tr.") at 220:19–221:3.

After extensive conversation at oral argument held 21 October 2022, *see id.*, the Court determined it did "not have enough information to make [an equitable] determination." 26 Oct. 2022 Order at 5, ECF No. 72. Accordingly, the Court issued an order "to seek USPS guidance on several reevaluation or resolicitation factors to craft an equitable remedy, if any, in [the present] order." *Id.* at 2. While the Court found "the OCIs connected to the 2020 solicitations remained in the 2022 resolicitation process and are immitigable, which may prompt the need to disqualify MSA from participation in the 2022 resolicitation[,]" the Court "ask[ed] USPS to offer guidance on the prospect of resoliciting or reevaluating the 2022 resolicitation in the event the Court's equitable remedy disqualifies MSA from participation in the 2022 resolicitation[.]" *Id.* at 4–5. The USPS filed two supplemental statements offering guidance and only plaintiff GK9 responded with its concerns. *See* Gov't's First Resp. to 26 Oct. 2022 Order, ECF No. 71; GK9's Resp. to 26 Oct. 2022 Order, ECF No. 75. The Court now makes its equitable determination on the motions and generally agrees with the USPS' proposed plans to phase-out MSA and disqualify MSA from future performance as a result of OCI-tainted solicitations.

For the following reasons, the Court grants AMK9's motion for judgment on the administrative record, grants in part GK9's motion for judgment on the administrative record, grants in part and denies in part the government's cross-motion for judgment on the administrative record, and denies MSA's motion for judgment on the administrative record. The Court grants AMK9's request for injunctive relief, grants in part GK9's request for injunctive relief, and denies MSA's request for injunctive relief. The Court has no choice but to enjoin MSA and ask the USPS to reevaluate the solicitation in a manner that does not violate its Supplying Principles and Practices. The Court finds as moot MSA's motion for stay pending appeal, MSA's motion to expedite, and GK9's and AMK9's motions for a status conference.

## I. Factual Background

This case relates to another pending case before the Court, *American K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020), which is a consolidated bid protest filed by disappointed offerors following the USPS's decision to award a contract for canine explosive detection and alarm resolution services to MSA. *See* Notice of Directly Related Case, ECF No. 7; Compl. ("2020 Compl."), ECF No. 1, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); Order, ECF No. 59, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Apr. 21, 2021) (consolidating cases).

### A. Aircraft Operator Standard Security Program

Following the September 11th attacks, the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission") issued a federal mandate to the Transportation Security Administration ("TSA") requiring "100% screening of all air cargo on passenger airlines by 2020." Admin. R. at 3 (USPS Supply Management Competitive Purchase Plan), ECF No. 23-2 ("2020 AR"), *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); *see also* 49 U.S.C. § 44901 ("The Administrator of the [TSA] shall provide for the screening of all passengers and property, including United States mail, . . . that will be carried aboard a passenger aircraft . . . ."). The USPS "is held to this mandate by the TSA/[Federal Aviation Administration] regulations under the Aircraft Operator Standard Security Program . . . , which includes mail over sixteen (16) ounces, Military Mail, [and] registered mail[.]" 2020 AR at 3. Currently, local law enforcement, funded by the TSA, provides screening of mail delivered on airplanes. *Id.* at 4. Under this system, the USPS has "little, to no, oversight or ability to manage the screenings or the locations as the program is run directly by the TSA." *Id.*

To grant the USPS control over the package screening process and facilitate development of a program expanding the number of sites with screening capabilities, TSA is currently developing a policy to relieve TSA from package screening and "require the shift of the explosives detection screening to [the USPS]." *Id.* TSA has "regulatory authority under 49 CFR [§ 5144] . . . to modify the procedures for air cargo security[,] [a]nd using that regulatory authority for the purposes of this new contract, the [Third-Party Canine-Cargo ('3PK9' or 3PK9-C')] program, for [the USPS] to conduct screening, part of that authority has set up procedures by which it would have the screening be permitted so that it could be part of the same overall screening process that goes onto airlines." Tr. of 8 Feb. 2021 OA on Cross-MJARs ("2021 OA Tr.") at 111:9–17 (quoting the government), ECF No. 44, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020).

### B. The USPS Pilot Program

In 2019, the USPS developed a pilot program to test the 3PK9-C program to conduct screening for mail weighing more than 16 ounces for transport via air carriers at Phoenix Sky Harbor airport. 2020 AR at 1899–1901 (2–11 February 2021 Supplier Disagreement Resolution Official Questions to the Unites States Postal Inspection Serive ("USPIS"), and their responses via email), ECF No. 62-4, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020), 812 (USPS Supplier Disagreement Resolution No. SDR-21-CS-001), ECF No. 62-3, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020). The USPS conducted this pilot program jointly with MSA for three months through a noncompetitive (nonformal) contract to MSA. *See id.* at 816. On completion of the program, the USPIS distributed a presentation to airlines. 2020 AR at 1906–36. The 6 July 2020 presentation was entitled "USPIS-3PK9 Mail Daily Best Practices—Airlines." *Id.* MSA was featured heavily in the presentation. *Id.* The USPIS Playbook sent to airlines did not identify any other TSA-certified 3PK9-C vendors, even though the USPS was aware other such companies existed, 2020 AR at 6–7 (USPS Supply Management Competitive Purchase Plan), ECF No. 23-2, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020), such as GK9, which has provided the same or similar services to all major airlines and at all major airports for several years. *Id.* at 988 (GK9 Proposal Cover Letter).

MSA's role with the USPS program did not end with the pilot program.  After the pilot program, MSA continued to consult with the USPS to develop the 3PK9 program.  2020 AR at 3678 (Contracting Officer ("CO") Franklin's Decision Following Second Remand), ECF No. 125-5, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020). After the pilot program, the USPS did not execute a formal contract with MSA for the consulting work.  *Id.*  Without a formal contract, the USPS did not include OCI restrictions or expectations for MSA.  *Id.*  Until at least July of 2020, MSA actively assisted the USPS in designing the entire USPS 3PK9 mail screening program, including preparing "internal quality control audit documents, program fundamentals documents, and what appears to be fairly extensive work on the playbook."  *Id.*  The USPS described MSA as being "instrumental in program development[,]" essentially working as a consultant to develop the program as a whole.  *Id.* MSA was "heavily involved in the designing of processes and procedures for the USPIS 3PK9 program."  *Id.* at 3682.

As it consulted with the USPS, MSA understood the USPS planned to enter a noncompetitive contract with MSA for expanded 3PK9 services across the country.  2020 AR at 3679.  In its consulting role, MSA obtained a list of intended USPS locations, mail volumes, and required hours.  *Id.* at 3678.  Further, "concepts that MSA appears to have assisted the USPIS with developing appear in the [2020 Statement of Work ("SOW")], including quality control concepts."  *Id.* at 3679–80.

On 14 August 2020, the USPS issued a request for information ("RFI") inviting "vendors in the marketplace to register their interest in providing services to the USPS should the USPS decide to develop the [3PK9-C] program."  *Id.* at 24 (RFI).  The RFI was sent to seven potential offerors "from TSA's list of SAFETY Act certified and in-process SAFETY Act certified organizations[.]"  *Id.* at 6–7 (USPS Supply Management Competitive Purchase Plan).  In the RFI, the USPS stated it was "peppering the market" regarding the "potential and ability" for suppliers to "provide the USPS with the canines and program management necessary, should the USPS invest in and develop a 3PK9-C program to screen cargo and mail being transported on domestic and international passenger commercial air carriers on a nationwide basis."  *Id.* at 24 (RFI).  If the 3PK9-C program were to be developed, the RFI stated the USPS would need "an Alarm Resolution protocol for instances when a canine alerts to a mail piece," among other "detection, analysis, and interpretation technology" services.  2020 AR at 24.  Anticipating its need for alarm resolution services, the RFI inquired about offerors' "capabilities around Alarm Resolution" and "procedure for clearing Alarms[.]"  *Id.* at 25.

The USPS's Competitive Purchase Plan ("CPP") explained its need for mail screening and resolution services.  *Id.* at 3–4 (USPS Supply Management CPP).  "Due to the ongoing COVID-19 pandemic," Air Transportation Operations predicted "a package shift in the global network of air carriers[,]" resulting in "a Peak Season shortfall on [the USPS]'s planned capacity with FedEx."  *Id.* at 3.  The CPP described a preference for offerors who "have SAFETY Act certified technology and processes to provide Real-Time X-Ray analysis and interpretation by trained bomb technicians for alarm resolution[.]"  *Id.* at 7.  The government acknowledged requiring SAFETY Act certification would limit the number of offerors who could submit responsive proposals but determined "this will not preclude diversity in the types and sizes of

offerors." *Id.* The CPP reiterated such a contract "will allow [the USPS] to control the [mail] screening process[.]" *Id.* at 4.

Although the USPS and MSA collaborated with the expectation MSA would receive a noncompetitive award, 2020 AR at 3678–79, other companies could compete (which several iterations of the USPS purchasing plans have subsequently acknowledged), and, with external pressure (i.e. the Alabama legislature, *see* Tr. at 123:20–124:19, ECF No. 74), the USPS held a competition. The USPS issued a solicitation in September of 2020 ("2020 solicitation"). *Id.* at 53–151 (2020 SOW, 2020 Solicitation Instructions and Evaluation Criteria, and 2020 Solicitation).

**C. The Solicitation**

On 22 September 2020, the USPS issued Solicitation No. 2B-20-A-0087 for "the procurement of Third-Party Canine-Mail Screening with Real-Time X-ray Analysis [and] Interpretation." *Id.* at 118 (2020 Solicitation). The solicitation contemplated "a four-year base period award with two two-year renewal options." *Id.* at 97 (2020 SOW). The pricing method for the contract contemplated: (1) a contract for 3PK9-C services; (2) a contract for alarm resolution services; or (3) a combined contract for both 3PK9-C services and alarm resolution. *Id.* The USPS specifically sought service contracts which included:

> 1. The services of a TSA-approved [3PK9-C teams] explosive detection canine team offeror to screen Priority Mail and mail weighing 16 ounces or greater transported on domestic and international passenger commercial air carriers on a nationwide basis. The offeror shall have the capability for 3PK9-C teams to respond at the request of a USPIS Postal Inspector on a nationwide basis . . . for investigative and preventative call-outs.
> 2. Alarm Resolution protocols for instances when a canine alerts to a mail piece. [the USPS] requires a combined comprehensive improvised explosive device (IED) screening, detection, analysis and interpretation solution which includes technology used in conjunction with [the USPS] or air transportation offerors' (air carriers) owned x-ray screening machines to facilitate remote alarm resolution analysis by FBI Hazardous Device School (HDS) or Naval School Explosive Ordinance Disposal (NAVSCOLEOD) certified bomb technicians.

*Id.* at 96–97.

Offerors would be evaluated under three factors: (1) capability (explosive detection canines ("EDC") service); (2) capability (alarm resolution); and (3) past performance. 2020 AR at 112–13. The government instructed offerors to "respond to the evaluation factors that are only relevant to what they plan on bidding on (Evaluation Factor One or Evaluation Factor Two) in addition to Evaluation Factor Three, which all bidders must respond to." *Id.* at 77 (2020 Solicitation Instructions and Evaluation Criteria). Under the first capability factor, EDC service, an offeror would be evaluated on its "ability to provide canine handler resources[,]" "ability to meet the required or proposed delivery schedules[,]" "management and staffing plan[,]" and its "ability to obtain the necessary certifications and security badges required at each location"

"relative to the SAFETY Act . . . and Certificate of SAFETY Act Designation." *Id.* at 78. The second capability factor, alarm resolution, would consider the "offeror's alarm resolution plan," the "offeror's management and staffing plan for K9s and handlers," and the "offeror's quality assurance and performance tracking plans." *Id.* (cleaned up). The evaluation of past performance would include, but would not be limited to: "demonstrated support for the execution of canine handler teams across the U.S., including the planning and administration of such a national level program"; "proven experience in developing national level canine handler programs"; and "offeror's national roll-out canine support experience." *Id.* (cleaned up).

The intention of the procurement was "to award one or more contracts based on a best value determination." *Id.* at 56 (2020 SOW), 96 (2020 Solicitation). The solicitation evaluation criteria noted the USPS's "strong preference for awarding one award that will encompass all as [sic] requirements of the SOW[,]" although the USPS was "willing to consider multiple awards, if that were determined to provide best value." 2020 AR at 113 (2020 Solicitation Instructions and Evaluation Criteria). First, the USPS would "make a preliminary best value decision among offerors who have proposed on the entire scope of work"; then, if satisfied with its first best value determination, the USPS would "proceed to award without further best value considerations." *Id.* In making its best value determination, the USPS would consider "whether pricing is reasonable compared to internal cost estimates and whether it is satisfied with the overall technical abilities for the proposed awardee of the single award." *Id.*

**D. Contract Award**

Each of the seven offerors submitted a proposal for combined 3PK9-C services and alarm resolution services, but MSA was recommended for the award as the CO determined MSA "provide[d] the best tradeoff between technical, risk, and price." *Id.* at 805 (Award Recommendation). On 9 November 2020, the USPS informed AMK9 and GK9 it awarded the contract to MSA. *See* AMK9 2020 Am. Compl., Ex. 1 at 2 (Unsuccessful Offeror Notice), ECF No. 20-1, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); GK9 2020 Am. and Restated Compl. at 5, ECF No. 82, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020).

**E. AMK9's Post-Award Administrative Dispute and Appeal**

AMK9 filed a post-award business disagreement with the USPS on 27 November 2020, challenging the award of the contract to MSA. 2020 AR at 1976–90 (AMK9's Post-Award Protest Before the CO). AMK9 alleged an "unreasonable and inconsistent" evaluation of its proposal and "clear [OCIs] that should have warranted MSA's removal from consideration for award." *Id.* at 1976. AMK9 further alleged the USPS used an "unstated evaluation factor" to evaluate AMK9's proposal, assigned unreasonable weakness to AMK9's proposal, "ignored portions of AMK9's proposal[,]" conducted an unreasonable tradeoff analysis, and "failed to consider the [OCI]." *Id.* at 1981–90.

**F. GK9's Administrative Dispute and Appeal**

On 30 November 2020, GK9 filed a post-award business disagreement with the USPS. *Id.* at 1937–45 (GK9's Post-Award Protest Before the CO). GK9 disputed USPS's effective identification, and resolution, of an "obvious" OCI involving MSA. *Id.* at 1942–44. GK9 further alleged the USPS improperly evaluated technical aspects of its proposal, including aspects related to x-ray technology, the number of command center locations, past rollouts, and projected staffing to meet the rollout schedule. *Id.* at 1944.

**G. The USPS's Second Pre-Award Investigation of MSA's Potential OCI**

The CO denied AMK9's post-award business disagreement on 7 December 2020. 2020 AR at 1991–98 (CO's Response to AMK9's Post-Award Protest). On 17 December 2020, AMK9 appealed to the Supplier Disagreement Resolution Official ("SDRO"), who denied the appeal on 21 April 2021. *Id.* at 1999–2016 (AMK9's Appeal to the SDRO), 2017–26 (SDRO's Response to AMK9's Appeal). The USPS CO denied GK9's post-award business disagreement on 10 December 2020. *Id.* at 1946–51 (CO's Response to GK9's Post-Award Protest). On 17 December 2020, GK9 appealed the CO's denial to the USPS SDRO. *Id.* at 1952–63 (GK9's Appeal to the SDRO). On 13 April 2021, the SDRO denied GK9's appeal. *Id.* at 1964–72 (SDRO's Response to GK9's Appeal).

**H. *American K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020)**

The protesters disputed the USPS's decision to combine several requirements into one procurement in a way that benefitted MSA, and the protestors further argued MSA had distinct advantages due to purported conflicts of interest. 2020 Compl. at 1. After briefing and oral argument, this Court twice remanded the case to the USPS to conduct a full OCI investigation. *See Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614, 2021 WL 1086225 (Fed. Cl. Mar. 19, 2021); *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248 (2021). After the second remand, the CO found MSA had OCIs involving unequal access to information and biased ground rules. *See* 2020 AR at 3665–84 ("CO Franklin's Report"). The USPS took corrective action on 18 February 2022 to mitigate the OCI by shortening MSA's contract by one year and cancelling all renewal options for the contract. *Id.* at 3682–83. The USPS also issued two new solicitations—one for Third-Party Canine Mail Screening ("Canine Screening") services and one for Mail Screening Alarm Resolution ("Alarm Resolution") services (collectively, "2022 resolicitation"). Admin. R. at 6806–6962 (Canine Screening Solicitation), ECF No. 48-4 ("2022 AR"); 2022 AR at 5877–5966 (Alarm Resolution Solicitation), ECF No. 44-5.

**I. MSA's Post-Award Business Disagreement Protest**

MSA filed a business disagreement with the CO on 7 April 2022 arguing the services should remain bundled and alleging the 2022 solicitations contained patent ambiguities. *See* 2022 AR at 6525–34 (MSA's Initial Disagreement), ECF No. 44-13. The CO denied MSA's disagreement, stating the USPS learned "that a single award to one supplier was unnecessary[,]" and "separating the services would allow for more companies to compete . . . [and] this increased competition would better serve [the USPS]'s objective of obtaining best value." *Id.* at 6535 (CO

Baker's Decision Letter to MSA). The CO also found MSA's allegations of patent ambiguities in the solicitations were unfounded. *Id.* at 6537–38. MSA appealed the denial to the SDRO, who upheld the CO's decision. *See id.* at 6597–6605 (SDRO's Decision Letter to MSA), ECF No. 44-12.

### J.   AMK9 and GK9's Post-Award Business Disagreement Protests

Around the same time as MSA's agency-level challenges, offerors GK9 and AMK9 submitted business disagreements; they argued the USPS's 18 February 2022 corrective actions were insufficient because MSA was still allowed to compete despite allegedly having an unfair advantage. *See* 2022 AR at 6326–43 (AMK9's Initial Business Disagreement), ECF No. 44-10, 6344–50 (GK9's Initial Business Disagreement). The CO initially denied AMK9's and GK9's business disagreements. *See id.* at 6395–6402 (CO's Decision Regarding AMK9's Business Disagreement), 6403–11 (CO's Decision Regarding GK9's Business Disagreement). GK9 and AMK9 appealed, and the SDRO denied AMK9's and GK9's business disagreements in part and sustained them in part. *See* 2022 AR at 6412–28 (AMK9's 2022 Appeal to the SDRO), 6455–63 (GK9's 2022 Appeal to the SDRO), ECF No. 44-11, 6606–20 ("SDRO's AMK9 Decision"), 6630–48 ("SDRO's GK9 Decision"). The agency amended the 2022 resolicitation to mitigate MSA's advantage as an incumbent but declined to exclude MSA from competing for awards under the 2022 resolicitation. *Id.* at 6619, 6646–47.

## II.   Procedural History

MSA filed this bid protest on 25 May 2022 and moved for a preliminary injunction and temporary restraining order ("TRO") the same day. *See* Compl., ECF No. 1; Pl.'s Mot. TRO & Prelim. Inj. On 25 July 2022, the Court denied MSA's motion for a preliminary injunction and TRO. *Michael Stapleton Assocs., Ltd v. United States*, 161 Fed. Cl. 151 (2022). GK9 then filed its complaint and motion for preliminary injunction on 6 June 2022. *See* Compl., ECF No. 1, *Global K-9 Detection Servs., LLC v. United States*, No. 22-620 (Fed. Cl. June 6, 2022); Pl.'s Mot. Prelim. Inj., ECF No. 5, *Global K-9 Detection Servs., LLC v. United States*, No. 22-620 (Fed. Cl. June 6, 2022). The USPS responded to MSA's preliminary injunction and TRO motion on 8 June 2022. *See* Def.'s Resp. Mot. TRO & Prelim. Inj., ECF No. 15. GK9 then filed a motion to withdraw its motion for a preliminary injunction, ECF No. 38, after the parties agreed to an expedited briefing schedule on the parties' MJARs. *See id.*

The Court held a status conference on 13 June 2022, in which the parties agreed to consolidate case numbers 22-620 and 22-630 with 22-573. *See* Order, ECF No. 17. The Court then consolidated the cases under Rule 42(a)(2) of the Rules of the Court of Federal Claims ("RCFC"), making this case the lead case. *See* Order at 2, ECF No. 19. The parties filed a joint status report ("JSR") on 14 June 2022 in which the USPS agreed to delay its award date for the 2022 solicitations until after 30 June 2022, mooting MSA's motion for a TRO. *See* JSR at 3–4, ECF No. 20. The next day, MSA filed a reply to the USPS's response to MSA's motion for a preliminary injunction as well as a supplemental motion for a preliminary injunction. *See* MSA's Reply, ECF No. 24; MSA's Suppl. Mot. Prelim. Inj., ECF No. 22. The USPS filed its response to MSA's supplemental motion for preliminary injunction on 21 June 2022, *see* ECF

No. 39, and MSA replied in support of its motion on 28 June 2022, *see* ECF No. 45. The Court then held oral argument on 29 June 2022. *See* Order, ECF No. 40.

On 14 July 2022, AMK9, MSA, and GK9 filed their respective MJARs, ECF Nos. 51, 52, and 53. On 28 July 2022, the government filed its responses to the MJARs as well as its cross-MJAR, ECF No. 56. Subsequently, AMK9, GK9, and MSA filed their respective replies in support of their MJARs, ECF Nos. 59, 60, and 61. The government filed its reply in support of its cross-MJAR on 18 August 2022, ECF No. 62. On 9 September 2022, the USPS awarded Canine Screening contracts to MSA, AMK9, and a third-party service and the Alarm Resolution contract to MSA. *See* JSR, ECF No. 66.

The Court held oral argument on 21 October 2022 to address remaining pre-award challenges in relation to the cross-MJARs.[1] *See* 15 September 2022 Order at 1. At oral argument, the parties confirmed, for purposes of this order, their challenges are limited to pre-award protests notwithstanding the award of the contracts. *See* Tr. at 218:13–219:17. The Court thus limits its discussion in this case to protests challenging the terms of the USPS's 2020 solicitation and 2022 resolicitation and does not address protests filed after the bid was awarded and contractors selected on 9 September 2022.

## III. Legal Standard

### A. Bid Protest Jurisdiction and APA Standard of Review

The Tucker Act grants this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). To be an "interested party," a protestor must show it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) (internal quotation marks omitted) (quoting 31 U.S.C. § 3551(2)(A)).

In rendering such judgment, courts "review the agency's decision pursuant to the standards set forth in section 706 of title 5 [of the Administrative Procedure Act ('APA')]." 28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).[2] "Among the various APA standards of review in section

[1] On 8 March 2022, the CO noted in his remand investigation analysis he conducted "a much more thorough review of the potential OCI" of Christopher Shelton, who served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center before working at MSA, and concluded no OCI existed. 2020 AR at 1869 (CO Decision After Remand). At oral argument, the parties agreed they were no longer arguing about Mr. Shelton. Tr. at 19:19–20:12.

[2] MSA previously argued the Court has jurisdiction under the APA according to *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970). *See* 2021 OA Tr. at 14:24–16:25. MSA now agrees this Court has jurisdiction pursuant to the Tucker Act. *See* MSA's Post-Award Cross-MJAR at 13, ECF No. 94, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); Tr. of 22 June 2021 OA on Cross-MJARs at 81:15–17 (counsel for MSA agreeing MSA "no longer suggests the *Scanwell* jurisdiction[.]"), ECF No. 104, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020). As stated in the

706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). Under this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). "The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

### B. Judgment on the Administrative Record in a Bid Protest

"RCFC 52.1(c) provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011) (Bush, J.); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356.

This Court may set aside a contract award if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Garufi*, 238 F.3d at 1332. "[D]e minimis errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (emphasis omitted). "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.* (internal quotation marks omitted) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors[.]" *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To establish prejudice, "a protester must demonstrate that but for the alleged error, there was a substantial chance that it would receive an award." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (cleaned up).

---

Court's first remand order, "jurisdiction in this USPS bid protest [is] pursuant to the Tucker Act as amended by the [Administrative Dispute Resolution Act of 1996], which 'subsumed' *Scanwell* APA jurisdiction." *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614, 2021 WL 1086225, at *11 (Fed. Cl. Mar. 19, 2021) (citing 28 U.S.C. § 1491(b)(1)).

**C. Organizational Conflict of Interest**

Application of 5 U.S.C. § 706 to OCI investigations enables courts to determine whether an agency's assessment lacked a rational basis. Courts deem an agency's decision as arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Application of 5 U.S.C. § 706 does not substitute a court's judgment for the agency's judgment. *Id.*

Federal Acquisition Regulation ("FAR") Subpart 9.5 governs OCIs in federal procurements. *See* FAR Subpart 9.5. Under FAR 2.101, an OCI is a situation where "a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR 2.101. Contracting officers are required to "[i]dentify and evaluate potential [OCIs] as early in the acquisition process as possible" and "[a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a). There are three situations leading to an OCI: "biased ground rules," "unequal access to information," and "impaired objectivity." *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007) (Allegra, J.) (citations omitted).

Congress specified "no Federal law dealing with public or Federal contracts [or] property . . . shall apply to the exercise of the powers of the [USPS]." 39 U.S.C. § 410(a). Neither the Competition in Contracting Act, 31 U.S.C. § 3553, nor the FAR are identified as applying to the USPS. *See id.*; *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 n.7 (Fed. Cir. 2001). There are a number of laws governing purchasing and material management at the USPS: "Some of those laws are mandated in 39 CFR either as enacted or since amended, and others are applied to the [USPS] by its own terms." Supplying Principles and Practices ("SP&Ps") § 7-7. To supplement the USPS's purchasing regulations contained in 39 C.F.R. Part 601, "[t]he Supplying Principles [of the SP&Ps] are the overarching business principles which the [USPS] will follow in its [supply chain management] efforts" by its own terms. The USPS, *Introduction to the Postal Service Supplying Principles and Practices* (Rev. Sept. 1, 2022). "It is the policy of the [USPS] and in the interest of suppliers to resolve supplier business disagreements at the contracting officer . . . level." SP&Ps § 7-4.

"This court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law." *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (citing *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1300 (Fed. Cir. 1999)). "To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." *Id.* (citing *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983); *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 380 (2004) (holding the disappointed bidder failed to provide "any factual basis" to establish the existence of an OCI)).

"Hard facts" and "concreteness" are necessary to show a CO's OCI determination lacked a rational basis under the APA's arbitrary and capricious standard; "sufficient alignment of interests[,]" "vague allegations[,]" and "mere suspicion and innuendo" are not enough. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1385 (Fed. Cir. 2011) (internal quotation marks omitted). "Hard facts do not need to show an actual conflict—a potential conflict can be sufficient." *Id.* at 1387 (cleaned up).

Mitigation actions contemplated by the SP&Ps "may include, but are not limited to":

> (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair a competition as possible. Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias.

SP&Ps 7-15.2.1. The SP&Ps further guide:

> If it becomes apparent when proposals are received that participation by a particular offeror could lead to an [OCI] and unfair competition, the offeror may be disqualified and its proposal rejected. The [CO] may take actions necessary and in the interest of the [USPS] and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest.

*Id.* "A CO's post-award evaluation can clear the air of any OCI taint by showing that no significant OCI existed. If, however, the CO's post-award evaluation shows that a significant potential OCI did exist and went unmitigated . . . then serious remedial actions are appropriate." *Turner Constr. Co.*, 645 F.3d at 1386.

### D. Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citations omitted).

## IV. The Parties' Arguments

### A. AMK9's Arguments

AMK9 moves for judgment on the administrative record on four primary grounds, all supporting AMK9's request for injunctive relief. *See* AMK9's MJAR. First, the AMK9 alleges "[t]he corrective action imposed by the SDRO is not rationally related to the 2022 [r]esolicitation's defects and does not reasonably alleviate the problem." *Id.* at 13. AMK9 states, "T]he SDRO sustained AMK9's protest finding that the procurement had a defect based on MSA's tainted incumbent advantages[,]" but the subsequent "corrective action [taken by the USPS] does not sufficiently resolve the defects found by the SDRO." *Id.* at 14–15. Second, AMK9 argues the "USPS acted arbitrarily, capriciously, and contrary to law by not disqualifying MSA from the competition[,]" and "[t]he SDRO's justification of allowing MSA to submit a proposal for the sake of 'competition' is irrational." *Id.* at 19–20. Third, AMK9 contends the "USPS's conclusion that MSA did not have a biased ground rules OCI . . . is arbitrary, capricious, and contrary to law." *Id.* at 25. AMK9 finds evidentiary support for this claim by asserting: (1) "MSA played a direct role in crafting documents that are part of the 2022 [r]esolicitation"; (2) "CO Baker's finding that MSA did not have a biased rules OCI because it performed 'development and design' work subject to an exception under the FAR is arbitrary, capricious, and contrary to law"; (3) "CO Baker's reversal of CO Franklin's decision has no rational basis and is arbitrary, capricious, and contrary to law"; and (4) "CO Baker's reliance on changes between the 2020 [s]olicitation and 2022 [r]esolicitation is insufficient to support a finding that MSA no longer has a biased ground rules OCI." *Id.* at 25–30. Fourth, AMK9 considers the "USPS['s] continued inclusion of [XXXXX] in the 2022 [r]esolicitation [to be] unreasonable." AMK9's MJAR at 31. AMK9 claims these actions, findings, and inclusions resulted in "irreparable harm" to the company, and "the balance of hardships and the public interest" support the Court entering an injunction. *See id.* at 32–34 (emphasis omitted).

### B. GK9's Arguments

GK9 moves for judgment on the administrative record on similar grounds to AMK9's arguments. *See* GK9's MJAR. First, GK9 contends "MSA has immitigable OCIs[,]" and the appropriate "remedy is exclusion from competition." *Id.* at 9. The "USPS acknowledged that MSA worked on the development and design of the program," and GK9 lists a multitude of alleged "entanglement[s] between USPS and MSA[,]" resulting in the "USPS: (1) adopt[ing] lessons learned from MSA; (2) ma[king] changes to the 2022 [s]olicitation [that] do not alter the most important factors; [and] (3) continu[ing] to use a substantial portion of the documents MSA developed." GK9's MJAR Resp. & Reply at 2–4. As a result of these entanglements, GK9 purports "[t]he balance of hardships weighs in GK9's favor[,]" and GK9 states it "will suffer irreparable harm if MSA is allowed to compete for [the] award[.]" GK9's MJAR at 18; GK9's MJAR Resp. & Reply at 6. In addition, GK9 claims the "public's interest in a fair competition free from OCIs" requires the Court to enter an injunction. GK9's MJAR Resp. & Reply at 6.

### C. MSA's Arguments

In MSA's MJAR, MSA raises four arguments, similar to those raised in its motion for a preliminary injunction and TRO,[3] regarding the USPS's 2022 resolicitation. *See* MSA's MJAR

[3] MSA moved for judgment on the administrative record on the same four grounds as its motion for a preliminary injunction and TRO. *See* MSA's MJAR; MSA's Mot. TRO & Prelim. Inj. In its motion for a preliminary injunction, MSA first asserted the USPS's "2022 [re]solicitation w[as] arbitrary and capricious and lacked a rational

at 1. First, MSA contends the USPS's "decision to conduct separate solicitations for 3PK9 and Alarm Resolution services was arbitrary and capricious." *Id.* at 30 (cleaned up). To this point, MSA indicates a lack of "evidence in the record that explains, from a technical perspective," why the two services were unbundled. *Id.* at 33. Second, MSA contends that the 2022 resolicitation contains patent ambiguities. MSA's MJAR at 35. MSA argues the 2022 resolicitation is ambiguous because it requires the 3PK9 and Alarm Resolution service providers to interact, but "provide[s] no further instruction as to expected protocols or chain of command for these required interactions." *Id.* Without "further instructions and guidance," MSA explains, "offerors will likely submit proposals that take a number of divergent approaches to screening the mail and thus make fair comparison of proposals improbable." MSA's MJAR Resp. & Reply at 7. Third, MSA contends USPS's mitigation strategies were inadequate both in reducing the look-back period from thirty-six to twenty-four months and treating mail and cargo screening experience equally. MSA's MJAR at 37–41. The goal of this reduction in the look-back period was to deemphasize "the past performance MSA accrued as incumbent on the 2020 Contract[,]" MSA argues; however, this mitigation is not rational because it is not related to MSA's past performance. *Id.* at 37–38. (internal quotation marks omitted) (quoting AR at 6647). MSA explains that it "was not performing the 2020 Contract 36 or even 24 months ago." *Id.* at 39. The goal of treating mail and cargo screening experience equally was also to deemphasize MSA's past performance for mail screening under the 2020 contract. *Id.* at 40. MSA argues this is not a rational mitigation strategy, because "the agency neglected to consider 'an important aspect of the problem.'" *Id.* (citing *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)). MSA explains the quicker pace in mail screening stems from the requirement to screen more items than in a cargo operation. MSA's MJAR at 40. MSA also explains mail and cargo screening involve different protocols and requirements for when a dog hits on a bag. *Id.* Fourth, MSA argues that it should not be disqualified from competition, because the USPS's "determination that MSA is eligible is rational and well-supported by the record." *Id.* at 41. MSA argues the USPS's mitigation efforts following the unequal access to information OCI were sufficient and rational. *Id.* at 43. Any OCI related to past performance of the 2020

---

basis." *Michael Stapleton Assocs., Ltd. v. United States*, 161 Fed. Cl. 151, 158–59 (2022). Specifically, MSA argued: "(1) the decision to unbundle the contracts for Canine Screening from the Alarm Resolution was arbitrary; (2) the 2022 [re]solicitation[] contained patent ambiguities as to how the two potential awardees would interact; (3) the decision to decrease the look-back period from thirty-six months to twenty-four months was arbitrary; and (4) the decision to consider past cargo screening experience to be equivalent to past mail screening experience was arbitrary." *Id.* at 159. Regarding MSA's contract unbundling claim, the Court reasoned "USPS provided a reasonable explanation sufficiently detailed to follow its reasoning . . . [so] MSA is unlikely to demonstrate USPS's decision to carry out separate solicitations for Canine Screening and Alarm Resolution services was arbitrary and capricious." *Id.* at 162. Regarding the patent ambiguities claim, the Court found "MSA is unlikely to succeed in proving the 2022 [re]solicitation[ is] so ambiguous as to be arbitrary and capricious." *Id.* at 163. For MSA's claim regarding the look-back period, the Court reasoned MSA is "unlikely to prove USPS lacks a rational basis for reducing the look-back period . . . to mitigate MSA's purported incumbency advantage and promote fair competition." *Id.* at 164. The Court further explained the "reduction in the look-back period . . . is roughly proportional to the period of MSA's incumbency." *Id.* For MSA's cargo and mail screening equivalency claim, the Court reasoned "MSA is . . . unlikely to prove USPS's decision to evaluate cargo screening experience and mail screening experience equivalently was arbitrary and capricious[,]" because "a reasonable method of mitigating MSA's unfair advantage regarding mail-screening experience would be to evaluate other offerors' cargo-screening experience equivalently." *Michael Stapleton Assocs.*, 161 Fed. Cl. at 164–65. The Court ultimately held MSA's claims were unlikely to succeed on the merits and, as a result, denied MSA's motion for a preliminary injunction. *Id.* The Court also denied as moot MSA's motion for a TRO. *Id.* at 166; *see supra* Section II.

contract, MSA argues, has been neutralized and therefore should not disqualify MSA's participation in the 2022 procurements. *Id.* at 49.

### D. The Government's Arguments

The government argues three main points: (1) "the Court should deny MSA's" MJAR; (2) "the Court should deny GK9's and AMK9's" MJARs; and (3) "the Court should deny plaintiffs' requests for injunctive relief." Gov't's Cross-MJAR & Resp. at i–ii (cleaned up).

#### 1. The Government's Arguments Regarding AMK9's and GK9's MJARs

The government asserts "[t]he Court should deny GK9's and AMK9's" MJARs. *Id.* at 27. The government's main evidentiary contention is "the SDRO's decision not to disqualify MSA had a rational basis." *Id*. (cleaned up). Supporting its claim, the government explains the "USPS appropriately concluded that the internal USPS information that was shared with MSA during the original solicitation was either outdated or had been shared equally with all potential offerors in the resolicitation, thus mitigating any OCI." *Id*. at 28. The government continues, the "USPS appropriately found that MSA had no role in preparing the specifications for the resolicitation," and "[w]ith respect to past performance . . . USPS further mitigated any advantage that MSA may have gained through its incumbent status by modifying the criteria for past performance[.]" *Id.* The USPS's findings combined with its corrective action in the past performance factor are enough, according to the government, to provide a rational basis. *Id.* at 29.

#### 2. The Government's Arguments Regarding MSA's MJAR

The government posits three arguments against MSA. First, the government argues "MSA has failed to establish success on the merits of its claims relating to the decision to issue separate solicitations for canine detection and alarm resolution services[,]" because it was grounded in meaningful discussions and research. *Id.* at 10. The government disagrees the "change in preference from a single supplier to separate suppliers amounted to a technical change" and instead contends the decision is supported by the administrative record. Gov't's MJAR Reply at 5. For example, in its purchase plan for the resolicitation, the USPS "documented its findings regarding the potential operational benefits of opening competition to additional suppliers[.]" Gov't's Cross-MJAR & Resp. at 16. The SDRO also consulted with the CO, who then discussed the operation of the contract with the USPS stakeholders who all "concluded that a single supplier was unnecessary." *Id.* The USPS based the conclusion on its experience operating a 3PK9 contract in 2020. *Id.* at 17. Additionally, the government argues the USPS has always "treated the services as separate" and allowed companies to bid on canine detection and alarm resolution individually in the original 2020 solicitation. *Id.* at 18. Regarding the playbook, the government argues, "MSA provides no basis to conclude that demonstrating the use of alarm resolution technology would require the sharing of proprietary methods or technology." *Id.* at 19. The government finally argues the "SDRO . . . found that several potential offerors did not provide both sets of services, so limiting the competition to offerors who provide both services would restrict competition and potentially raise costs to USPS." *Id.* at

20 (citing AR at 6603). The government adds a decision related to claiming "efficiency gains . . . is squarely within USPS's discretion to determine best value." Gov't's Cross-MJAR & Resp. at 20 (citing *Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

Second, the government contends "MSA's allegations of patent ambiguities involving the need for coordination" between the two service providers are "unfounded and moot" because the "USPS addressed these issues in Amendment 0001 to the solicitation and MSA did not challenge the amendment in its business disagreement before the SDRO, thus waiving any argument with respect to the revised language. *Id.* at 10.

Third, the government argues "MSA has failed to establish success on the merits for its arguments relating to the USPS SDRO's decision to modify the criteria for past performance [evaluating cargo and mail screening equally and reducing the lookback period from 36 to 24 months] in response to GK9's and AMK9's business disagreements." *Id.* at 10–11. The government asserts it has "broad discretion in how to mitigate potential OCIs" and the USPS did mitigate to "deemphasize the past performance that MSA accrued as incumbent on the 2020 contract[.]" *Id.* at 23–24. Because the USPS addressed the incumbent advantage MSA would have had without these changes, the measures had a rational basis. *Id.* at 25. The changes also "allow[ed] for more offerors to demonstrate sufficient past performance[.]" *Id.* at 26–27.

## V. Whether Continued Inclusion of [XXXXX] in the 2022 Resolicitation Was Arbitrary and Capricious

Following the second remand of this protest to the USPS, CO Franklin determined the involvement of [XXXXX], a USPS Aviation Mail Specialist, constituted an OCI. CO Franklin's Report at 3675–83. Accordingly, CO Franklin determined "[XXXXX] should not be permitted to participate on the . . . technical evaluation team [('TET')]" in the 2022 resolicitation. *Id.* at 3683. Upon review of the administrative record in this case, AMK9 discovered [XXXXX] participated in the "lessons learned" consultation for the 2022 resolicitation. *See* Tr. at 175:18–23; 2022 AR at 6592 ("Lessons Learned Consultation Email"). The Court accordingly reviews the history of [XXXXX]'s involvement in the 2020 procurement to determine if his continued participation violated the CO's directive, lacked a rational basis, and violated the SP&Ps.

### A. [XXXXX]'s Participation in the Prior Solicitations and Exclusion from the Technical Evaluation Team

During his review of the 2022 resolicitation, CO Franklin found [XXXXX]'s involvement in the 2020 solicitation process was potentially an unmitigated OCI. *See generally* CO Franklin's Report. CO Franklin found [XXXXX], a member of the 2020 TET, sent an internal presentation to Gerald Goss, Executive Vice President of Government and Aviation Security Business at MSA during the 2020 solicitation process.[4] *Id.* at 3677. "The USPS was

[4] The Court notes much of the 2020–2021 discussions regarding OCIs amongst the parties revolved around Christopher Shelton, Vice President of Air Cargo for MSA, who previously served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center. *See* 2020 AR at 621 ("MSA's air cargo business line is managed by Chris Shelton"), *id.* at 621 n.6. CO Franklin reported "TSA did find an email from [XXXXX] from the USPS dated

using [the presentation] for financial decision-making purposes on various aspects of the 3PK9 program [and,] [i]t contained several slides that provided competitively useful information, such as insights into the USPS' expected savings related to the 3PK9 program, expected costs, and planned order of rollout of airports." *Id.* [XXXXX] "failed to disclose his actions while USPS conducted three OCI investigations . . . [and] provid[ed] MSA with competitively useful documents." AMK9's MJAR Resp. & Reply at 14. "When [CO Franklin] asked the USPIS about these communications, it stated that it was planning for a noncompetitive award to MSA. However, no noncompetitive justification was ever approved . . . ." CO Franklin's Report at 3678.

As part of CO Franklin's OCI investigation, CO Franklin explored [XXXXX]'s motivation in sending the email. CO Franklin conducted interviews with various stakeholders, and "the USPIS ran an e-mail search through a USPS IT contractor of individuals that worked on the SOW development." *Id.* at 3666. "These e-mail searches revealed information previously unknown to the CO and USPS legal counsel relating to MSA's role in the development of the 3PK9 program and access to information beyond what other offerors had." *Id.* When CO Franklin inquired into the motivation surrounding the correspondence, [XXXXX] responded he "must have sent it in error and it was likely intended for a USPS employee with a last name beginning with the letter 'g.'" *Id.* at 3677. Instead, [XXXXX] sent the presentation to Mr. Goss at MSA. *Id.* MSA stated "it did not recall the context but seems to assume that it was asked to provide feedback on the presentation[.]" *Id.* CO Franklin noted in his report MSA's response "is different than [XXXXX]'s recollection" and highlighted he "did not see any evidence of feedback provided." CO Franklin's Report at 3677. According to the government at oral argument, [XXXXX] was likely under the "mistaken impression" the contract following MSA's 2019 pilot program was sole-source—a contract entered into without a competitive bidding process—and "improperly sent . . . information to MSA." *See* Tr. at 177:25–178:2, 177:14. MSA also noted it "never thought that it had an OCI, . . . because it was going to receive a sole-source award[.]" *See* Tr. at 121:4–8. [XXXXX] seemingly viewed MSA as a consultant to define the contract and receive feedback on what the solicitation should look like because he believed the contract was sole-source and MSA was the presumptive awardee. *See infra* Section IX.C; *see also* Tr. at 177:25–178:2.

CO Franklin found [XXXXX]'s involvement created a significant OCI and fashioned a remedy to mitigate future risk. CO Franklin concluded "USPS cost savings and projected cost information . . . was likely competitively useful Government information that was not available to other offerors." CO Franklin's Report at 3678. Regarding the planned order of rollout of airports, MSA argued "the rollout schedule underwent changes between the presentation and solicitation issuance[.]" *Id.* at 3677. CO Franklin agreed "some" changes were made but could "not determine that the overall early look at planned rollout did not provide an advantage, especially as most of the very first sites started with minimal time between offer submission and

---

September 5, 2019 sent only to Mr. Shelton while still under the employ of TSA and copying Mr. Gerald Goss of MSA Security regarding the TSA approved equipment list for the legacy canine teams." CO Franklin's Report at 3675. [XXXXX] copied Mr. Shelton "on several communications . . . dated September 4, 2019 to members involved in the pilot regarding the results of a canine screening test earlier in [Phoenix Sky Harbor Airport]." *Id.* Mr. Shelton was voluntarily "walled off" from the 2022 resolicitation by MSA. *Id.* at 3670. MSA determined Mr. Shelton was potentially an OCI, and [XXXXX] was his associate, as evidenced by email correspondence, but the USPS did not similarly wall [XXXXX] off.

rollout stayed consistent from the . . . presentation [sent by [XXXXX]] to the solicitation[.]" *Id.* at 3677–78. In his report, CO Franklin concluded "regardless of the reason it was shared, MSA had competitively useful information that could have been especially helpful, given the rapid pace of competition[.]" *Id.* at 3678. CO Franklin, as a result, determined "[XXXXX] should not be permitted to participate on the . . . [TET]" in the 2022 resolicitation. *Id.* at 3683.

At first glance, it is unclear why CO Franklin excluded [XXXXX] because he does not explicitly tie his discussion of [XXXXX]'s email to MSA on pages 13 and 14 of his report to his conclusion to exclude [XXXXX] at the end of his report. *See id.* at 3677–78, 3683. Upon further review, CO Franklin likely attributes biased ground rules to [XXXXX]'s actions:

> Without a contract in place, the USPS contracting officer and others in the [USPS], including counsel, were not aware of the history MSA had in helping to design the program. However, due to communications between USPIS and MSA relating to the program design, [CO Franklin] think[s] that it is nearly impossible to say that MSA did not have a biased ground rules OCI and/or unequal access to information.
>
> Once a decision was made to compete the requirement, MSA's involvement in the development of the program appears to have created a competitive advantage for MSA. This was likely further compounded by having the same USPIS people materially involved in both the development of the program and on the [TET].

CO Franklin's Report at 3679. [XXXXX]'s role "further compound[s] [MSA's competitive advantage] by having the same USPIS people materially involved in both the development of the program and on the [TET]." *Id.* [XXXXX] sent MSA competitively useful information regarding the development of the program, so CO Franklin separated him from the TET to prevent him from further compounding MSA's competitive advantage.

### B. [XXXXX]'s Participation in the "Lessons Learned" Consultation

The USPS recognized issues relating to the 2020 SOW and devised a number of steps to revise the SOW for the 2022 resolicitation. The USPS elected to revise the 2020 SOW based on lessons learned from MSA's pilot program. 2022 AR at 6795, 6797, ECF No. 48-3. The "lessons learned" consultation was instituted to "improve the SOW/program" and involved several USPS employees. Lessons Learned Consultation Email at 6592. The lessons learned were documented and sent to the CO. *Id.* Despite CO Franklin's directive following his finding of a potential OCI due in part to [XXXXX]'s communications with Mr. Goss, the USPS included [XXXXX] in the "lessons learned" consultation in 2022.[5] *See id.* The TET relied on the consultation's improved SOW to review technical proposal responses. Specifically, the 2022 TET was tasked with "evaluat[ing] each offeror's technical approach to meet the requirements of the SOW[.]" 2022 AR at 5853 (Purchase Plan for Alarm Resolution). The outcome of the proposal evaluation process was also sent to the CO. *Id.* In other words, the "lessons learned" consultation aimed to revise the SOW the TET would use to evaluate offerors. "Lessons learned" consultants adapted the evaluation criteria in the SOW in preparation for the 2022

---

[5] [XXXXX]'s participation in the "lessons learned" consultation with members of the TET was only discovered upon AMK9's review of the administrative record. *See* Tr. at 175:18–23.

consultation. The CO received the findings from both the "lessons learned" consultation regarding the SOW and the TET regarding how the offerors met the requirements of the SOW. The "lessons learned" conclusions were the basis for the TET evaluation criteria.

In 2022, an email from CO Jeremiah Baker to Supply Management Specialist Russell Jacobs and SDRO Steven Fazekas memorialized [XXXXX] "participated in 'lessons learned' discussions in preparation for the 2022 Solicitations." Lessons Learned Consultation Email at 6592. Beyond the shared work regarding the SOW, participation in the "lessons learned" consultation appears to have overlapped with the TET team—the team from which [XXXXX] was excluded. *Id.*; 2022 AR at 5853 (Purchase Plan for Alarm Resolution). The TET included three members "who [CO Baker] remember[s]" also associated with the "lessons learned" discussions with [XXXXX]: Chairperson [XXXXXX];[6] Team Lead and CO/Supply Management [XXXXXX]; and Supply Management Specialist [XXXXXX]. 2022 AR at 5853; *see* Lessons Learned Consultation Email at 6592. The TET Chair, [XXXXXX], "sen[t] a final written report to the [CO] for consideration after the technical evaluations [were] completed." 2022 AR at 5853. Three other consultation members were also TET members with one acting as the chair, and they were tasked with "evaluat[ing] each proposal against the individual factors considering strengths, weaknesses, deficiencies, risks, and responsiveness to meet the objectives set forth in the SOW." *Id.* In sum, [XXXXX] was involved in improving the SOW with TET members who would use the SOW to evaluate offerors. [XXXXX] crafted the criteria in the SOW as part of the "lessons learned" team, and the TET used the criteria in the SOW he helped formulate to assess offerors' ability to meet the demands of the USPS.

### C. Whether [XXXXX]'s Participation in the "Lessons Learned" Consultation is in Violation of the CO's Report Directions

The parties dispute whether [XXXXX]'s participation in the "lessons learned" consultation was a violation of the CO's directive. AMK9 considers the "USPS['s] continued inclusion of [XXXXX] in the 2022 Resolicitation [to be] unreasonable." AMK9's MJAR at 31. The government asserts AMK9's argument fails "given that the result of this 'lessons learned' consultation was the contract structure that AMK9 initially requested[: separate solicitations for canine detection and alarm resolution services]." Gov't's Cross-MJAR & Resp. at 43.

As an initial matter, CO Franklin notes a discrepancy in the rationales furnished by the USPS and MSA during his investigation. [XXXXX] noted he sent his email containing competitively useful information—a presentation—to Gerald Goss of MSA because of a typographical error, trying to send it to a co-worker with a last name starting with "g." CO Franklin's Report at 3677. MSA stated it was supposed to provide feedback on the presentation to [XXXXX]. *Id.* The government said [XXXXX] thought MSA was the sole-source contract provider. Tr. at 177:25–178:2. In resolving this dispute of fact, the Court finds it more likely

[6] In the government's supplemental statement responding to the Court's 26 October 2022 Order, CO Baker claimed in his declaration he "confirmed with [XXXXXX], the Chair for [TET] for 3PK-9 alarm clearing, that [XXXXX] was not given any access to the offers and that he did not participate in the evaluations." Decl. of Jeremiah Baker ¶ 7, ECF No. 71-1. During oral argument held 21 October 2022, however, the government stated, "[T]he chairman [of the TET] is [XXXXXX][.]" Tr. at 192:18–20. The administrative record corroborates the TET Chair was [XXXXXX]—not [XXXXXX]. 2022 AR at 5853 (Purchase Plan for Alarm Resolution). CO Baker's declaration, therefore, objectively contradicts the findings of oral argument and the administrative record.

[XXXXX] was operating under the assumption the contract was going to be sole-source, so the information sent by [XXXXX] was in furtherance of MSA's forthcoming award of the contract. Tr. at 177:25–178:7 ("[XXXXX]apparently is under the mistaken impression it was going to be sole source contract . . . .  CO Franklin said, he's removed from the technical evaluation going forward."); *see supra* Section V.A; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005) (describing the standard for reviewing factual determinations in a judgment on the administrative record pursuant to RCFC 56.1 (replaced by RCFC 52.1 on 20 June 2006):  "the Court of Federal Claims, when making a prejudice analysis in the first instance, . . . make[s] factual findings from the record evidence as if it were conducting a trial on the record").

The Court first analyzes whether the inclusion of [XXXXX] in preparation for the 2022 resolicitation was an objective violation of CO Franklin's directive.  [XXXXX]'s continued participation in the 2022 resolicitation is a "hard fact" creating an appearance of impropriety. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011).[7]  Case law "dr[aws] a distinction between circumstances where 'hard facts' indicate the existence or potential existence of impropriety and circumstances . . . where the finding of an OCI relies on inferences based upon 'suspicion and innuendo.'"  *Id.* at 1387.  "Hard facts" do not need to show an actual conflict—a potential conflict can be sufficient.  *See id.*; CO Franklin's Report at 3678 ("Thus, regardless of the reason it was shared [by [XXXXX]], MSA had competitively useful information that could have been especially helpful, given the rapid pace of the competition . . . .").  "If 'hard facts' establish the appearance of impropriety, it is not irrational for a reviewing body to" find the agency action arbitrary and capricious.  *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 573 (2010) (Futey, J.), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).  For the 2022 resolicitation, CO Franklin believed "MSA had unequal access to information and possibly benefited from biased ground rules" which was "further compounded by having the same USPIS people materially involved in both the development of the program and on the [TET,]" constituting a biased ground rule.  CO Franklin's Report at 3682, 3679.  The USPS, thus, had to take "corrective action[,]" including the exclusion of [XXXXX] from the TET because [XXXXX] assumed MSA was the sole-source awardee and gave them competitively useful information, which contributed to a biased ground rule OCI.  *Id.* at 3683.  Indeed, [XXXXX] was the only person called out by name and was the only person excluded.  *Id.*  In 2021, MSA voluntarily "walled off" one of its employees, Christopher Shelton, in part, when emails were discovered between Mr. Shelton and [XXXXX] regarding the pilot program.[8]  CO Franklin's

---

[7] In *Turner Construction Co. v. United States*, the Federal Circuit determined "intermittent merger discussions that occurred during the procurement process [for the construction of a government hospital] between [awardee]'s design subcontractor and the parent company of the Army's design consultant" was too "attenuated" to qualify as an OCI. 645 F.3d at 1379.  The Federal Circuit, thus, upheld this court's holding the notion "someone 'may have had access' to unidentified information or that someone 'was familiar with the details'" lacked "concreteness" for an OCI finding because the "vague allegations" noted possible rather than actual access to "unidentified information" rather than specific, sensitive information.  *Id.* at 1385 (internal quotation marks omitted).  In *NKF Engineering, Inc. v. United States*, however, the Federal Circuit held where facts show a potential OCI may exist, the mere "appearance of impropriety" is enough for a CO to disqualify a bidder, "[w]hether or not inside information was actually passed[.]"  805 F.2d 372, 376 (Fed. Cir. 1986).

[8] The issues surrounding Mr. Shelton's involvement have received extensive discussion.  In October 2019, Christopher Shelton left TSA and began working for MSA.  2021 AR at 621.  Mr. Shelton manages MSA's air cargo business line and, while at TSA, was closely involved in the development of TSA's canine screening program.  *Id.*  In a previous order in the related case, after the Court expressed concern the USPS's CO Jeremiah Baker "did not fully resolve what risk MSA identified that caused it to wall off Mr. Shelton[,]" the Court remanded the case for

Report at 3670, 3675.  If Mr. Shelton was walled off by MSA,[9] the USPS should have followed suit regarding [XXXXX].  The "lessons learned" consultation and the TET are overlapping enough in content (analyzing the SOW) and members (including at least three members of both entities) to "indicate the existence or potential existence of a conflict" because of the violation of the CO's directive to avoid OCIs.  *Turner Constr. Co.*, 94 Fed. Cl. at 573; *compare PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010) (finding a "bare allegation" of "a prior contractual relationship . . . is insufficient to show a significant potential conflict."), *with NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 520 (2011) (Allegra, J.) (finding hard facts, including four employees having agency budget executive plans, "strongly suggest the existence of an OCI[.]"), *aff'd*, 473 F. App'x 902 (Fed. Cir. 2012).  "A firewall that is not implemented and enforced . . . will not withstand scrutiny."  Keith R. Szeliga, *Conflict and Intrigue in Government Contracts: A Guide to Identifying and Mitigating Organizational Conflicts of Interest*, 35 Pub. Cont. L.J. 639, 666 (2006).

To justify his decision to exclude [XXXXX] from the TET, CO Franklin reported [XXXXX]'s correspondence with MSA likely "further compounded" MSA's competitive advantage because the same USPIS people were "materially involved in both the development of the program and on the [TET]."  *See* CO Franklin's Report at 3679.  CO Franklin concluded "[XXXXX] should not be permitted to participate on the [2022 TET.]"  *Id.* at 3683.  CO Franklin's instruction was not "[XXXXX] cannot be a member of the TET" but rather was "[XXXXX] should not . . . *participate* on the [2022] technical evaluation *team*[.]"  *Id.* (emphasis added).  *Merriam Webster Dictionary* defines "participate" as "to have a part or share in something[.]"  Participate, *Merriam Webster Dictionary* (11th ed. 2022).  [XXXXX] had a part in crafting the SOW the TET used.  The other keyword is "team," which *Merriam Webster Dictionary* defines as "a number of persons associated together in work or activity[.]"  Team,

---

further OCI investigation, including more details about Mr. Shelton.  CO Franklin's Report at 3670.  MSA explained "Mr. Shelton was walled off from government business during the first year of his employment . . . [and] the walling off was voluntary and was motivated by business and appearance concerns as opposed to any belief that there was a legal requirement."  *Id.* at 3671.  When asked about why Mr. Shelton was walled off, MSA stated:

> Mr. Shelton was walled off . . . for two reasons.  The first was a practical, business reason—Mr. Shelton was hired specifically to manage the operations of MSA's commercial customers, particularly Federal Express and MSA wanted Mr. Shelton to focus his efforts on those operations.  Second, MSA wanted to avoid any situation where Mr. Shelton's performance of his duties for MSA would raise any questions as to the propriety of his participation or lead to any process related to Mr. Shelton's performance of his duties.  The walling off was not documented.  Rather, it was verbal direction provided by Glen Kucera [CEO of MSA], to Mr. Shelton upon Mr. Shelton's arrival at MSA.

*Id.*  "Mr. Shelton performed no work for MSA related to MSA's USPS business until approximately January or February of 2021 (which is after the one-year wall-off expired)."  *Id.*  Despite MSA's walling off Mr. Shelton for "business and appearance concerns[,]" MSA filed a motion for a stay or injunction pending appeal of the Court's non-final request for guidance from the USPS supported by a declaration from Mr. Shelton, who "[a]s Vice President, Air Cargo, [of MSA] . . . ha[s] direct operational oversight and responsibility for all of MSA's air cargo clients, including the [USPS]."  *Id.*; *see* MSA's Mot. for a Stay or Inj. Pending Appeal, ECF No. 79; Decl. of Chris Shelton, ECF No. 79-1.  The government filed two declarations from CO Baker in this case, ECF Nos. 71-1 and 77-1, despite his finding no OCIs existed before CO Franklin's opposite finding.  The continued inclusion of Mr. Shelton and CO Baker supports the notion MSA was in a consulting role with the USPS, creating potential OCIs.  CO Franklin's Report at 3679.

[9] *Supra* note 8.

*Merriam Webster Dictionary* (11th ed. 2022). [XXXXX] was associated with the work of preparing for the 2022 resolicitation. While [XXXXX] was not on the TET, he did participate on the team preparing for the 2022 resolicitation evaluation process. Accordingly, CO Franklin's directions were violated on their face because he was on the TET under the different title of "lessons learned" consultation and participated in the evaluation process for the 2022 resolicitation by shaping the SOW. In its response to the 26 October 2022 order requesting guidance from USPS, CO Baker asserts in his declaration [XXXXX] "did not participate in the evaluations." Decl. of Jeremiah D. Baker ¶ 7, ECF No. 71-1. CO Baker, however, misses the mark. By participating in the "lessons learned" consultation, [XXXXX] "improve[d]" the SOW, Lessons Learned Consultation Email at 6592, and the TET evaluated offerors based on the SOW. 2022 AR at 5853 (Purchase Plan for Alarm Resolution). [XXXXX] was involved in the evaluations by helping to craft the criteria. *See* Szeliga, *supra*, at 666 ("A firewall that is not implemented and enforced . . . will not withstand scrutiny.").

The Court next analyzes whether the inclusion of [XXXXX] in preparation for the 2022 resolicitation violates the spirit of CO Franklin's directive. At oral argument held 21 October, the Court explained its interpretation of the purpose of CO Franklin's directions: "[T]he implication is that [XXXXX] should be walled off from this 3PK9 new evaluation, because he had improperly tainted things towards MSA in 2020." Tr. at 184:12–16. The purpose of CO Franklin's directions "to avoid, neutralize or mitigate the [OCI]" was also violated because [XXXXX], whose conduct is a "hard fact" of an OCI violation, continued to engage in the "appearance of impropriety." *See* CO Franklin's Report at 3665; Tr. at 192:5–10 ("GK9: . . . [T]he CO who is specifically appointed to address an OCI or investigate an OCI on the basis of a second remand from this Court says, stay away from [XXXXX] in terms of technical evaluation, and we know he's at least participating in some level. I think that is certainly the appearance of impropriety."). In response, the government was cautious in accepting the Court's interpretation: "[W]hether there should be a limitation on his overall involvement, akin to a walling off, and that's the spirit where that's coming from[,] I think it's appropriate to think that there's some of that spirit behind it[.]" Tr. at 187:9–13. The government, however, conceded even if the explicit words of CO Franklin were not expressly violated, the instructions were violated "in spirit." *See id.* at 187:22–188:1 ("THE COURT: So . . . the specific wording of the relief was not violated but the spirit was likely violated? [THE GOVERNMENT]: Well, if that's the interpretation of where the Court is coming from."). According to *Merriam Webster Dictionary*, "wall off" means "to separate (something) from the area around it with a wall[.]" Wall Off, *Merriam Webster Dictionary* (11th ed. 2022). [XXXXX] was supposed to be metaphysically walled off from the 2022 resolicitation process yet still participated by shaping the SOW through the "lessons learned" consultation. [XXXXX]'s participation in the 2022 resolicitation accordingly violated CO Franklin's purpose of corrective action.

The intent of CO Franklin's directive was to separate the 2020 OCIs from the 2022 resolicitation so as not to repeat the impropriety of the 2020 solicitation. [XXXXX] was operating under the notion of a sole-source award to MSA in 2020, so he was excluded, but [XXXXX] continued to have a role in the solicitation process in 2022. *See id.* at 177:25–178:2. CO Franklin aimed to exclude any USPS employees with the previous mindset MSA was the sole-source contractor. His intent was to start anew in 2022. The USPS's continued inclusion of [XXXXX] was irrational as well as arbitrary and capricious because the USPS objectively—and

in spirit—violated the directions of its own CO. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001); *AugustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018); *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1316–17 (Fed. Cir. 2021).

### D. Whether [XXXXX]'s Continued Inclusion in the 2022 Resolicitation Violated the SP&Ps

Although AMK9 and GK9 do not expressly argue [XXXXX]'s participation was a direct violation of the SP&Ps but rather a general violation as well as arbitrary and capricious, the Court further analyzes whether there was a violation under the SP&Ps. *See Garufi*, 238 F.3d at 1332 (holding a court may set aside a contract award if "the procurement procedure involved a violation of regulation or procedure."). "The [SP&Ps] are the [self-imposed] overarching business principles which the [USPS] will follow in its [supply chain management] efforts." The USPS, *Introduction to the Postal Service Supplying Principles and Practices* (Rev. Sept. 1, 2022). An agency's decision may be set aside under the arbitrary and capricious standard if there is "a clear and prejudicial violation of applicable statutes or regulations." *Garufi*, 238 F.3d at 1333 (internal quotation marks omitted) (quoting *Kentron Hawaii, Ltd v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

The Court finds, *supra* Section V.C, the USPS's allowance of [XXXXX] to prepare the 2022 resolicitation after the USPS's own CO prohibited [XXXXX] from inclusion on the TET was arbitrary and capricious to AMK9 and GK9. *See CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014) (stating "unequal treatment is fundamentally arbitrary and capricious[] and violates . . . full and open competition"). COs have been delegated "the authority to negotiate, award, modify, and terminate contracts[.]" The USPS, *Authority and Responsibility, Postal Service Supplying Principles* (Rev. Sept. 1, 2022). Here, the USPS found a problem, mitigated the problem by creating a rule it was bound by, and then broke its own rule. *See supra* Section V.C. The USPS violated the SP&Ps because it disregarded the CO's authority to neutralize or mitigate the potential OCI—[XXXXX]. *See* SP&Ps § 7.15.2.1 ("[T]he [CO] should . . . avoid, neutralize or mitigate the [OCI]."); *see also* CO Franklin's Report at 3683. The USPS's actions are "a clear and prejudicial violation of applicable . . . regulations [in violating the SP&Ps,]" so the Court further finds the USPS violating the SP&Ps was arbitrary and capricious. *Garufi*, 238 F.3d at 1333.

## VI. Whether the USPS's Mitigation Strategies Were Arbitrary and Capricious

As part of the mitigation process, the USPS went through several reviews and changes before resoliciting the contract in 2022. The SDRO, CO Franklin's superior who resolves business disagreements arising during the purchasing process, directed corrective actions for the USPS. *See generally* 39 C.F.R. § 601.108 (regarding SDRO disagreement resolution); SDRO's AMK9 Decision at 6606–20; SDRO's GK9 Decision at 6630–48. The corrective actions affected Evaluation Factor Three of the solicitation criteria. *See* SDRO's GK9 Decision at 6647 (finding "the [CO] should modify the evaluation criteria of the 2022 Solicitations to further deemphasize the advantages of incumbency"). The SDRO's decisions are "final and binding" on all parties, 39 C.F.R. § 601.108(g), so the USPS revised Evaluation Factor Three to: "[(1)]

reduce the look-back period of TSA audit/test records from 36 months to 24 months; and [(2)] further clarify that past performance involving mail screening will be evaluated as equivalent to past performance involving cargo screening." 2022 AR at 5833 (Solicitation Amendment Email). The Court next determines if the mitigation factors sufficiently deemphasized MSA's OCIs and, if not, whether the USPS could have taken functionally different actions such that its past actions were arbitrary and capricious.

### A. MSA's Participation in the Development and Design as Part of the Pilot Program in 2019

In 2019, the USPS created a "pilot program" for canine screening administered by the USPS in advance of a full procurement. *See* CO Franklin's Report at 3673. "The pilot program would allow TSA and USPS to bring in an airline and a canine screening company to determine what modifications to the cargo screening program would need to be made to handle mail." *Id.* at 3674. "American Airlines was selected as the airline, Phoenix was determined to be the airport, and MSA was selected as the canine company." *Id.* The USPS and TSA "used their experiences at the pilot program to determine the best practices for mail screening[,]" and these best practices were "enhanced by interactions with American Airlines and MSA to resolve issues the pilot revealed." *Id.* "[T]he [2020] SOW contained the critical information that was learned through the pilot program." *Id.*

After the pilot program, MSA continued to consult with the USPS to develop the 3PK9 program without a formal contract. *Id.* at 3679. After the pilot program in 2019, until at least July 2020, MSA's relationship with the USPS "seemed to take on more of a consulting role in creating the . . . 3PK9 program." CO Franklin's Report at 3679. In its consulting role, MSA obtained a list of intended USPS locations, mail volumes, and required hours, and "concepts that MSA appears to have assisted the USPIS with developing appear in the [2020] SOW, including quality control concepts." *Id.* at 3679–80. "Without a contract in place, the USPS [CO] and others in the [USPS], including counsel, were not aware of the history MSA had in helping to design the program" until after the USPS solicited the contract. *Id.* at 3679. Having no contract in place also meant the USPS did not include OCI restrictions or expectations for MSA. *Id.* In July 2020, "MSA was taking actions to get ready to perform the contract, including getting canine teams ready and obtaining USPS equipment for training those teams." *Id.*

Although the USPS and MSA collaborated with the expectation MSA would receive a noncompetitive award, *id.*, the USPS legal department allegedly learned of the sole-source contract in May or June and ordered competitive solicitations be presented in August. *See* Tr. at 125:23–126:15; *see also* Tr. at 120:25–121:3 ("[MSA]: MSA was always operating under the assumption that it was going to be getting a sole source contract. And so when it was competed, it was very surprised."), 124:13–15 (GK9 stating it was "made aware . . . this was going to be sole sourced").[10] The solicitation period was supposed to be longer, but because of treaty

[10] In August 2021, AMK9 argued the government unduly restricted competition by issuing the solicitation in a manner encouraging a single award. *See* AMK9's 2021 MJAR at 20–21, ECF No. 27, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020). Specifically, it argued the government unlawfully crafted the solicitation to favor MSA. *See id.* at 22. The Court denied AMK9's contentions, holding the government "did not unduly restrict competition" and "USPS acted rationally . . . in the solicitation." *See Am. K-9*

obligations, the USPS expedited the process. *See* Tr. at 125:23–126:15. The USPS issued a competitive solicitation in September of 2020. 2020 AR at 118 (2020 Solicitation).

### B. CO Franklin's Findings of OCIs in 2020

The USPS asked CO Franklin to serve as CO for the second Court-ordered remand to further investigate whether the contract award to MSA was "tainted" by an OCI. CO Franklin's Report at 3665. In addition to the [XXXXX] OCI, *see* supra Section V.A, CO Franklin determined "due to communications between USPIS and MSA relating to the program design, it is nearly impossible to say that MSA did not have a biased ground rules OCI and/or unequal access to information." *Id.* at 3679. CO Franklin found MSA sent an MSA-created presentation on 14 November 2019 to the USPS in an e-mail with "a significant amount of USPS information in it[,]" such as "a list of USPS locations that will require screening, including airlines that are at the locations, mail volumes for the locations, days of the week and number of hours required." *Id.* at 3678. CO Franklin expressly mentioned the "chart of USPS requirements appears to be very similar to the attachments to the solicitation and the contract[,]" meaning "MSA had significant details about USPS requirements nearly one year before the solicitation." *Id.* "This would have been competitively useful because it would have allowed MSA to prepare teams for the locations required by USPS and to allow MSA to handle what turned out to be a fairly rapid rollout." *Id.* In fact, according to CO Franklin, the Award Recommendation noted:

> MSA's current geographic distribution of canine teams across the country aligns 100 percent with the [USPS]'s requested network and roll-out schedule. MSA will not need canine teams to travel to meet the deployment needs of the [USPS], thereby reducing the risk associated with late deployments. . . . MSA was also the only offeror that provided a detailed description of how it planned to meet the roll-out schedule and how its canine teams would be managed and staffed. . . . MSA demonstrated an excellent understanding of the requirements. . . . All other offerors need to recruit canines and canine handlers. The need to recruit is a risk.

*Id.* In concluding on the utility of MSA's information, CO Franklin determined "it appears that having access to USPS requirements for nearly one year in advance of the solicitation likely provided an unfair competitive advantage to MSA that other offerors likely did not have." CO Franklin's Report at 3678.

Further, CO Franklin's review of "e-mails reveal[ed] rather substantial work up until at least July of 2020 that MSA was doing for the USPIS to assist in program design[,]" such as

---

*Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 273, 275 (2021). CO Franklin, however, determined in October 2021 "MSA was more instrumental in program development and engaged with USPIS well beyond the purchase of 3PK9 services for the 2019 pilot. The relationship was ongoing and appears to have morphed into more of a consulting role, despite no contract existing between the parties." CO Franklin's Report at 3678. "When [he] asked the USPIS about these communications [with MSA], it stated that it was planning for a noncompetitive award to MSA." *Id.* Accounting for CO Franklin's findings in October 2021, the Court acknowledges it incorrectly found the solicitation was not written to accommodate MSA in August 2021. *See Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 753 (2012) (finding "bias had infected the procurement process"); *Harmonia Holdings Grp., LLC v. United States*, 160 Fed. Cl. 674, 689 (2022) ("[B]ias—or even the mere appearance of bias—is a legitimate reason to cancel a solicitation . . . .").

"internal quality control audit documents, program fundamentals documents, and what appears to be fairly extensive work on the playbook[ included in the 2022 SOW]." *Id.* CO Franklin deduced the ongoing relationship and communications "demonstrate[d] that MSA was more instrumental in program development and engaged with USPIS well beyond the purchase of 3PK9 services for the 2019 pilot." *Id.*; *see* supra Section VI.A. When asked about the communications, the USPS "stated that it was planning for a noncompetitive award to MSA[;] [h]owever, no competitive justification was ever approved[.]" CO Franklin's Report at 3678. Despite no contract existing between the parties, MSA's function "appears to have morphed into more of a consulting role[.]" *Id.* One example of the ongoing relationship CO Franklin highlighted is "The Speed of Mail" document, which instructs canine handlers to arrive to the airport early and "appears to have been prepared at least in large part by MSA[.]" *Id.* at 3679. CO Franklin also uncovered MSA's involvement in compiling a playbook, a PowerPoint presentation memorializing "best practices" from the pilot program. *See generally* 2020 AR at 1906–36 (USPIS-3PK9 Mail Daily Best Practices-Airlines PowerPoint). During CO Franklin's investigation, MSA claimed "MSA had no direct involvement in the creation of [the playbook]." CO Franklin's Report at 3682. CO Franklin rebutted, "[His] review . . . demonstrates more direct involvement than revealed by MSA." *Id.* CO Franklin ultimately concluded "because standard USPS contracting processes were not followed related to the pilot and consulting work thereafter, potential OCIs went undiscovered, which prevented such OCIs from being appropriately addressed at the proper time when mitigation strategies or any appropriate waivers could have been considered." *Id.* at 3680. "[N]ow, it is impossible to conclude, looking back, that no OCIs existed." *Id.* In other words, CO Franklin recognized MSA and the USPS's relationship led to OCIs, the extent of which are now impossible to fully discern.

### C. Whether the SDRO's Corrective Actions Regarding the 2020 OCIs Deemphasized or Removed the "Taint" of Incumbent Advantage in 2022

In response to CO Franklin's Report, the SDRO required the USPS to amend only one factor of the four evaluation criteria to mitigate MSA's roles in 2019 and 2020. *See supra* Section VI.A. To determine "which proposal offers the best value to USPS[,]" the USPS crafted four evaluation criteria: (1) Service Capability; (2) Resource Allocation and Roll-out Responsiveness; (3) Past Performance; and (4) Price. 2022 AR at 6882–84 (3PK9 Solicitation Instructions and Evaluation Criteria). Factor one is particularly concerned with offerors' "current capability to meet the requirements in the SOW." *Id.* at 6883. Per factor one, the USPS evaluated each offeror's:

> [1] ability to provide canine handler resources adequate to perform the work as outlined with the SOW . . . ; [2] ability to meet the required or proposed schedule . . . ; [3] ability to provide a management and staffing plan; and . . . [4] ability to obtain the necessary certifications and security badges required at each location.

*Id.* Factor two corresponds to offerors' responsiveness in meeting a proposed roll-out schedule. *Id.* Factor three involves "the depth of the offeror's experience and degree to which successful performance has occurred in the past for a national level program for cargo or mail screening[ regarding 36 months of data]" from "TSA audit/test records[.]" *Id.* Factor four contemplates price. *Id.* at 6884. To address GK9's disagreement regarding MSA's accrual of past

performance due to its incumbent status, the SDRO ordered the USPS to modify a single solicitation evaluation criterion to deemphasize any benefits MSA may receive in terms of past performance due to its incumbent status. SDRO's GK9 Decision at 6645–6647. The SDRO ordered the USPS to: (1) modify the criteria for past performance to given equal weight to past cargo screening experience and past mail screening experience; and (2) reduce from 36 to 24 months the minimum duration of past performance below which an offeror could receive a less favorable past performance rating. *Id.* at 6647.

The parties disagree on whether the SDRO's corrective actions were adequate to mitigate unequal access of information and biased ground rules OCIs. AMK9 argues the "USPS's corrective action only attempts to deemphasize MSA's tainted incumbent advantage under one evaluation factor; and it does not sufficiently remove MSA's tainted incumbent advantages stemming from years of performing a contract it should never have received." AMK9's MJAR at 16. GK9 adds the SDRO "directed USPS to 'deemphasize the benefits MSA may derive from its status as an incumbent; and required it to alter minimal aspects of past performance, the least important evaluation factor[,]" but "the SDRO did not address any of the criteria under Service Capability, the most important factor[.]" GK9's MJAR at 7, 15 (quoting SDRO's GK9 Decision at 6646). The government argues AMK9 and GK9 "fail to demonstrate that it would be necessary for USPS to adjust the other technical evaluation or pricing criteria to eliminate any potential incumbent advantage that MSA would receive from the 2020 contract." Gov't's MJAR Reply at 11.

The parties also disagree whether OCIs stemming from MSA's participation in the pilot program, including unequal access to information and biased ground rules, still exist. GK9 and AMK9 argue MSA has an immitigable biased ground rules OCI stemming from its participation as a consultant in the 3PK9 pilot program. *See* GK9's MJAR at 9–12; *see also* AMK9's MJAR at 25–30. The continued use of the playbook and other best practice materials evidence present biased ground rules. *See* Tr. at 42:12–15 ("[THE GOVERNMENT]: . . . [T]here was continued back and forth with MSA giving input, especially to [XXXXX], that was incorporating that into the playbook and such."). The government, on the other hand, maintains "the SDRO concluded that the biased ground rules OCI involving MSA was effectively mitigated by the changes to the [SOW] in the 2022 solicitation compared to the 2020 solicitation." Gov't's Cross-MJAR & Resp. at 30 (citing SDRO's GK9 Decision at 6644–6645).

The "'court may set aside a procurement action,' such as a corrective action, 'if . . . the procurement official's decision lacked a rational basis[.']" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 990 (Fed. Cir. 2018) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). The Federal Circuit has also stated "corrective action only requires a rational basis for its implementation." *Id.* at 991. In other words, the rational basis review for agency corrective actions is "highly deferential," *id.* at 992 (internal quotation marks omitted) (quoting *Croman Corp. v. United States*, 724 F.3d 1357, 1363 (Fed. Cir. 2013)), and is satisfied if the agency "provided a coherent and reasonable explanation of its exercise of discretion." *Id.* (internal quotation marks omitted) (quoting *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). OCIs call into question the integrity of the competitive procurement process, and, as with other such circumstances, no specific prejudice need be shown to warrant corrective action. *See, e.g.*, *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed.

Cir. 1986) ("Whether or not inside information was actually passed . . . , the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify [plaintiff]."); *Compliance Corp. v. United States*, 22 Cl. Ct. 193, 201 (1990) ("Even assuming the conduct itself was devoid of improper motives, what remains is the appearance of impropriety, which is a proper basis for disqualification."), *aff'd*, 960 F.2d 157 (Fed. Cir. 1992). Applying this standard, the Court considers the parties' arguments as to the rationality of the USPS's changes to its evaluation factors.

**1. Whether Amending Evaluation Factor Three Removes the "Taint"**

Both AMK9 and GK9 argue the USPS's amendment to one factor is insufficient. AMK9 contends "[t]he SDRO's directed corrective action included amending only the least important evaluation factor of the 2022 [r]esolicitation, past performance, to 'deemphasize' MSA's tainted incumbent advantages[,]" but "[m]inor revisions to the least important technical evaluation factor (10% of the evaluation) do not remedy the impropriety brought on by MSA's and USPS's failure to acknowledge or disclose the OCIs sooner." AMK9's MJAR at 10, 16; see GK9's MJAR at 15. The government contends "the SDRO rationally determined that the ordered modification to the criteria for past performance adequately addressed the OCI resulting from MSA's having received the 2020 3PK9 contract." Gov't's Cross-MJAR & Resp. at 36.

AMK9 and GK9 assert MSA will continue to have significant incumbent advantages despite the changes to Factor Three. For example, AMK9 notes "while offerors will be treated equally for 'cargo' and 'mail,' MSA is the only entity with experience with USPS for this program[,]" which "will allow MSA to cite the relevance of its 'national level program' for mail screening with USPS, something other offerors cannot offer." AMK9's MJAR at 18. GK9 adds the USPS was apparently "unable to release all relevant documents to bidders because MSA authored, owned the rights to them, and had declined to provide those rights to USPS." GK9's MJAR at 6; *see* Tr. at 98:22–25 ("[AMK9]: . . . [O]fferors such as AMK9 and GK9 were required to sign a[ non-disclosure agreement ('NDA')] late in the game to get information that MSA owned that MSA had throughout the entire procurement process.").

The Court notes "the controlling inquiry . . . [is] whether the [agency]'s decision was a rational one" and a court must not "impermissibly undert[ake] . . . its own independent *de novo* determination" of the matter. *Honeywell, Inc. v. United States*, 870 F.2d 644, 647 (Fed. Cir. 1989). In *Turner Construction Co.*, the Court of Federal Claims found an agency's decision to follow the Government Accountability Office's ("GAO") recommendation was arbitrary and capricious because the agency's finding of an unequal access OCI was due, in part, to categorizing an offeror's access restrictions themselves as deficient and concluding the CO had not been sufficiently involved in crafting and monitoring any mitigation efforts. 645 F.3d 1377, 1382–83 (Fed. Cir. 2011), *aff'g* 94 Fed. Cl. 561 (2010). Like in *Turner*, the CO in this case was not directly involved in the mitigation effort regarding the evaluation; additionally, when the government was asked about the rationale behind only amending one factor at oral argument, it could only answer the OCI was related to past performance which was the topic of Factor Three. *See* Tr. at 115:16–18 ("[THE GOVERNMENT]: . . . [T]hey adjusted it for past performance because that was what was most related to the OCI that had happened previously[.]"). When pressed on why no other factors were changed, the government repeatedly answered, "That was

not part of the corrective action by the SDRO." Tr. at 109:8–9; *see also* Tr. at 112:24–113:3. Much like the agency in *Turner* conflated security protocols with OCIs, the agency here apparently conflates past performance with OCIs, ignoring "tainted" incumbent advantages in other evaluation factors because of their title. For example, under the price evaluation criteria, MSA's phase-in costs are less expensive than other offerors because they are already in most of the airports to be serviced. *See* Tr. at 115:24–116:10. Additionally, under Factor One, MSA already has all the badging and credentialing necessary to be onsite, whereas the new contractors would have to obtain the necessary credentials at each new site. *See* Tr. at 112:7–10. Factor Two contemplates roll-out responsiveness; MSA is the only offeror who has rolled out, so it knows the exact criteria to meet the USPS's expectations. *See* Tr. at 112:17–20. It is irrational not to mitigate OCIs effectively. *See* infra Section IX.D; *Turner Constr. Co.*, 645 F.3d at 1387 ("[T]he Court of Federal Claims did not err in its application of the hard facts requirement.").

Neither the CO's decision nor the USPS furnish reasoning beyond the categorization of the evaluation factor in amending Factor Three. For example, the government claims "[t]he modifications to the past performance criteria are less severe than ignoring MSA's past performance under the 2020 contract entirely, which MSA has argued would be a 'reasonable mitigation strategy.'" Gov't's Cross-MJAR & Resp. at 24–25. The government does not articulate why MSA's past performance is still considered despite MSA's own admission it would be reasonable to preclude evaluation of MSA's 2020 contract performance. *Id.* at 25 (citing MSA Reply in Support of Def. Mot. Dismiss at 10, ECF No. 143, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020)) ("There is a simple way to mitigate this ostensible advantage—preclude MSA from using its work on the instant contract as a past performance in a future solicitation. . . . [This] would be a reasonable mitigation strategy that is short of disqualifying MSA."). The government fails to justify its abbreviated mitigation strategy—only amending one evaluation criterion of four. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)) ("A court evaluating a challenge on the [grounds of lacking a rational basis] must determine 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'").

**2. Whether Not Amending Evaluation Factors One and Two and Pricing Added to the "Taint"**

Both AMK9 and GK9 argue the non-amended factors benefit MSA. While GK9 admits the SDRO "altered the past performance factor," GK9 states the "most important factor," Service Capability, was not changed. GK9's MJAR at 15. Additionally, the second most important factor, Resource Allocation and Roll-Out Responsiveness, was left untouched. *Id*. GK9 asserts "the SRDO's silence" regarding why these factors were left unchanged "is not a valid defense." *Id*. AMK9 argues, "By allowing MSA to compete, MSA will continue to benefit under each of the evaluation factors in the Solicitation." AMK9's MJAR at 16.

For Factor One, Service Capability, AMK9 argues MSA can: "tout its 'current capability' of performance on the markedly similar scope of work'; "highlight . . . its current staffing to show its 'current capability'"; "discuss its current management and staffing plan"; and "emphasize 'lessons learned' during performance in management and staffing of the 2020

contract and revise its plan accordingly"—all because the USPS improperly awarded MSA the 2020 contract. *Id.* Additionally, "MSA has already obtained the[] necessary certifications and security badges at many of the locations required in the 2022 Resolicitation." *Id.* at 17.

For Factor Two, Resource Allocation and Roll-Out Responsiveness, GK9 stated responsiveness is also related to past performance because it was demonstrative. *See* Tr. at 112:19 ("[GK9]: . . . MSA has already rolled out at 30 airports or so[.]"). For example, MSA was already servicing about 19 airports of the 28 airports it was awarded in the 2022 resolicitation. *See* Tr. at 129:19–21. AMK9 contends "MSA already has canines and staff at most of the airports—including all of the international geographic cluster airports. Only those international airports will be staffed on a full time 24/7/365 basis, leaving MSA in line for the most significant work under the 2022 Resolicitation." AMK9's MJAR at 18. "[W]ith nearly identical evaluation factors in 2020, MSA received a strength because its 'current geographic distribution of canine teams across the country aligns 100 percent with the [USPS]'s requested network and roll-out schedule. MSA will not need canine teams to travel to meet the deployment needs of the [USPS], thereby reducing the risk associated with late deployments." *Id.* (quoting 2020 AR at 784 (2020 Award Recommendation)).

For pricing, AMK9 argues other offerors "will need to expend considerable time, effort, and financial commitment to support recruitment efforts for all geographic clusters—both for canines and for personnel[,]" whereas "MSA already recruited staff for the 2020 Solicitation (with knowledge a full year before its competitors about the roll-out schedule)." *Id.* at 19. "MSA's recruiting and training budget will be considerably lower than other offerors" because it has already deployed canines at the majority of the locations for the 2022 resolicitation. *Id.*

The government admitted at oral argument the other factors gave MSA an incumbent advantage, although no mitigation analysis was completed on any factor other than past performance. *See* Tr. at 110:1–23 ("THE COURT: . . . [W]hy is it that the incumbent advantage dollars were not part of the mitigation? [THE GOVERNMENT]: . . . I don't think we had a specific analysis on that[.]"), 113:5–12, 116:7–10. The government could not articulate why the USPS did not reduce Factors One and Two beyond SDRO direction and the monetary disincentive. *See* Tr. at 110:17–111:13. For example, the government did note it would cost the USPS more if it mitigated Factors One and Two, and the USPS did not seriously contemplate changing Factor One because it was getting the best value and because the OCI was related to past performance which was the topic of Factor Three. *See* Tr. at 110:17–23.

The CO's report, *supra* Section VI.B, reasonably raised the concern for potential OCIs arising from MSA's knowledge and insight into competitively useful information. At oral argument, the government argued "the [USPS] would have been within its rights to terminate MSA in October of '21 after CO Franklin's report" but it was "not in a position to terminate them" because of "treaty obligations" and "cost savings." Tr. at 117:5–15. The CO's report indicated biased ground rules OCIs were not originally considered by the USPS. *See* CO Franklin's Report at 3679 ("Because there was no contract in place for the consulting or program design services, the standard USPS clause addressing OCI concerns did not set forth the expectations for the relationship. It would have been best to have a consulting contract in place (or even a pilot and consulting contract) that could have addressed how OCIs would be reviewed

and analyzed."), 3680 ("[B]ecause standard USPS contracting processes were not followed related to the pilot and consulting work thereafter, potential OCIs went undiscovered, which prevented such OCIs from being appropriately addressed at the proper time when mitigation strategies or any appropriate waivers could have been considered. And now, it is impossible to conclude, looking back, that no OCIs existed."). The absence of additional analysis on other evaluation factors is particularly troubling when CO Franklin expressly mentioned "potential OCIs went undiscovered" and, consequently, unmitigated. CO Franklin's Report at 3680. The USPS relying on the SDRO's corrective action plan is insufficient and irrational, particularly in light of the government's admission other factors favor MSA. *See* Tr. at 117:1–3, 109:2–14; *see also Garufi*, 238 F.3d at 1332 (This Court may set aside a contract award if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.").

### D. Whether the USPS's Refusal to Take Functionally Different Actions Was Arbitrary and Capricious

The USPS followed the SDRO's directions, but a court must "determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983). The arbitrary-and-capricious standard "does not allow a reviewing court to sift through an agency's rationale with a fine-toothed comb." *Turner Constr. Co.*, 94 Fed. Cl. at 571. AMK9 notes, however, "[t]he record contains no indication that the SDRO reasonably considered the[] other tainted advantages, instead summarily concluding that revising past performance would be sufficient." AMK9's MJAR at 19. The USPS offers "no justification in the record" for only "a minimal amendment to merely 'deemphasize' MSA's significant tainted advantages plaguing the 2022 Resolicitation" after CO Franklin found the absence of "standard USPS contracting processes were not followed related to the pilot and consulting work thereafter . . . which prevented . . . OCIs from being appropriately addressed at the proper time when mitigation strategies . . . could have been considered." *Id.*; CO Franklin's Report at 3680.

At oral argument, the Court addressed other potential actions the USPS could have taken. For example, MSA benefitted from incumbent advantage in the pricing criteria because they are already onsite, whereas other offerors had to factor price into the transition; the USPS could have "allow[ed] for a higher price due to phase-in costs because [other offerors are] going to have to spend more money in order to get those airports[.]" *See Tr.* at 110:1–7. In another example, Factor One, Service Capability, benefitted MSA: "[T]he other companies are doing targeted screening in some of these airports, but the only company that's got current capability with demonstrated experience across the country is MSA"; and "MSA's already got all these badges and certifications to be onsite. That's something the new contractor is going to have to do at every one of the places where they roll in." *See* Tr. at 112:1–4, 7–10 (quoting GK9). "Then on Factor Two, they phrased the requirement as a demonstrated responsiveness to the rollout schedule. . . . MSA has already rolled out at 30 airports or so[.]" Tr. at 112:17–19 (quoting GK9). The Court finds the corrective action did not "minimize the reality that MSA was the incumbent[.]" *See* Tr. at 114:4–5; *see also NetStar-1 Gov't Consulting Inc. v. United States*, 101 Fed. Cl. 511 (2011) (finding potential OCI regarding potential awardee's unequal access to plaintiff's proprietary pricing data was inadequately mitigated), *aff'd*, 473 F. App'x 902 (Fed.

Cir. 2012); *Axiom*, 564 F.3d at 1382 ("[T]he evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion.").

Further, the USPS's rationale in retaining MSA is national security, but the agency fails to justify its minimal mitigation efforts. At oral argument, the government asserted the USPS could have terminated MSA in October 2021 after CO Franklin's Report, but "couldn't do that because [it] ha[d] to continue these services, particularly the international mail, due to . . . international convention obligations . . . and . . . cost savings." Tr. at 117:8–15. The government essentially concluded national security and cost savings concerns supersede disqualification concerns. *See id.* As a result of the inability to disqualify, the government engaged in mitigation efforts, highlighting the differences between the 2020 and 2022 SOWs. *See* 2022 AR at 6800–05 (2022 SOW Substantive Revisions). The list of differences is somewhat negligible, however, because CO Franklin already clarified MSA was in a consulting role to essentially create the SOW. CO Franklin's Report at 3679–80 ("[S]ome of the concepts that MSA appears to have assisted the USPIS with developing appear in the SOW, including quality control concepts."). The government concedes it did what it could to reduce the "taint" but agreed MSA was favored because they were the incumbent. Tr. at 117:16–23 ("[THE GOVERNMENT]: . . . [I]f [the USPS] had terminated MSA in October of '21, then there would have been no incumbent at all, but then we wouldn't have been in compliance with those obligations, and we would also have been . . . suffering cost effects after that. . . . [W]e didn't terminate and then . . . the other side has objected to the corrective action, but . . . we are where we are."). GK9 highlighted the government's fallacy in claiming there was no path forward other than to continue working with MSA; in the 2022 resolicitation, MSA kept 20 of their 31 existing airports despite two other awardees also receiving awards. Tr. at 136:6–11. The government stated, per the pending 2022 contract, MSA services 31 airports, 17 of which are new. *See* Tr. at 128:21–129:2. Regardless of the exact number of continuing and new airports serviced by MSA, the government not only continued but also bolstered its relationship with MSA, evident in the increase in MSA-serviced sites in 2022 to which all parties agree, which shows "taint" is still present in the resolicitation.

Identifying and mitigating OCIs is necessary to the development of sound business strategy. In 2021, the primary focus of any action was to get airports online because there was a maximum national security concern. *See generally Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020) (originally a paper-only record).[11] In 2022, the focus has shifted to removing OCIs and correcting mistakes made in the past solicitation. *See* Gov't's MJAR Reply at 2 ("In the second remand, USPS concluded that there was an OCI involving MSA, and correspondingly ordered a resolicitation of the 3PK9 contract.").[12] The

---

[11] *See* Def.'s Mot. to Remove Existing Highly Sensitive Docs. from the Court''s [sic] Electronic Filing System at 4, ECF No. 34, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020) ("These documents should be treated as [Highly Sensitive Documents ('HSDs')] because . . . they contain information that involves matters of national security, government enforcement information; and the reputational interests of the United States."); Procedures for the Filing, Service, and Management of Highly Sensitive Documents (Jan. 12, 2021) (general order issued by the Chief Judge of the Court of Federal Claims establishing procedures and requirements regarding the filing of HSDs).

[12] The SDRO clarified in 2022 the national security concerns have waned since the Court's previous order, with the only mention of national security as "anyone who has been a passenger in an airplane understands how critical it is

Court finds the USPS lacked a rational basis in minimally amending one evaluation factor when the USPS could have undertaken other actions to further mitigate incumbent advantage still present in the solicitations. *See Croman Corp.*, 724 F.3d at 1367; *see also Raytheon Co. v. United States*, 809 F.3d 590, 595 (Fed. Cir. 2015) (inquiring whether the grounds for the challenged corrective action were "rationally justified"); *Chapman L. Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (affirming this court's "inquiry into the reasonableness of the Government's . . . proposed corrective action"). The USPS's actions—or lack thereof—are accordingly arbitrary and capricious. *See Garufi*, 238 F.3d at 1331 (confirming "disappointed bidders" can "challenge contract awards . . . for lack of rationality").

## VII.   Whether the USPS Could Have Engaged in Further Mitigation Strategies to Make Any Option Other than Disqualification Viable

While the USPS claims their mitigation strategies sufficiently removed any incumbent advantage, the Court finds the "taint" remains and must determine appropriate mitigation options. *Supra* Section VI. The Court accordingly assesses whether additional action by the USPS could have mitigated unequal access to information OCIs. The Court will then review whether any option other than disqualification is viable to mitigate biased ground rules OCIs. Finally, the Court will discuss whether the SP&Ps and FAR prescribe the same remedy of disqualification when biased ground rules OCIs exist.

### A.     Whether Additional Actions by the USPS Could Have Mitigated Unequal Access to Information Due to 2019 Consulting Role

*Supra* Section VI, the USPS's attempt to "deemphasize" MSA's "tainted" incumbent advantage failed. *See* AMK9's MJAR at 19 (noting the USPS's "minimal amendment to merely 'deemphasize' MSA's significant tainted advantages plaguing the 2022 Resolicitation"). The Court reviews MSA's unequal access to information to determine what mitigation strategies the USPS could have conducted to remove MSA's "tainted" incumbent advantage.

The notion MSA had unequal access to information is well-documented by CO Franklin's Report. *See supra* Section VI.B. MSA had access to information almost a year before any other offerors because of its consulting role. CO Franklin's Report at 3677–78; *see* Tr. 159:12–20 ("[GK9]: . . . We have no idea what MSA's consulting work consisted of, when it started. We know it ended roughly June or July of 2020. We know about the pilot program. We know that they were doing this work as part of the pilot at one airport. But what else they did, we don't know, and there's nothing in any of these administrative records or their supplements that says here's what the consulting work consisted of."). For example, the USPS sent MSA anticipated costs and a rollout schedule that mostly stayed consistent through the solicitation process and in which "most of the very first sites started with minimal time between offer submission and rollout[.]" CO Franklin's Report at 3677–78. Additionally, MSA sent the USPS a presentation in January 2020 that contained a substantial amount of competitively useful information from the USPS, including required-screening locations, mail volume, and the hours

---

for the [USPS] to be able to consider the technical merits of as many potential offerors as possible." SDRO's AMK9 Decision at 6619.

required by location. *Id.* at 3678. After CO Franklin's findings, the USPS took corrective actions to mitigate MSA's unequal access to information OCIs. *See supra* Section VI.C.

The parties, however, disagree on whether mitigation eliminated the OCI or whether the OCI persists. As the Court explored *supra* Section VI.D, the USPS could have engaged in other mitigation options besides only amending the "past performance" factor. Beyond the evaluation factors, the government claimed at oral argument the USPS personnel "improperly sent MSA" information, and while the USPS "shouldn't have done that," the information was either "competitively stale" or "shared with the other bidders[.]" Tr. 95:22–24, 96:6, 26:24. The government contends the information was shared early enough, so no bias persisted. *See* Tr. at 100:22–101:7. AMK9 and GK9 clarify they had delayed access to information even if they did eventually receive it after signing an NDA "two weeks before proposals were due." Tr. at 99:5–19.

"To prevail on an OCI claim of 'unequal access to information,' it is axiomatic that the government contractor must have access to 'the kind of specific, sensitive information that would create an OCI.'" *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 688 (2008) (quoting *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 772 (2006) (Lettow, J.)), *rev'd on other grounds*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) ("We have considered [plaintiff's] arguments regarding alleged [OCIs] . . . and we concur with the trial court's decision on th[at] issue[]."). Additionally, the bid protestor "must demonstrate the awardee was in the unique position of having access to information to which no other offeror had access." *Id.* (cleaned up) (quoting *Sys. Plus, Inc.*, 586 F.3d at 771). "[A]n unequal access OCI may be mitigated through the implementation of an effective mitigation plan[.]" *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1382 (Fed. Cir. 2011). "The purpose of an OCI mitigation plan is to minimize the impact of prospective OCIs by establishing strategies to resolve anticipated conflicts before they affect the procurement process. Mitigation plans do not permit a contractor to participate in a procurement that already has been tainted by an OCI." Szeliga, *supra*, at 673. The Court finds, *supra* Section VI.C, the mitigation plan regarding the evaluation factors was insufficient to remove the "taint" of MSA's unfair incumbent advantage. Amendments to the other evaluation factors are feasible. For example, Factor One, Service Capability, and Factor Two, Resource Allocation and Roll-Out Responsiveness, could have included a "ramp-up" period (the time between initial development and maximum capacity utilization of a service) as opposed to evaluating offerors' capability and responsiveness at the time of bid submission. Additionally, the price factor could have allowed for a higher price to account for phase-in costs for non-incumbent offerors. Irrespective of eventually sharing information with other offerors, CO Franklin found "having access to USPS requirements for nearly one year in advance of the solicitation likely provided an unfair competitive advantage to MSA that other offerors likely did not have." CO Franklin's Report at 3678.

"[A]n unequal access OCI may be mitigated through the implementation of an effective mitigation plan[.]" *Turner Constr. Co.*, 645 F.3d at 1382. In *NFK Engineering, Inc. v. United States*, the Federal Circuit found the plaintiff-awardee "obtained information not in the possession of their competitors thereby creating an unfair competitive advantage." 805 F.2d 372, 380 (Fed. Cir. 1986). Given "[t]he appearance of unfair competitive advantage [was] certainly inescapable[,]" the Federal Circuit enjoined the agency from awarding the plaintiff, finding it

"would raise serious question and damage the integrity of the competitive proposal system." *Id.* Similarly, MSA cannot escape the appearance of unfair competitive advantage. Deemphasizing was not enough to get rid of the "taint" of MSA's incumbent advantage because MSA created and owned the rights to documents the other competitors only received after signing an NDA two weeks before proposals were due. *See* Tr. at 134:14–19 ("THE COURT: . . . [I]s it your position that the deemphasizing wasn't enough[?] . . . [AMK9]: Yes[.]"). The unequal access to information OCIs remained in the 2022 resolicitation because of a failure to implement an effective mitigation plan. The USPS could have mitigated MSA's unequal access to information OCIs but did not. Other mitigation strategies were necessary to minimize MSA's unequal access of information. "Ad hoc mitigation strategies are unlikely to withstand scrutiny." Szeliga, *supra*, at 673. Although the Court cannot second guess what an agency can do, the Court can determine the mitigation plan was insufficient to mitigate unequal access to information OCIs. *See Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.9 (1999) (Firestone, J.) ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs."); *Turner Constr. Co.*, 645 F.3d at 1384 (internal quotation marks omitted) (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009)) ("[T]he identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."). The Court therefore assesses whether the USPS's mitigation strategy "lacked a rational basis." *Turner Constr. Co.*, 645 F.3d at 1383 (internal quotation marks omitted) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)).

### B. Whether Additional Actions by the USPS Could Have Mitigated Biased Ground Rules Due to 2019 Consulting Role

The biased ground rules OCIs stemming from MSA's involvement in the pilot program still exist, but the parties dispute whether biased ground rules OCIs could be mitigated under the SP&Ps. *See supra* Section VI.B. Regarding the immitigability of biased ground rules OCIs under the FAR, the government argues the FAR's presumptive disqualification does not apply to the USPS, as the USPS abides by its own guiding principles codified in the SP&Ps. *See* Tr. at 163:4; 39 U.S.C. § 410(a). The government contends the SP&Ps' language affords more "flexibility [than the FAR] to determine whether [OCIs have] been effectively mitigated" without disqualifying MSA. Tr. at 69:7–12. The Court reviews the SP&Ps' language as compared to the FAR. Specifically, the Court differentiates the FAR and SP&Ps' exceptions, determining whether the SP&Ps carve out exceptions to biased ground rules OCIs and "prescribe a particular method of mitigation or exclusion" like the FAR. *See* Tr. at 38:20–21, 64:20–24. The Court then analyzes the design and development exception to the FAR's supposedly "stricter requirements," which excludes presumptive disqualification of a contractor involved in the design and development of a procurement when biased ground rules OCIs would usually disqualify the contractor. *See* Tr. at 68:2–12. Despite the FAR's inapplicability to the USPS, the government claims the FAR exception is "analogous" to the facts here, so the Court reviews whether the "design and development" exception to the FAR would apply to inform the Court's interpretation of the SP&Ps. Tr. at 42:5–6 (quoting the government). Finally, the Court determines whether, under the SP&Ps, MSA's biased ground rules OCIs could have been mitigated or whether MSA's involvement necessitates its disqualification.

CO Franklin found numerous potential bases for biased ground rules, *see supra* Section VI.B, including a "Speed of Mail" document, internal quality control documents, a playbook, and the SOW—all created during the pilot program, *see supra* Section VI.A, or during MSA's consulting period after the pilot. CO Franklin's Report at 3678–79. MSA created a "Speed of Mail" document setting a thirty-minute timeframe for canine handlers to arrive before their shifts. *Id.* at 3679. MSA also produced an "internal quality control audit document[,]" a document MSA owns. *Id.* at 3678. The USPS continues to use the playbook, which "MSA made extensive contributions to," "in the 3PK9 program for alarm resolution purposes." 2022 AR at 6797 (CO Baker's OCI Review for 2022 Resolicitation). This playbook, which MSA owns the rights to, "walks a supplier employee through the processes that must be used when an alarm occurs." *Id.* Ultimately, changes to the 2022 SOW, as the SDRO found, were "not major departures from" the 2020 SOW. SDRO's GK9 Decision at 6645; *see* 2022 AR at 6800–05 (2022 SOW Substantive Revisions). CO Franklin concluded "because standard USPS contracting processes were not followed related to the pilot and consulting work thereafter, potential OCIs went undiscovered, which prevented such OCIs from being appropriately addressed at the proper time when mitigation strategies . . . could have been considered." CO Franklin's Report at 3680.

A biased ground rules OCI exists when contractors, "by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Constr. Co.*, 645 F.3d at 1382. A biased ground rules OCI may occur when a firm "has in some sense set the ground rules for another government contract by, for example, writing the [SOW] or the specifications[,]" *Sys. Plus, Inc.*, 69 Fed. Cl. at 773 (citing *In re Aetna Gov't Health Plans, Inc.*, B-254397, 1995 WL 449806 (Comp. Gen. July 27, 1995)), or "in situations where an offeror, as part of [prior] performance of a government contract, has provided input to the [SOW] or specifications of a [solicitation] in such a way as to provide the firm a competitive advantage in responding to the [solicitation,]" *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (2011) (Damich, J.) (citing *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010), *aff'd*, 645 F.3d 1377). Mitigation of a biased ground rules OCI under the FAR results in disqualification. FAR 9.505-2(b)(1). The FAR, however, does not govern the USPS, and there is no case law analyzing mitigation strategies for biased ground rules OCIs under the SP&Ps. *See* Tr. at 67:9–12; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1084–85 (Fed. Cir. 2001).

The Court looks to whether the USPS violated its own SP&Ps. The SP&Ps guide:

> Although [OCIs] are not limited to any particular type of purchase, they are more likely to occur in contracts involving professional, technical, and consultant services; performance of or assistance in technical evaluations; and for those projects that are purchased in separate phases (e.g. design and then construction, research and development and then production).
>
> . . . .
>
> If it becomes apparent when proposals are received that *participation by a particular offeror could lead to an [OCI] and unfair competition, the offeror may be disqualified and its proposal rejected*. The [CO] may take actions necessary and

in the interest of the [USPS] and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest.

SP&Ps 7-15.2; 7-15.2.1 (emphasis added).  The Court reviews each direction in turn.

First, the SP&Ps direct "[i]f it becomes apparent when proposals are received that participation by a particular offeror could lead to an [OCI] and unfair competition, the offeror may be disqualified and its proposal rejected." *Id.* at 7-15.2.1.  MSA's participation in the pilot program, *see supra* Section VI.A, was initially in furtherance of a sole-source contract, so the USPS did not include OCI restrictions or expectations for MSA.  CO Franklin's Report at 3679.  CO Franklin categorized MSA's function after the pilot program as a "consulting role" despite no contract existing between the parties at that time.  *Id.*  MSA's undocumented relationship with the USPS did not contemplate OCI mitigation, considering MSA was the presumed sole-source awardee, so the association between MSA and USPS was particularly susceptible to OCIs.  *Id.*  In fact, the SP&Ps specifically state OCIs "are more likely to occur in contracts involving . . . consultant services."  SP&Ps 7-15.2.  CO Franklin ultimately concluded "because standard USPS contracting processes were not followed related to the pilot and consulting work thereafter, potential OCIs went undiscovered, which prevented such OCIs from being appropriately addressed at the proper time when mitigation strategies . . . could have been considered."  CO Franklin's Report at 3680.  The government claims the SP&Ps afford the USPS "more flexibility to make their operations more businesslike and more efficient."  Tr. at 69:1–2.  "Businesslike" and "efficient" operations necessitate addressing prospective OCIs before actual conflicts arise because it is difficult—and sometimes impossible—to mitigate biased ground rules OCIs after they have already affected a procurement.  *See* Szeliga, *supra*, at 673–74 ("Mitigation plans do not permit a contractor to participate in a procurement that already has been tainted by an OCI. . . .  The risk of 'biased ground rules' OCIs is best mitigated by making an informed decision regarding whether to perform services that may set the ground rules for future procurements and, if appropriate, reserving the right to be recused from tasks that could influence procurements in which a contractor wishes to compete.").  The USPS should have been aware participation by MSA could lead to an OCI and unfair competition—even before the agency received proposals (although the SP&Ps consider OCIs "when proposals are received" SP&P 7-15.2.1)—because the USPS did not follow its standard contracting processes with MSA, which account for avoiding potential OCIs.  *See* CO Franklin's Report at 3680.  The USPS was definitively aware MSA's bid could lead to an OCI or unfair competition at the time proposals were received for the 2022 resolicitation because the USPS's employee, CO Franklin, explicitly noted in his report "having access to USPS requirements for nearly one year in advance of the solicitation likely provided an unfair competitive advantage to MSA that other offerors likely did not have."  *Id.* at 3678.  The USPS was on constructive (from not following standard contracting processes for MSA's consulting role) and actual (from CO Franklin's report documenting OCIs) notice MSA's participation in the competition could—and did—lead to an OCI and unfair competition.  The SP&Ps prescribe a specific remedy if it becomes apparent OCIs are probable:  disqualification.  The OCIs were impossible to separate from the 2022 resolicitation given MSA helped create the program, so disqualification is the remedy.  *Id.* at 3879–80.  The government admits disqualification was contemplated but not effectuated given "cost effects."  Tr. at 117:8–20 ("[THE GOVERNMENT]: . . . [The USPS] would have been within its rights to terminate MSA in October of '21 after CO Franklin's report.  [The USPS]

couldn't do that because . . . [it] would have . . . been . . . suffering cost effects[.]")]. The USPS's failure to disqualify MSA accordingly violates the SP&Ps. SP&Ps 7-15.2.1.

Second, the SP&Ps allow the CO to "take actions necessary and in the interest of the [USPS] and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest." *Id.* The Court finds *supra* Section VI.C the USPS failed to take actions to "avoid, neutralize or mitigate" the *apparent*—considering the Court remanded twice for OCIs—conflict of interest with MSA's "tainted" incumbent advantage. *See* SP&Ps 7-15.2.1. After the second remand, the SDRO[13] minimally amended one of four evaluation factors despite the government conceding the other factors provided MSA an incumbent advantage. *See* Tr. at 117:1–6; 126:22–127:20. To justify its mitigation plan—which comprised two changes to one factor: (1) decreasing the "look-back" period for past performance by twelve months; and (2) treating mail and cargo screening experience equally—the USPS highlights differences in the 2020 and 2022 SOWs. *See* 2022 AR at 6800–05 (2022 SOW Substantive Revisions). CO Franklin, however, documented MSA was in a consulting role to essentially create the SOW. CO Franklin's Report at 3679–80 ("[S]ome of the concepts that MSA appears to have assisted the USPIS with developing appear in the SOW . . . ."). If a contractor knows it will have the opportunity to compete in a procurement, the contractor will have an incentive to draft specifications or a SOW for the procurement that favors its own capabilities. *In re Aetna*, 1995 WL 449806, at *8. "Once the . . . [SOW] has been drafted, the OCI is established and the harm already has occurred." Szeliga, *supra*, at 667; *see In re Aetna*, 1995 WL 449806, at *12. The OCIs stemming from MSA's participation in the pilot program and subsequent consulting role encompass the SP&Ps' concern with contracts particularly ripe for OCIs: "consulting services"; "research and development and then production". SP&Ps 7-15.2. Although "the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion[,]" exemplified in the SP&Ps' inclusion of the word "may," the discretion is not unbounded. *Axiom*, 564 F.3d at 1382; *see also PAI Corp.*, 614 F.3d at 1351–52. The USPS contravened both methods for eliminating OCIs under the SP&Ps by disregarding the SP&Ps' guidance to disqualify an offeror presenting OCIs and to "avoid, neutralize or mitigate" OCIs. SP&Ps 7-15.2.1. OCIs related to MSA's "tainted" incumbent advantage persisted throughout the 2019 pilot program, non-contract consulting role, 2020 solicitation, and 2022 resolicitation; thus, unfair competition still exists. *See id.* In failing to adequately address MSA's advantage, the USPS violated its own rules. *See id.*; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.").

The government relies on the "flexibility" of the SP&Ps to argue any biased ground rules related to MSA have been mitigated and disqualification is not warranted given the inapplicability of the FAR to the USPS. Tr. at 69:7–12. The government argues the FAR is stricter, but the FAR explicitly carves out exceptions to disqualification for biased ground rules

---

[13] The SDRO "provides a means for the [USPS]'s supplier community to lodge disagreements concerning the [USPS]'s purchasing. " SP&Ps 7-4.1. Although the SP&Ps state, "*The contracting officer* may take actions necessary . . . to avoid, neutralize or mitigate the potential or apparent conflict of interest[,]" the SDRO is equivalent to a CO for purposes of the SP&Ps as the remedies an SDRO grants include directing the CO. *See* SP&Ps 7-15.2.1 (emphasis added); 39 C.F.R. § 601.108(e).


OCIs—unlike the SP&Ps. *See* FAR 9.505-2(b)(1). Mitigation actions contemplated by the SP&Ps "may include, but are not limited to":

> (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair a competition as possible. Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias.

SP&Ps 7-15.2.1. Under the FAR,

> *If a contractor prepares, or assists in preparing, a [SOW] to be used* in competitively acquiring a system or services—or provides material leading directly, predictably, and without delay to such a [SOW]—that contractor *may not supply the system, major components of the system, or the services unless*—
>
> (i) It is the sole source;
> (ii) *It has participated in the development and design work*; or
> (iii) More than one contractor has been involved in preparing the [SOW].

FAR 9.505-2(b)(1) (emphasis added). The SP&Ps carve out no exceptions to biased ground rules OCIs, making the SP&Ps more rigid than the FAR in this case.

Both the FAR and the SP&Ps highlight the immitigable nature of biased ground rules. Comparing two provisions of the SP&Ps and FAR elucidate the justification for disqualifying competitors with biased ground rules OCIs. Under the SP&Ps,

> An [OCI] exists when the nature of the work to be performed under a contract may give an offeror or supplier an unfair competitive advantage and when an offeror or supplier has other interests that may impair its objectivity or ability to render impartial assistance or advice or to provide objectivity in performing the contract work. *Although such conflicts are not limited to any particular type of purchase, they are more likely to occur in contracts involving professional, technical, and consultant services; . . . and for those projects that are purchased in separate phases (e.g. . . . research and development and then production).*

SP&Ps at 7-15.2 (emphasis added). Under the FAR, there is a presumption of disqualification when "a contractor prepares and furnishes complete specifications covering nondevelopmental items"; the SP&Ps do not have a presumption of disqualification. *Compare* FAR 9.505(a)(1), *with* SP&Ps at 7-15.2. Although FAR subpart 9.5 is not limited to any particular type of procurement, FAR 9.502(b) notes OCIs are most likely to arise in contracts involving:

> (1) Management support services;
> (2) Consultant or other professional services;
> (3) Contractor performance of or assistance in technical evaluations; or

> (4) Systems engineering and technical direction work performed by a contractor that does not have overall contractual responsibility for development or production.

The FAR specifically acknowledges OCIs are more likely to arise for contracts involving consultant services. FAR 9.502(b)(2). The SP&Ps contemplate design and development is particularly susceptible to creating OCIs, recognizing OCIs "are more likely to occur in contracts involving . . . design and then construction, research and development and then production[]." SP&Ps at 7-15.2. MSA's involvement in the pilot program and subsequent consulting role—under both the FAR and the SP&Ps—is particularly susceptible to immitigable biased ground rules OCIs.

If biased ground rules are immitigable and require the disqualification of MSA, the USPS claims the FAR exception is "analogous" to the facts here, and under the FAR, the "design and development" exception applies; AMK9 and GK9 disagree. Tr. at 42:4–7. The USPS argues the FAR "design and development" exception excuses MSA's incumbent advantage stemming from the pilot program, *see supra* Section VI.A. Tr. at 41:10–17 ("[THE GOVERNMENT]: . . . [W]e wouldn't get a lot of takers for pilot programs if someone who was developing a pilot program was ineligible to participate in the main procurement."). AMK9 and GK9 contend the government's application of the "design and development" exception does not apply here because participation in development and design of a program is for a product-type procurement, not a services procurement. *See* Tr. at 37:24–38:4; 39:4–6.

The FAR is not directly applicable to the USPS; however, as the SDRO found, the FAR is "instructive" and "persuasive." SDRO's AMK9 Decision at 6611, 6614; Tr. at 70:7–8. Following the SDRO's logic, the Court examines the FAR and case law involving the FAR's "design and development" exception to further understand the meaning of the exception and whether a similar exception applies under the SP&Ps. Under the FAR's "design and development" exception, a contractor is exempt from disqualification for preparing the SOW of a program if it has also participated in design and development work for the program. *See* FAR 9.505-2(b)(1)(ii). FAR 9.505-2(a)(3) states:

> In development work, it is normal to select firms that have done the most advanced work in the field. These firms can be expected to design and develop around their own prior knowledge. Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government. In many instances the Government may have financed the development. Thus, while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.

In reviewing case law related to the FAR "development and design" exception, the Court notes the FAR exception is generally only applied when products are being designed and developed—not service programs. The parties agree no case law provides an example of the

FAR's "development and design" exception applying to service contracts.[14] *See* Tr. at 93:17–19 ("[GK9]: I have never seen a case where the development and design exception applied to something other than a product."), 162:25–163:3 ("THE COURT: . . . [I]s there any example case where a design and development exception has applied to a services solicitation? [THE GOVERNMENT]: I am not aware of any."), 166:15–19 ("[MSA]: . . . [T]he Court was asking for . . . any cases that show that the design and development exception has been applied in a services case. . . . [I]t doesn't seem that there are any[.]"). The Court, however, reviews the products cases involving the FAR's "design and development" exception for clarity.

A case related to the FAR's "development and design" exception is *Vantage Associates, Inc. v. United States*, where the Air Force issued a solicitation for the manufacture of gray radomes (structural, weatherproof enclosures that protect a radar antenna). 59 Fed. Cl. 1, 2 (2003) (Horn, J.). The *Vantage* court found an offeror's participation in a pilot inspection program for gray radomes did not preclude the offeror from competition. *Id.* at 10–11. The decision in *Vantage* supports the contention the "development and design" exception is reserved for contracts for products, such as gray radomes—not for services, such as MSA's participation in the 3PK9 pilot program.

In *AAR Manufacturing, Inc.*, this court held, under the FAR, "[a] contractor that has a biased-ground-rules OCI must be excluded from the competition for the system or service for which it helped develop the [SOW], unless '[i]t has participated in the development and design work[.]'" *AAR Mfg., Inc. v. United States*, 149 Fed. Cl. 514, 524 (2020) (Hertling, J.) (quoting FAR 9.505-2(b)(1)(ii)). The government argues *AAR Manufacturing* is instructive despite the FAR's inapplicability to the USPS. Tr. at 42:4–7 ("[THE GOVERNMENT]: . . . [I]n the *AAR* case, development and design work, which we think is analogous to what was going on in the pilot program, does not constitute an OCI."), 76:16–17 ("[THE GOVERNMENT]: . . . [T]he [USPS] is not subject to the FAR."); *see* Gov't's Cross-MJAR & Resp. at 34 (quoting *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1079 n.7) ("[T]he USPS is exempted from all federal procurement laws not specifically enumerated in 39 U.S.C. § 410(a)[.]"). The contract in *AAR*

[14] Despite the parties' contentions, the Court independently found a Court of Federal Claims case applying the FAR's "development and design" exception to a services contract. In the 2018 *Ernst & Young, LLP v. United States* decision, Chief Judge Braden reviewed a post-award bid protest related to a contract for services establishing Veterans Health Administration health care facility and services networks. 136 Fed. Cl. 475, 483 (2018). One of the offerors in *Ernst & Young*, acting as a consultant, participated in a pilot study to develop a methodology evaluating the strengths and weaknesses of the proposed project. *Id.* at 483–84. The court assessed the applicability of the FAR's "development and design" exception to OCIs by merging the analysis of unequal access to information and biased ground rules. *Id.* at 508–09, 512. *Ernst & Young* is distinguishable for a couple of reasons. First, the solicitation in *Ernst & Young* was issued before the development work concluded, so there was no possibility of biased ground rules OCI. *See id.* at 495. If the agency had issued the solicitation after the development work, however, there may very well likely have been a biased ground rules OCI. Second, the Court's holding exemplifies it is impossible to separate the unequal access to information from conducting development work for the solicitation for a services contract. *See id.* at 509–511. Chief Judge Braden recognized "the Solicitation required offerors to comply with the Methodology" created in the pilot study. *Id.* at 512. Although the court explained the Methodology did not "require the use of proprietary products or services[,]" it also recognized "[t]he competitive significance of the Pilot Study Data is . . . evidenced by the fact that *every* other offeror made 'staffing level' assumptions that were [redacted] to the [consultant company's subcontractor's.]" *Ernst & Young, LLP*, 136 Fed. Cl. at 509–12. In other words, an OCI will likely always remain when the party acts as a consultant for a services contract. The Braden court, ultimately, granted plaintiff's MJAR. *See id.* at 519. This Court has yet to find a case in which there was a service contract including development work in which there was no OCI.

*Manufacturing*, however, was for the manufacture of Air Force air cargo pallets—not services. 149 Fed. Cl. at 518. Assuming the FAR is instructive, *AAR Manufacturing* confirms the FAR's "development and design" exception presumably only applies to product-type contracts, not service-type contracts.[15] The Court finds the FAR's development and design exception would not apply to MSA's participation in the pilot program even if the USPS was bound by the FAR. *Id.*; *Vantage Associates, Inc.*, 59 Fed. Cl. at 2. Likewise, the stricter SP&Ps do not contemplate a "development and design" exception. SP&Ps at 7-15.2. The Court, accordingly, must assess if disqualification is the appropriate mitigation strategy.

The parties disagree on whether biased ground rules are immitigable under the SP&Ps. The USPS believes changes made to the SOW, best practices, and internal audit documents despite "certain commonalities[,]" such as "carryovers in terms of methods[ and] in terms of best practices for setting up the physical structure[,]" were sufficient to overcome biased ground rules OCIs. Tr. at 41:10–20; s*ee* Tr. at 40:24–41:9 ("[THE GOVERNMENT]: . . . [T]he ground rules have changed, first in the substantive revisions . . . , and the things that were explicitly found by CO Franklin to be constituting potentially biased ground rules, those are either going to be created anew, like a brand new playbook with a new awardee, or it's information that is being shared with all offerors and is not uniquely benefitting MSA's approach or an MSA proprietary method or requiring . . . a number of personnel that only MSA has . . . ."). AMK9 and GK9 counter: "[T]he substantive work remains the same and the substantive work was developed with the input of MSA under a nondocumented contract . . . [The playbook] was used as MSA's input into . . . the [SOW] in 2020, which became substantively and similar to the [SOW] in 2022." Tr. at 27:10–22; *see* Tr. at 39:18–23 ("[GK9]: . . . [The USPS] certainly moved some things around and did some things a little differently, but there's not a major departure, and that is their finding and they're stuck with it. I just don't see any way . . . , having found that there is a biased ground rules OCI, that MSA could be eligible under the law."). At oral argument, the government admitted the 2022 SOW is ninety-five percent the same as the 2020 SOW. *See* Tr. at 90:9–11.

Once a contractor has already influenced the ground rules for a procurement, it is questionable whether such an OCI can be mitigated. "The appearance of unfair competitive advantage is certainly inescapable" and "would raise serious question and damage the integrity of the competitive proposal system." *NFK Eng'g, Inc.*, 805 F.2d at 380. The original plan for the 3PK9 program was a non-competitive sole-source contract, so OCIs were not contemplated, according to CO Franklin's Report and the parties at oral argument. CO Franklin's Report, documenting MSA's role from a pilot program participant to consultant, emphasizes the notion the original contract "taint" could not have been corrected. CO Franklin's Report at 3678 ("[The USPIS] stated that it was planning for a noncompetitive award to MSA."). MSA was in an undocumented consulting role which informed the 2020 solicitation which in turn became the

[15] The Court independently found a non-procurement case addressing the FAR's "development and design" exception arising out of qui tam litigation in the United States District Court for the District of Columbia. *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18 (D.D.C. 2005). In that case, the court happened to analyze FAR 9.505-2(b)1)(ii) in conjunction with an inquiry into a possible failure to disclose a conflict of interest related to a solicitation from the HUD for a financial advisor to oversee its loan programs. *Id.* at 54–55. A securities company advised the HUD of the necessity for financial advisor services, then competed for the contract. *Id.* After a brief discussion of the company's development role, the court ultimately found insufficient evidence to prove the company failed to disclose a conflict of interest as a violation of the False Claims Act. *Id.*

2022 resolicitation; MSA still has advantages stemming from 2019, highlighting irreversible "taint." *See* Tr. at 159:11–160:4. Nothing could have been done to mitigate MSA's "tainted" incumbent advantage. *See In re DZS/Baker LLC*, B-281224, 1999 WL 46706, at *4 (Comp. Gen. Jan. 12, 1999) (emphasis omitted) ("[W]e note that there is a presumption of prejudice . . . where a conflict of interest, other than a de minimis or insignificant matter, is not resolved."); Tr. at 38:5–11 ("THE COURT: "[T]here's no amendment to the [SOW] that could have made it level? [AMK9]: Correct. . . . [GK9]: I agree with that."). Caselaw and the SP&Ps confirm service contracts are ripe for biased ground rules OCIs, and while the Court does not hold a service contract "tainted" by biased ground can never be mitigated, in this case, nothing could have been done to mitigate MSA's biased ground rules OCIs. *See Ernst & Young, LLP*, 136 Fed. Cl. at 510–12; SP&Ps at 7-15.2. The only way to remove MSA's biased ground rules OCI is to remove MSA from the procurement process because the biased ground rules are immitigable here.[16] *See, e.g.*, *NFK Eng'g, Inc.*, 805 F.2d at 375 (The "appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged.").

### C. Whether the SP&Ps and the FAR Prescribe the Same Remedy

The parties dispute whether the SP&Ps and FAR prescribe the same remedy for immitigable biased ground rules: disqualification. The government contradicts itself on the indirect applicability of the FAR to USPS.[17] *Compare* Tr. at 163:4 ("[THE GOVERNMENT]:

---

[16] In a 2006 article reviewing thirty-six OCI cases before the GAO and this Court, the author summarized:

> No case has analyzed the mitigation of 'biased ground rules' OCIs in detail. It is questionable, moreover, whether such an OCI could be mitigated once a contractor already has influenced the ground rules for a procurement. If a contractor knows, prior to preparing specifications or a [SOW], that it will have the opportunity to compete in the resulting procurement, that contractor will have an incentive to draft specifications or a [SOW] that favors its own capabilities. Once the specifications or [SOW] has been drafted, the OCI is established and the harm already has occurred.

Szeliga, *supra*, at 667 (footnote omitted).

[17] As part of the previous orders in this case, the Court notes this is not the first time the government has generally sought special treatment for USPS. *See, e.g.*, *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1083 ("[T]he government's position amounts to an argument that no judicial forum is available to review USPS pre-award government contract protests."); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1357 (Fed. Cir. 2004); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 21 (2005). In *Emery*, the Federal Circuit reviewed a bid protest decision in which the USPS argued this court lacked subject matter jurisdiction because USPS is not a "federal agency" for purposes of the Tucker Act. *Emery Worldwide Airlines*, 264 F.3d at 1074. The Federal Circuit rejected USPS's argument, holding USPS was a federal agency and thus subject to the government contract procurement protest jurisdiction of this court. *Id.* at 1081. In *Banknote*, the Federal Circuit acknowledged the different standards under the Purchasing Manual, a precursor to the SP&Ps, as compared to the Federal Acquisitions Regulation. *Banknote Corp. of Am.*, 365 F.3d at 1349 n.1 ("The Purchasing Manual, not the Federal Acquisition Regulations (FAR), applies to USPS procurements."). Nonetheless, in holding for the government, the Federal Circuit stated, "[t]he USPS Purchasing Manual sets forth the policies and procedures for the USPS's purchasing activities and is incorporated by reference into USPS regulations." *Id.* In *Asia Pacific*, USPS argued before this court the Purchasing Manual was unenforceable based on a disclaimer in the manual stating that the manual did not "create any right or benefit, substantive or procedural by a party against the Postal Service or the United States." *Asia Pac. Airlines*, 68 Fed. Cl. at 22 n.14 (citing the Purchasing Manual § 1.1.1.b.4). The court rejected USPS's claim, finding the Purchasing Manual was "incorporated by reference in the Code of Federal Regulations," before holding the

. . . [W]e're not in a FAR context here."), *with id.* at 71:7–8 ("[THE GOVERNMENT]: . . . I find that MSA's work under the pilot program is analogous to the development and design exception under the FAR . . . ."). All parties agree, however, no case law exists where the SP&Ps inform mitigation efforts that correct biased ground rules OCI. *Id.* at 67:9–12 ("THE COURT: . . . [I]s there any case that relates to how the SP&Ps relate to OCIs? [THE GOVERNMENT]: Well, this Court's previous opinions are the only ones we know of.").

Case law confirms fairness is the underlying principle considered when determining if disqualification is warranted. "There is an overriding public interest in preserving the integrity of the procurement process . . ." *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242 (2010). "[Offeror's] hardships are the product of the agency's failure to conduct a fair procurement, or to ensure that a new procurement would be fair." *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 673 (2021) (Sweeney, J.); *see also Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 997 ("Under these circumstances, the Government concluded it would, upon rebidding, level the playing field for those successful offerors who did not propose the lowest price and now deserve a chance to revise their proposals to fairly compete during the rebidding process."). Continuing the government's unsettled use of the FAR's applicability to USPS, the government distinguishes *SAGAM* on the basis of the FAR in its MJAR: "*SAGAM* is legally distinguishable because the solicitation in *SAGAM* was a procurement under the FAR that was subject to Federal procurement statutes, whereas USPS is not subject to the FAR or the bulk of Federal procurement statutes." Gov't's Cross-MJAR & Resp. at 34. In the context of a services contract, the court in *SAGAM* disqualified an offeror because of fairness principles. In *SAGAM Securite Senegal v. United States*, the plaintiff argued the appropriate remedy for the agency's improper disclosure was to disqualify another offeror from the competition for the contract requirement of providing local guard services to the United States embassy in Dakar, Senegal. 154 Fed. Cl. at 658. The *SAGAM* court determined the remedy for the other offeror's unfair competitive advantage was disqualification to "level the competitive playing field." *Id.* at 670. Irrespective of the FAR in *SAGAM*, the case showcases the underlying reason for disqualification in a services contract: fairness. *Id.* at 670 (holding the "agency turned a blind eye to the fairness principles that require that all offerors be treated equitable" and ultimately disqualified the offeror).

The parties agree the FAR and SP&P's directions to mitigate biased ground rules OCIs are both underlined by the principal of fundamental fairness. Tr. at 74:20–23 ("[GK9]: Contracting fairness and public trust. That's one of the reasons why OCIs can be presumed in some instances if there's an appearance of impropriety."), 75:1–3. ("[THE GOVERNMENT]: We would agree that, yeah, OCIs are to protect fairness. We agree that that is the purpose of them."). Both regulations expressly state the goal of promoting "fundamental fairness, the public trust in procurements . . . that's a pervasive obligation in government procurement. And it's in the SP&Ps. I mean, it may not have the same word as the FAR, obviously they don't, but that is the same concept embedded in there." *Id.* at 74:10–15 (quoting GK9). The USPS confirms its mission of fairness in its Ethics and Social Responsibility guidance:

USPS acted arbitrarily and capriciously in removing an offeror based on ambiguous terms in the solicitation that failed to meet Purchasing Manual criteria. *Id.* at 21, 24.

> The Postal Service has an interest in the early identification and remediation of organizational conflicts of interest on the part of its suppliers. The Postal Service will attempt to avoid situations in which a supplier has an unfair competitive advantage . . . .

USPS, Ethics and Social Responsibility (Rev. Sept. 1, 2022). The FAR, likewise, has a similar mission:

> The two underlying principles [of the FAR] are—(a) [p]reventing the existence of conflicting roles that might bias a contractor's judgment; and (b) [p]reventing unfair competitive advantage.

FAR 9.505. Regardless of which regulation applies, the standard is the same: fairness in competition. *See* Tr. at 71:1–4 ("[THE GOVERNMENT]: . . . [the] standard is consistent, we think, . . . with what needs to be done under the FAR, even though the remedy isn't presumptive."). The Court uses the same standard of fairness in assessing these pre-award protests. MSA and USPS formed a relationship in 2019 assuming MSA would receive a sole-source contract in 2020, so USPS did not include OCI restrictions or expectations for MSA. CO Franklin's Report at 3679. In September 2020, the USPS presented the 2020 solicitation after its legal department required competitive solicitations. *See* Tr. at 125:23–126:15; *see also id.* at 120:25–121:3. MSA was essentially creating the program it thought it would perform. When the solicitation became competitive and MSA bid on it, the solicitation became fundamentally unfair and compromised the integrity of the procurement process. As soon as USPS opened the solicitation to competition, fairness needed to guide the procurement process. *See Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 635 (2002) (Gibson, J.) ("What is of singular importance is fundamental fairness in administering the [procurement] process.").

If the FAR and SP&Ps are both concerned with preventing OCIs to preserve the fairness of the procurement process, it begs the question whether the FAR and SP&Ps prescribe the same remedy. The government contends "we are not saying that the Postal Service has to be less fair, we're saying they have options on how to go about it . . ." because "[t]he Postal Service is supposed to have more flexibility to make their operations more businesslike and more efficient."[18] Tr. at 75:24–76:1, 68:25–69:2. The government twice conceded at oral argument under the FAR, MSA would be disqualified. *Id.* at 64:25–65:2 ("THE COURT: So under the FAR, MSA would have had to have been excluded? [THE GOVERNMENT]: Well, presumably excluded . . . ."), 65:15–18 ("THE COURT: . . . Under the FAR, then, going into the

---

[18] The Postal Reorganization Act may have made the Postal Service more businesslike, but the Act did not abrogate the Postal Service's purpose: to serve the public interest. *See* 39 U.S.C. § 101(a) (USPS "shall be operated as a basic and fundamental service provided to the people by the Government of the United States[.]"). Fairness in the procurement process is fundamental to serving the public interest. *See Asia Pac. Airlines*, 68 Fed. Cl. at 27 ("[I]t is well-established that the public interest is well-served by ensuring that the government procurement process is fair.") (citing *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995)). Government contract disputes are resolved in the Court of Federal Claims "to ensure national uniformity in government contract law." *Tex. Health Choice, L.C. v. Off. of Personnel Mgt.*, 400 F.3d 895, 899 (Fed. Cir. 2005); *see also Emery*, 264 F.3d at 1079 ("[T]o prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims.").

2022 solicitation, the result would have been a presumption that MSA is excluded?  [THE GOVERNMENT]:  I think that's right.").  The government argues despite "hav[ing] to meet the same standard of fairness, the[] [SP&Ps] . . . don't have a presumptive method of [disqualification]."  *Id.* at 75:7–14.  The FAR and SP&Ps, generally speaking, should apply the same remedy because of the same underlying standard.  The government admits, "[T]here might not have been as much of a difference in application as there was in the language of the two provisions."  *Id.* at 71:12–14.  The FAR and SP&Ps prescribe the same remedy of exclusion for a biased ground rules OCI:  disqualification.  *See SAGAM Securite Senegal*, 154 Fed. Cl. at 667 (quoting and agreeing with plaintiff's memorandum stating "'the only effective way to remove the taint . . . is to disqualify [incumbent] and proceed to award under the current Solicitation or to disqualify [incumbent] from participating in the planned resolicitation . . . .'"); *NFK Eng'g, Inc. v.*, 805 F.2d at 373 (finding contracting officer's decision to disqualify low bidder for government contract based on appearance of impropriety was not irrational or unreasonable).  Under the SP&Ps and the FAR, USPS must be held to fairness standards.  MSA's involvement with USPS beginning in 2019 created unfair competition and immitigable biased ground rules OCIs in the 2022 resolicitation; therefore, MSA should be excluded if the injunction factors weigh in favor of that outcome with all factors weighed.  *See infra* Section IX.C.4; *NFK Eng'g, Inc.*, 805 F.2d at 380.

## VIII.  Whether the USPS's Actions Were Prejudicial to AMK9 and GK9

"The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law."  *Info., Tech. and Applications Corp. v. United States*, 51 Fed. Cl. 340 (2001) (*citing GraphicData LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).  To prevail, "the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it."  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (*citing LaBarge Prod., Inc. v. West*, 46 F.3d 1547, 1556 (Fed. Cir. 1995)).  "There is a presumption of prejudice to competing offerors where an [OCI] (other than a de minimis matter) is not resolved."  *In re Aetna Gov't Health Plans, Inc.*, B-254397, 1995 WL 449806 (Comp. Gen. July 27, 1995).  If MSA had been properly excluded from the competitive solicitation, the USPS could have come to a different conclusion regarding the evaluation criteria and eventual awardees.  AMK9 and GK9 have adequately demonstrated the agency's arbitrary actions in allowing MSA to compete for a contract for which it should have been excluded were to their prejudice, ultimately depriving AMK9 and GK9 of the opportunity to compete for the solicitation on a level playing field.  *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (Lettow, J.) ("[U]neven treatment goes against standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

## IX.  AMK9's and GK9's Requests for Permanent Injunctive Relief

At the time of oral argument, the Court understood services at new airport sites (where the airport has no existing screening services) would begin on 9 November 2022, and the first transition away from MSA would occur on 14 December 2022.  *See* Roll-Out Schedule at 3–4, ECF No. 67; 15 Sept. 2022 Order, ECF No. 63.  The Court, therefore, immediately requested the

USPS to provide guidance, in advance of this complete opinion, "on the prospect of resoliciting or reevaluating the 2022 resolicitation in the event the Court's equitable remedy disqualifies MSA from participation in the 2022 resolicitation." 26 Oct. 2022 Order at 5. The government filed a supplemental statement responding to the order on 31 October 2022 and GK9 filed a supplemental brief responding to the order on 1 November 2022. MSA and AMK9 did not file responses.[19] If the Court awards injunctive relief, it may fashion its own remedy to fit the contours of its decision. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). Accordingly, the Court crafts the injunctive relief considering the USPS's and GK9's statements—and MSA's confusing motions.

### A. The Government's Roll-Out Before and After the 26 October 2022 Order

The government's roll-out plans before and after oral argument informs the Court's perspective on injunctive relief. The objective of the USPS's Canine Screening program is "to execute one or more contracts via geographical clusters for commercial suppliers to provide, disseminate, and administer [EDC] teams across the United States . . . with the purpose to screen mail intended for transport on domestic and international passenger commercial air carriers on a nationwide basis. The service locations, referred to as 'sites,' will be divided across the US in geographic clusters." 2022 AR at 6673 (Canine Screening Solicitation). On 7 October 2022, the government submitted a status report regarding the anticipated roll-out schedule for the 2022 Canine Screening awards by the USPS. *See* Roll-Out Schedule. The USPS confirmed "[f]rom the beginning of the current rollout schedule [9 November 2022] through 15 March 2023, there are seven new screening locations expected to be added." Roll-Out Schedule at 1. "The first new site—where an airport location has no existing screening services—was initially awarded to MSA and would begin on 9 November 2022 at Raleigh-Durham International Airport with an estimated weekly volume of 7,000 screens followed by Charlotte Douglas International Airport on 16 November 2022 with an estimated weekly volume of 40,000 screens." Sealed 26 Oct. 2022 Order at 4, ECF No. 69. "Existing sites—where MSA currently conducts screening services—would transition to new screening providers between 30 November 2022 through 15 March 2023." 26 Oct. 2022 Order at 4. "AMK9 would begin servicing the first existing site, George Bush Intercontinental/Houston Airport, on 14 December 2022." *Id.*

The Court held oral argument on 21 October 2022 to address remaining pre-award challenges in the parties' MJARs. *See* 15 Sept. 2022 Order. At the conclusion of oral argument, the Court did not have enough information to make any remedy determination and, therefore, "ask[ed] USPS to offer guidance on the prospect of resoliciting or reevaluating the 2022

---

[19] While MSA did not respond to the Court's 26 October 2022, it did, on 3 November 2022, file a notice of appeal from the Court's 26 October 2022 Order. MSA Notice of Appeal, ECF No. 76. MSA purports the Court's 26 October 2022 Order decided the MJARs. *Id.* at 2. While the Court ruled in favor of AMK9's and GK9's MJARs in the 26 October 2022 Order, it did not direct the Clerk's Office to grant or deny any MJARs or enter judgment in the case as the remedy had not yet been decided. The Court's order was not a final judgment, so the appeal would presumably have to come under an exception (as it is not an appeal as of right), which requires the court of appeals to grant permission under 28 U.S.C. § 1292(b) or 158(d). MSA has yet to ask permission to appeal. Additionally, MSA filed a motion for a stay or injunction pending appeal. MSA's Mot. for a Stay or Inj. Pending Appeal. The motion contains arguments responsive to the USPS's supplemental statement responding to the 26 October 2022 Order. *Infra* Section XII. Though untimely and under the guise of a motion for a stay, the Court considers the arguments within MSA's motion for a stay or injunction pending appeal.

resolicitation in the event the Court's equitable remedy disqualifies MSA from participation in the 2022 resolicitation."  26 Oct. 2022 Order at 5.  Accordingly, the Court sought the UPSP's guidance regarding agency plans on the following:

> (1) preference on a resolicitation or reevaluation of the 2022 solicitation or a combination of both (as well as an explanation of the desired procedure—e.g., reevaluating certain cluster groups or resoliciting only MSA-awarded sites);
> (2) a timeline regarding replacement of incumbent MSA as the sole Alarm Resolution contract awardee given the potential exclusion of MSA;
> (3) the anticipated roll-out of new and anticipated locations in 2022 and 2023; and
> (4) a schedule regarding completion of a potential resolicitation or reevaluation of 2022 bids.

*Id.*  The government responded on 31 October 2022, but CO Baker felt it was necessary to submit modifications to the government's first response because it lacked clarity.  Gov't's Second Resp. to 26 Oct. 2022 Order, ECF No. 77; Am. Decl. of Jeremiah D. Baker ¶ 3, ECF No. 77-1.  The USPS filed another amendment to its response on 22 November 2022, ECF No. 83.

The USPS's supplemental statement, supported by a declaration from CO Baker, addresses the 3PK9 screening and alarm resolution services separately.  Regarding the 3PK9 screening solicitation, the government contends it "can proceed by making a new best-value determination utilizing the current offers received from the non-MSA offerors and issuing new awards for the clusters that were awarded to MSA."  Decl. of Jeremiah D. Baker ¶ 6.  The USPS estimates it would need "approximately 8 weeks after receipt of any Court directive" for time to complete the multilevel review and approval process before it could issue awards.  *Id.* ¶ 10.  Contracts awarded to non-MSA offerors would move to the top of the schedule, "allow[ing] new sites that were not awarded to MSA to be implemented first while USPS issued new awards."  *Id.* ¶ 11.  The USPS "would not transition any MSA 3PK9 screening sites to a new awardee until April 26, 2023" to "allow ample time for a new awardee to get badges from the airport authority, receive the mail amendment [which is essentially permission from TSA], and secure 3PK9 teams ready to screen the mails."  *Id.* ¶ 12.  The USPS highlights "[a]t all times MSA would need to continue to provide screening services under the original contract until a new awardee is transitioned."  *Id.* ¶ 13.

For the alarm resolution solicitation, the USPS states it would have to resolicit the alarm clearing services to allow for subcontracting and "cannot deviate from one national plan with one awardee and a unified approach for these services."  *Id.* ¶¶ 15, 16.  "Based upon the 26 weeks necessary to award the alarm clearing contract and minimum 60 days to implement the alarm clearing services, [the USPS] anticipate[s] that a transition of alarm resolution will not begin for approximately 8 months after the Court issues a directive."  Decl. of Jeremiah D. Baker ¶ 23.  MSA would continue to perform alarm clearing services until the USPS resolicits the services.  *Id.* ¶ 18.  As such, "MSA's performance of the alarm resolution services will transition from MSA's 2020 contract to MSA's 2022 alarm resolution contract to effectuate the rollout schedule" on 21 December 2022.  Am. Decl. of Jeremiah D. Baker ¶ 9.  The USPS clarifies "for new locations that were not in the 2020 contract, MSA will prepare to commence providing alarm resolution services at those locations under the 2022 contract sufficiently in advance of the

first day that 3PK9 screening is set to begin at each location so that the alarm resolution services are coordinated with 3PK9 screening." *Id.* Ultimately, "MSA will not be eliminated from both contracts for a year and a half." Decl. of Jeremiah D. Baker ¶ 23.

GK9 filed its response to the USPS's 31 October 2022 supplemental statement, addressing 3PK9 screening and alarm resolution services separately. First, GK9 argues the USPS's proposed course of action under the 3PK9 screening is irrational. GK9's Resp. to 26 Oct. 2022 Order at 2. "By limiting the scope of the source selection only to the awards made to MSA, USPS is not only making a best value decision that lacks a rational basis, but it also deprives itself and other offerors of a full tradeoff analysis that might alter its award decision." *Id.* at 3. Addressing the USPS's anticipated timeline to make a new award decision of 8 weeks after receipt of any Court directive, GK9 contends the USPS's planned course of action causes the new awardees to lose valuable time on contract and also deprives GK9 of a remedy in the event it succeeds in a post-award protest. *Id.* at 3–4. Second, GK9 argues, the "USPS's decision to cancel the alarm resolution solicitation lacks a rational basis." *Id.* at 4. During the solicitation evaluation process, GK9 was assigned a weakness because of the "USPS's arbitrary conclusion that GK9 did not propose 'real time' alarm resolution." *Id.* at 5. The USPS determined cancelling the 2022 resolicitation for alarm resolution was appropriate because, of the three offers submitted, only MSA proposed services that "did not include the subcontracting of services." *Id.* at 2. According to GK9, the "USPS's new position ignores the responses to the questions it posed during the evaluation and its actual evaluation." GK9's Resp. to 26 Oct. 2022 Order at 5. GK9 requests the Court:

1. Prohibit USPS from performing a partial best value decision for 3PK9 solicitation and require USPS to consider all companies in its best value analysis;
2. Develop and deploy a timeframe for receiving badges and clearances that is consistent among all awardees;
3. Prohibit USPS from canceling the alarm resolution solicitation and make a best value and award decision for the alarm resolution solicitation among the two remaining offers, consistent with the contemporaneous evaluation record or, in the alternative, supply the Court and parties with all portions of its evaluation record addressing USPS's evaluation of GK9 and the other offeror's proposed approach under the alarm screening solicitation;
4. Require USPS to inform the Court whether it believes its proposed course of action will dispossess GK9 of an injunctive remedy should it succeed on the merits of its post-award protest; and
5. Require USPS to supply a date certain for its SDRO decision on GK9's post-award bid protest.

*Id.* at 5–6.

### B. Logistical Concerns Regarding the USPS's Revised Roll-Out

Logistical concerns arise regarding the USPS's revised roll-out schedule based on the government's and GK9's responses. The Court may not "substitute its judgment for that of the

agency," but instead looks to see if an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. United States*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085–86 (Fed. Cir. 2001). In this inquiry, the Court does not second-guess the decisions being reviewed, but looks at the "why" of the decision. *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010) (Wolski, J.); *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247 (2011) (Wolski, J.). "This involves verifying that objective elements contained in the agency's analysis . . . correspond to the evidence in the record and checking to see if subjective judgments are reached elsewhere in the analysis that contradict the evaluators' conclusions making the decision too 'implausible.'" *USfalcon, Inc.*, 92 Fed. Cl. at 462 (internal citations omitted).

First, GK9 complains reevaluation of only certain clusters is irrational. The Court finds the USPS has correctly agreed to reevaluate certain clusters based on "making a new best-value determination utilizing the current offers received from the non-MSA offerors and issuing new awards for the clusters that were awarded to MSA"; however, the government must articulate why they cannot recalculate all clusters.[20] Decl. of Jeremiah D. Baker ¶ 6. Accordingly, the issue requires additional briefing from the USPS to address the USPS's rationale, including why a best value analysis would be fair if only reevaluating certain clusters. *Motor Vehicle Mfrs. Ass'n. of U.S., Inc.*, 463 U.S. at 43 (requiring a satisfactory explanation for agency action).

Second, GK9 contends the timeline the USPS proposes is arbitrary. Regarding the questions of fact on badge and clearance timeframes between the USPS and AMK9, the Court needs more information to address the issue; therefore, the parties need to brief the issue. *Id.* While the Court determines the USPS should resolicit the alarm resolution solicitation, the Court does not have the requisite temporal understanding to address what timeline is reasonable without complete briefing. *See Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.9 (1999) ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs."). Relatedly, according to the USPS, the alarm resolution solicitation did not accept subcontracting because "market research appeared to reveal a number of potential offerees" capable of performing the alarm resolution solicitation without subcontracting services. *See* Decl. of Jeremiah D. Baker ¶ 14. The USPS ultimately only received offers from three offerors but determined the two non-MSA offerors, [XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXX] and, thus, awarded the alarm resolution contract to MSA. *Id.* [XXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXX] The dispute of fact regarding alarm resolution [XXXXXXXXXXXXXXXXXXX] between the USPS and GK9 needs to be briefed, as the Court is not capable of making that determination without response and operational detail from the USPS. *See Input/Output Tech., Inc.*, 44 Fed. Cl. at 72 n.9.

[20] At oral argument, GK9 mentioned it "understand[s] there's two best value decisions, and the second one was to decide how many awards were made. . . . [S]o MSA's participation impacted the best value decision at two levels. And there are some of these clusters we didn't bid on. I think it's the one [AMK9] got. But we certainly bid on [others], and we're certainly going to continue our post-award protest as to those at least if the injunction doesn't prevent the whole thing from going forward, but I think if [the Court] determines that MSA shouldn't have been allowed to compete, then their participation infected the whole process." Tr. at 200:23–201:9.

Finally, the USPS's inability to eliminate MSA from both contracts within a year is a moot issue.[21] The USPS may have to delay MSA's initial termination, but MSA is no longer a viable awardee for a follow-on contract if the injunction factors weigh in favor of MSA's exclusion. *See infra* Section IX.C.4. While the USPS prepares to resolicit the contracts for alarm resolution and canine screening, MSA will continue to provide services for the USPS in the interim. *See* Decl. of Jeremiah D. Baker ¶¶ 13, 18. MSA, however, will not perform any services for the USPS upon resolicitation of the contracts if MSA is excluded after the weighing of the injunction factors. *See infra* Section IX.C.4. In other words, although MSA will not be eliminated from their original contract within a year, MSA could be ineligible to compete for the follow-on contract if the injunction factors favor disqualification, *infra* Section IX.C.4.

### C. Whether Injunctive Relief is Merited[22]

In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). No one factor is dispositive, and "the weakness of the showing of one factor may be overborne by the strength of others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). AMK9 and GK9 have succeeded on the merits of their case, so this factor weighs in their favor. *See supra* Section IX. The Court analyzes the remaining factors.

#### 1. Irreparable Harm

To succeed on irreparable harm, a plaintiff must demonstrate "[a]bsent injunctive relief . . . it would be irreparably damaged." *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 94 Fed. Cl. 389, 392 (2010). An irreparable injury is one for which there is no adequate legal remedy. *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) (Bruggink, J.).

All parties claim irreparable harm. AMK9 and GK9 contend they have been irreparably harmed because the USPS's actions have prevented them from "fairly competing for the contract." AMK9's MJAR at 32; *see* GK9's MJAR at 18. GK9 specifies it "will suffer irreparable harm if MSA is allowed to compete for award under a program it built with USPS, to other bidders' competitive detriment." GK9's MJAR Resp. & Reply at 6. AMK9 articulates it "cannot compete fairly because it is being left to compete against MSA, an entity with tainted incumbent advantages and a continued OCI that cannot be reasonably rectified." AMK9's MJAR at 33. GK9 adds, absent an injunction disqualifying MSA, it will lose the opportunity to fairly compete and "enjoy the resulting benefits" of a contract award. GK9's MJAR at 18–19. The government claims AMK9 and GK9 have not demonstrated irreparable harm because lost

---

[21] CO Franklin originally determined "the best course of action would be for the [USPS] to end the MSA contract early[,]" so the contract now expires on 6 November 2023 instead of 6 November 2024. CO Franklin's Report at 3682–83.

[22] MSA's request for injunctive relief is addressed *infra* Section IX. This section primarily addresses AMK9's and GK9's request for permanent injunctive relief enjoining MSA from participating in the competition.

profits from a future contract is speculative, and, as non-incumbent offerors, AMK9 and GK9 do not stand to lose any business under the current 3PK9 contract, only the possibility of the award under a new contract. Gov't's MJAR at 45–46. The government argues, "The only potential harm arising from this competition . . . would be lost profits from an anticipated future contract award." *Id.* at 45. The government contends "lost profits" do not constitute irreparable harm to the protester, but that potential "lost savings" to the government constitute irreparable harm.[23] In its MJAR, the government highlights the USPS would potentially be harmed by injunctive relief because it would "prevent . . . operational and financial gains [from the roll-out] from progressing." *Id.* at 46. MSA claims its irreparable harm "manifest[s] in the form of employee layoffs and financial hardship." MSA's Mot. for a Stay or Inj. Pending Appeal at 9.

"The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *CW Gov't Travel, Inc., v. United States*, 110 Fed. Cl. 462, 494 (2013) (Sweeney, J.) (citing *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 390–91 (2010) (Allegra, J.))*; see also Glob. Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 211 (2018) (Campbell-Smith, J.); *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 708 (2016) (Wolski, J.); *Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 606 (2016) (Firestone, J.); *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009) (Hewitt, J.); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008) (Allegra, J.); *Hosp. Klean of Tex., Inc.*, 65 Fed. Cl. at 624. Loss of profit stemming from a lost opportunity to compete on a level playing field has been found sufficient to constitute irreparable harm. *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 333 (2003)

[23] Concerning irreparable injury, the 2011 *MORI Associates, Inc. v. United States* case similarly issued an injunction halting a procurement contract. 102 Fed. Cl. 503 (2011) (Wolski, J.). In *MORI*, Judge Wolski cited more than ten orders from this court and its predecessors recognizing the lost potential profits of bid protesters cannot be recovered in an action at law and thus, by their very nature, constitute irreparable injury. *Id.* at 552; *see, e.g.*, *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 369–70 (2004) (Miller, J.); *Vanguard Sec. Inc. v. United States*, 20 Cl. Ct. 90, 112 (1990) (Nettesheim, J.); *Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) (Williams, J.); *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004) (Firestone, J.). Judge Wolski further distinguished an opinion in which the protester was alleging other financial harms, but not lost profits. *MORI Assocs.*, 102 Fed. Cl. at 552; *see Sierra Mil. Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) (Merow, J.) (distinguishing cases involving lost profits because "[i]n this case, [plaintiff] will not lose business and profit on the . . . contract" and "will still have the opportunity to obtain the contract"). The defendant in *MORI Associates* attempted to distinguish Judge Wolski's cited authorities as involving protests where plaintiffs were denied level playing fields, not ones in which a procurement was cancelled as was the case in *MORI Associates*. 102 Fed. Cl. at 552. To the extent resolicitation is necessary, Judge Wolski suggested there will always be some element of arbitrary distinction between cancelling an improper solicitation and awarding a "tainted" contract. *Id.* In other words, no matter the catalyst to a bid protest—an unlevel playing field or the arbitrary cancellation of a contract—the outcome is the same: the underlying contract should be canceled. *See id.* Judge Wolski, therefore, explained the Court of Federal Claims has found lost profits due to an arbitrary solicitation cancellation or an unequal competitive edge constitute irreparable injury. *See id.*; *Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748, 753 (1999) (Margolis, J.). *MORI Associates* accordingly supports an injunction in this case, as plaintiffs here were denied a level playing field. *See* 102 Fed. Cl. at 552–53. A later decision by Judge Wolski, the 2018 *ARxIUM, Inc. v. United States* case, discussed the alternative to granting an injunction: recovery of bid preparation and litigation costs. 136 Fed. Cl. 188 (2018) (Wolski, J.). In *ARxIUM*, the solicitation and award were arbitrary and capricious, so an injunction was necessary because recovering bid preparation and litigation costs would not make plaintiff whole. *See id.* at 208. Judge Wolski explicitly held "[t]he alternative to a permanent injunction—recovery of bid preparation and litigation costs—does not redress the loss of the opportunity to compete on a level playing field for a valuable business contract." *Id.*

(Margolis, J.) (citations omitted); *see MORI Assocs., Inc.*, 102 Fed. Cl. at 552 (holding lost profits "constitute irreparable injury" because "the lost potential profits of bid protesters cannot be recovered in an action at law."); *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 317 (2004) (Miller, J.); *Overstreet Elec. Co., v. United States*, 47 Fed. Cl. 728, 744 (2000) (Allegra, J.). "The loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work" on an important and profitable procurement. *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) (Horn, J.), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) (citation omitted).

When assessing irreparable injury, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp.*, 27 Fed. Cl. at 447; *see also Younger v. Harris*, 401 U.S. 37, 43–44 (1971) (noting "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"). Without an injunction, MSA will continue providing services in the near term. AMK9 and GK9, however, deserve to bid on a contract not "tainted" by OCIs. *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 582 (2005) (Hodges, J.) ("[T]here is an overriding public interest in preserving the integrity of the procurement process by requiring government officials to follow procurement statutes and regulations."). MSA received the contract when it should have been barred from receiving it. As a result, MSA has received and will continue to receive millions of dollars. *See* 2020 AR at 97 (The solicitation contemplated a "four-year base period award with two two-year renewal options."); Civil Cover Letter at 179, ECF No. 1-2 (Civil Cover Sheet noting approximate dollar amount of procurement at issue for four-year base period is $77,000,000). MSA will receive about a million dollars of additional work as a result of the "peak season" on the current contract. Tr. at 19:3–4. Absent an injunction, AMK9 and GK9 continue to lose profits from a 26-month contract worth up $154,000,000 with renewals. *See* 2020 AR at 97 ("The solicitation contemplated a four-year base period award with two two-year renewal options."); Civil Cover Letter at 179 (Civil Cover Sheet noting approximate dollar amount of procurement at issue [four-year base period] is $77,000,000). With an injunction, MSA will not be able to compete for the follow-on contract—a contract MSA should not have originally been able to compete for because its "unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged." *NFK Eng'g, Inc. v. United States*, 805 F.2d 372, 375 (Fed. Cir. 1986); *see supra* Section VII. The Court finds, absent injunctive relief, AMK9 and GK9 will suffer irreparable harm; the second factor weighs in favor of AMK9 and GK9. *See Acetris Health, LLC v. United States*, 138 Fed. Cl. 579, 604–05 (2018) (Sweeney, J.), *aff'd in part, vacated in part, and remanded*, 949 F.3d 719 (Fed. Cir. 2020).

**2. Balance of Hardship**

In considering whether the third factor, balance of the hardships, a court must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the government and the awardee should the injunction be granted. *ES–KO v. United States*, 44 Fed. Cl. 429, 435 (1999) (Bruggink, J.); *see PGBA, LLC*, 389 F.3d at 1228–29.

The parties assert they will be harmed. AMK9 argues MSA still benefits from immitigable biased ground rules OCIs, making the solicitations unfair if an injunction is not

granted. AMK9's MJAR at 33. GK9's harm stems from opportunity loss "to fairly compete for a contract award and enjoy the resulting benefits . . . because of the Agency's irrational, arbitrary, and unlawful decision-making." GK9's MJAR at 18–19. The USPS claims it would be harmed by injunctive relief because of the "adverse[] [e]ffect on USPS's progress under the new solicitation." Gov't's MJAR Reply at 18.

MSA purports the balance of hardships warrants denial of the injunction. Mr. Shelton, an MSA employee, claims in his declaration supporting MSA's motion for a stay or injunction pending appeal "any change over from one canine explosive detection contractor to another inherently creates risk of performance failures and also increases cost."[24] Decl. of Chris Shelton ¶ 3. Mr. Shelton argues, "There is a certain comfort level with the mission and knowledge about the particular location that is lost every time contractors change out." *Id.* ¶ 4. Mr. Shelton insinuates the balance of hardship weighs against an injunction because "[e]ach time a new company takes over inevitably it will need to create new explosive detection teams and it will take at least 60 days and possibly in excess of 90 days to get these new teams fully trained and certified to begin work." *Id.* ¶ 8. In the USPS's revised roll-out proposal, *supra* Section IX.A, the USPS does not mention any of the transitional issues opined on by Mr. Shelton. *See* Decl. of Jeremiah D. Baker. The USPS explains, "[W]e are confident that we will be able to issue replacement awards from the offers received." *Id.* ¶ 9. Indeed, the USPS presented a revised roll-out schedule accounting for training timelines and providing a path to transition without any of the logistical harm raised by Mr. Shelton. *See id.* The USPS appeared to account for transitional issues and determined the issues MSA raised were not insurmountable; the Court can only assume the USPS knows best on this level of program detail and operational nuance. *See Input/Output Tech., Inc.*, 44 Fed. Cl. at 72 n.9 ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs."); *Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020).

The harm to AMK9 and GK9 and the systemic, long-term interest in the integrity of the procurement process must be weighed against the "the harm that injunctive relief would impose on the government." *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005) (Hodges, J.) (citing *Overstreet Elec. Co., Inc.*, 47 Fed. Cl. at 744). AMK9 and GK9 have expended significant funds pursuing protests since November of 2020, ultimately learning their pre-award protests raised in 2020 should have resulted in MSA's disqualification. *See* AMK9's MJAR at 22. Now, two years later, AMK9 and GK9 "continue[] to have the same fight, but this time all parties know the facts MSA and USPS failed to previously disclose." *See* AMK9's MJAR Resp. & Reply at 15. GK9 highlights the USPS "could have forestalled this controversy by appropriately considering OCIs." GK9's MJAR at 19; *see, e.g.*, *Anham FZCO v. United States*, 144 Fed. Cl. 697, 724 (2019) (Campbell-Smith, J.) ("The irreparable harm plaintiff would suffer absent an injunction weighs heavily against defendant's hardships that are, to some degree, of its own making."). AMK9's and GK9's inability to fairly compete continues without injunctive relief. If injunctive relief is granted, the Court can fashion an injunctive remedy to

[24] On 16 November 2022, MSA filed a motion for stay or an injunction pending appeal of the Court's 26 October 2022. The motion was supported by a declaration by MSA's Vice President of Air Cargo, Christopher Shelton (an employee who was voluntarily walled off in October 2019 "to avoid any possibility or appearance of a conflict of interest" due to his previous government employment). 2020 AR at 1773; *See* MSA's Mot. for a Stay or Inj. Pending Appeal at 21–25.

minimize the USPS's alleged harm with de minimis interruption in the program. *See supra* Section IX.B. Accordingly, the harms posited by the government and MSA are outweighed by the harm to AMK9 and GK9, so the third factor favors AMK9 and GK9. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009) (articulating the exercise of "common sense, good judgment, and sound discretion" is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it).

**3. Public Interest**

The final factor contemplates whether an injunction serves the public interest. When "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

The parties offer incompatible public interests. AMK9 claims "[t]he American taxpayer has funded an improper award for the last two years" because MSA failed to disclose the extent of the information it learned from the USPS. AMK9's MJAR at 33. GK9 argues enhancing competition by "[r]equiring [the USPS] to remediate an organizational conflict of interest and . . . solicit bids on a level playing field" are in the public interest. GK9's MJAR at 19. The USPS argues "progress of the new solicitations [with MSA] will serve the public interest by enabling USPS to achieve its statutory mandate of delivering the mail more efficiently and improving USPS's financial stability." Gov't's MJAR at 47.

On the public interest factor, the Court first appreciates the national security implications of the USPS's 3PK9 program and notes the initial concerns surrounding public security for the implementation of airport screening are no longer present. The Tucker Act requires the Court consider the interest of national security in its bid protest decisions. 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security . . . ."). In 2021, the government highlighted the national security concerns surrounding the solicitation, and, in fact, GK9 withdrew its motion for a preliminary injunction due to the need for new airport screenings to continue opening because of national security. *See Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 311 (2021) ("The Court appreciates the national security and public safety concerns the government discussed in its HSD filings and at the 16 February 2021 status conference, and the Court notes AMK9's counsel agreed at the 16 February status conference with the validity of these concerns."); 16 Feb. 2021 Status Conference Tr. at 60:11–15, ECF No. 47, *Am. K-9 Detection Servs., LLC v. United States*, Case No. 20-1614 (Fed. Cl. Nov. 18, 2020); GK9's Mot. Withdraw Mot. for Prelim. Inj. Without Prejudice, ECF No. 38, *Am. K-9 Detection Servs., LLC v. United States*, Case No. 20-1614 (Fed. Cl. Nov. 18, 2020). In 2022, those same concerns are no longer present. *See* Tr. at 79:7 (MSA claimed it is "just here trying to help national security" while no other party raised national security issues). Given the absence of national security issues, the Court takes "the interests of national defense and national security" under consideration but finds them adequately accounted for in the 2022-2023 timeframe. *See* 28 U.S.C. § 1491(b)(3).

The Court determines whether other public interests weigh in favor of injunctive relief. While "there is a countervailing public interest in minimizing disruption" to the procuring

agency, the USPS would be able to continue the roll-out—just without MSA.[25] *See Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 80 (2007) (Miller, J.). Progress on the resolicitation, therefore, will not be forestalled simply because a "tainted" incumbent is barred from competing. Further, "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring government officials to follow procurement statutes and regulations." *LABAT-Anderson, Inc.*, 65 Fed. Cl. at 582. The Court recognizes generally the public interest is served by ensuring fair and open competition in the procurement process. *Cincom Sys. v. United States*, 37 Fed. Cl. 266, 269 (1997) (Futey, J.) (citing *Magellan Corp.*, 27 Fed. Cl. at 448). The USPS's need for alleged cost savings does not outweigh the public's interest in a fair competition free from conflicts of interest. The Court, accordingly, finds the fourth and final factor weighs in favor of AMK9 and GK9. *See Turner Constr. Co. v. United States*, 94 Fed. Cl. 586, 597 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).

**4. Conclusion**

The injunction factors favor injunctive relief for AMK9 and GK9. In addition to prevailing on the merits of the protest, AMK9 and GK9 establish they will suffer irreparable harm if the Court withholds injunctive relief. The balance of hardships tips in AMK9's and GK9's favor and an award of injunctive relief is in the public interest. Accordingly, the issuance of a permanent injunction is warranted. In issuing a permanent injunction, the Court tailors relief, so any harm to the government, private parties, and the public interest is minimized. *See, e.g.*, *Heritage of Am., LLC*, 77 Fed. Cl. at 79. In this case, the "appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged" and necessitates a remedy. *NFK Eng'g, Inc.*, 805 F.2d at 375 (emphasis omitted) (finding contracting officer's decision to disqualify low bidder for government contract based on appearance of impropriety was not irrational or unreasonable); *see also Impresa Construzioni from. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001). "Cost savings" to the USPS do not outweigh the integrity of its solicitations. A permanent injunction will promote full and open competition in the procurement process and will preserve confidence in the fairness of government contract awards. *See Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process"); *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 673 (2021) ("[T]he court imposes an injunction that will safeguard fundamental fairness principles"); *NFK Eng'g, Inc.*, 805 F.2d at 379 (focused on "protect[ing] the integrity of the procurement process"). Having considered GK9 and the USPS's recommendations as to the terms of the permanent injunction, *see supra* Section IX.B, the Court imposes an injunction that will safeguard fundamental fairness principles.

In balancing the best value to the USPS and fairness in the procurement process, and after "giv[ing] due regard to the interests of national defense and national security" pursuant to 28 U.S.C. § 1491(b)(3), the Court grants AMK9's and GK9's requests for injunctive relief barring MSA from competing in the 3PK9 procurement process. *See Palantir USG, Inc.*, 129 Fed. Cl. at

[25] At oral argument, MSA commented, "I think most of the parties here also have teams that are performing work for commercial entities, such as FedEx, . . . DHL, and UPS." Tr. at 14:6–9. GK9 confirmed it "has a significant footprint and contracts with all the airlines, so [it] ha[s] personnel in virtually every one of the[] airports . . . working on commercial contracts with the airlines." *Id.* at 15:7–11.

291 (granting the plaintiff's request for permanent injunctive relief enjoining agency from issuing a solicitation with national security implications until making changes to the solicitation). The Court approves the government's revised resolicitation effort espoused in the government's 31 October response to the Court's 26 October Order, which moves contracts awarded to non-MSA offerors to the top of the schedule to allow new sites not awarded to MSA to be implemented first. *See supra* Section IX.A; Decl. of Jeremiah D. Baker; Am. Decl. of Jeremiah D. Baker. While the Court approves the proposal from the USPS's 31 October supplemental statement at this time, the Court will further evaluate the transition timeline following additional briefing. As discussed *supra* Section IX.B, the Court requests additional information through follow-up briefing to craft a more comprehensive reevaluation remedy timeline. Considering the USPS must repeat the evaluation, any current post-award protests appear to be moot; however, "this court's role is not to second guess what the [procuring agency] has determined to be its needs" and defers to the agency's determination. *Input/Output Tech., Inc.*, 44 Fed. Cl. at 72 n.9; *see Palantir USG, Inc. v. United States*, 904 F.3d 980 (Fed. Cir. 2018).

## X. Whether the Court Should Grant MSA's MJAR

In its MJAR, MSA argues in regard to the 2022 resolicitation: (1) "the Agency failed to provide a rational basis for its decision to hold separate procurements"; (2) if the procurements are unbundled, there are "patent ambiguities with respect to the interaction that will be needed between the two service providers"; and (3) the agency provided "no rational basis for changing [the] technical requirements to the solicitations," mainly the reduction of the look-back period and the equal treatment of mail and cargo screening. MSA's MJAR at 3–4. The Court addresses the look-back period and equal treatment of mail and cargo screening separately. Additionally, MSA asserts the agency's determination MSA is eligible to participate in the 2022 resolicitation is correct. *Id.* MSA asks the Court to order the USPS to combine the solicitations, or in the alternative, clarify the interaction required from the separate service providers. *Id.* MSA also urges the Court find the USPS had "no rational basis" for reducing the look-back period and treating mail and cargo screening equally. *Id.*

The Court previously examined MSA's three arguments in its decision denying MSA's motion for a preliminary injunction. *See Michael Stapleton Assocs., Ltd v. United States*, 161 Fed. Cl. 151 (2022). MSA agrees the relief requested in its MJAR is the same as requested in its motion for a preliminary injunction. Tr. at 220:19–221:3. MSA also agrees the administrative record has not changed since the Court issued its decision denying the preliminary injunction. *Id.* Therefore, the Court adopts the reasoning and analysis used in its decision denying MSA's preliminary injunction and expands on any new arguments raised by the parties.

### A. Whether the Government's Decision to Unbundle the Services Was Arbitrary or Capricious

MSA first argues the government's decision to unbundle the services was arbitrary and capricious. MSA disagrees with the Court's assessment characterizing the unbundling as "a question of subjective ability, not technical specifications." MSA's MJAR Reply at 4 (citing *Michael Stapleton Assocs.*, 161 Fed. Cl. at 161). While MSA agrees splitting "is within an agency's discretion to change its position as to whether to bundle or separate services," MSA

contends the unbundling of the services amounts to a technical change; under a 1997 Court of Federal Claims case, *Redland*, detailed *infra*, "the technical requirement changes must be supported by a rational basis and present in the administrative record in order for the Court to provide judicial review of the agency's decision." *Id.* at 5; *see* MSA's MJAR at 31 (quoting *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 234 (1997)); Tr. at 222:20–25 ("[MSA]: [W]e do think that the *Redland* case stands for the proposition that when there has been a . . . big reversal treating similar situations differently, that the scrutiny is heightened, and that some documentation would certainly satisfy that heightened scrutiny."). The record, according to MSA, does not contain facts allowing "the Court to review the rationality of the Agency's decision." MSA's MJAR at 33.

The government maintains the unbundling was rationally based and supported by the record. The government disagrees the change was a technical one and asserts "[t]he change in preference from a single supplier to separate solicitations reflected USPS's experience under the current contract with its ability to manage the rollout and contract management, not a change in the technical specifications[.]" Gov't's MJAR Reply at 6. Further, the government argues the SOW does not describe the solicitations as part of a "unified process," and, therefore, cannot be a technical change. *Id.* at 5. Regardless of whether the unbundling of services is a question of technical change or subjective ability, the government contends an agency must only prove a rational basis for the decision, and the record here supports the basis. *See* Tr. at 223:2–3 ("[THE GOVERNMENT]: Well, we think the standard is rational basis no matter what the situation.").

The Court's reading of *Redland* and its application to this case has not changed since denying MSA's motion for preliminary injunction on 25 July 2022. In *Redland Genstar, Inc. v. United States*, the agency changed the solicitation criteria related to technical specifications of a tangible product (i.e., changing the quality standards an offeror's stone must meet to be eligible for a government contract), and the court in *Redland* required "expressed reasons for judgment." 39 Fed. Cl. at 331. In the USPS's solicitation here, the change was related to the number of contractors the agency could effectively manage and collaborate with to administer the 3PK9 program. Lessons Learned Consultation Email at 6593. Unbundling the services was not a technical change, as MSA asserts; the decision to unbundle the solicitations did not change the criteria of the solicitation or the quality of the services provided. The agency, accordingly, did not need "expressed reasons for judgment" but rather a rational basis for the change. *See Redland Genstar, Inc.*, 39 Fed. Cl. at 331. Even if the USPS's decision had technical implications, the Federal Circuit instructed in its 2001 decision in *Impresa Constuzioni Geom. Domenico Garufi v. United States* every government solicitation is different, and what is necessary to provide a rational basis for a change regarding technical requirements may not be necessary for the evaluation of subject services. 238 F.3d 1324, 1332 (Fed. Cir. 2001). The Court, based on the change related to the USPS's subjective ability to manage its mail screening program, therefore, must determine whether the record supports a rational basis for the unbundling of the solicitations. *See id.*

To show an agency's action is arbitrary and capricious, the plaintiff must demonstrate "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* at 1332. The rational basis test requires the Court to ask "whether the contracting agency provided a coherent and reasonable

explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). As a preliminary matter, MSA agreed the facts and the administrative record have not changed since the Court denied MSA's preliminary injunction. Tr. at 220:19–221:3 ("THE COURT: . . . [H]as anything in the administrative record or any facts changed since the Court denied the preliminary injunction? [MSA]: . . . [N]o, the facts have not changed. . . . [T]he administrative record has not changed since that time."). In denying MSA's preliminary injunction, the Court found "MSA is unlikely to demonstrate USPS's decision to carry out separate solicitations for Canine Screening and Alarm Services was arbitrary and capricious." *Michael Stapleton Assocs.*, 161 Fed. Cl. at 162. The Court's decision was based on the USPS's market research, meaningful discussions with key personnel involved in the program under the 2020 contract and other senior leadership, and the USPS's determination the alarm resolution service provider and the canine screening provider did not interact under the 2020 contract and therefore could be separated. *Id.* at 6–10; *see* Lessons Learned Consultation Email at 6592–93; Gov't's MJAR at 16; 2022 AR at 6537 (CO Baker's Decision Letter to MSA), 6600–01 (SDRO's Decision Letter to MSA). The USPS conferred with USPS stakeholders to determine whether a single supplier was necessary. Lessons Learned Consultation Email at 6594. The CO also conducted market research assess whether increased competition would save costs for the USPS. *Id.* at 6592–93. At the conclusion of discussions with stakeholders, analyses of market research, and conversations with internal personnel, the USPS determined logistics of the contracts, cost savings, and increased competition favored unbundling the solicitations. *Michael Stapleton Assocs.*, 161 Fed. Cl. at 159–62; *see* Lessons Learned Consultation Email at 6592–93; Gov't's MJAR at 16; 2022 AR at 6537 (CO Baker's Decision Letter to MSA), 600–01 (SDRO's Decision Letter to MSA). MSA complains the USPS "failed to consider how the split in services would affect several technical requirements of the 2022 contracts." MSA's MJAR at 33. The 2022 SOW does not, however, require a single process between the contracts. *See* Lessons Learned Consultation Email at 6592–94. Additionally, Federal Circuit precedent does not require the USPS to document the particular facts it relies upon in every decision; rather the USPS is only required to show a rational basis for its choice. *See e.g.*, *Garufi*, 238 F.3d at 1332. The record here supports a rational basis for unbundling the services, as it did when the Court denied MSA's preliminary injunction; the administrative record and facts have not changed since that time. *See Michael Stapleton Assocs.*, 161 Fed. Cl. at 159–62; Tr. at 220:19–221:3. The Court finds the administrative record supports a rational basis for unbundling the solicitations. *See Garufi*, 238 F.3d at 1332*; Dell Fed. Sys.*, 906 F.3d at 992. The USPS "provided a coherent and reasonable explanation," and therefore the unbundling of the solicitations is not arbitrary and capricious. *See Garufi*, 238 F.3d at 1332*; Dell Fed. Sys.*, 906 F.3d at 992; *Turner Constr. Co.*, 645 F.3d at 1381; Lessons Learned Consultation Email at 6592–93; 2022 AR at 6537 (CO Baker's Decision Letter to MSA), 600–01 (SDRO's Decision Letter to MSA).

**B. Whether the 2022 Resolicitation Contains Patent Ambiguities**

MSA contends if the 2022 resolicitation remains unbundled, the resolicitation contains patent ambiguities. Repeating its argument in support of its preliminary injunction, MSA again argues the 2022 resolicitation is ambiguous because it requires the 3PK9 and alarm resolution service providers interact, but "provide[s] no further instruction as to expected protocols or chain of command for these required interactions." MSA's MJAR at 35; *see Michael Stapleton*

*Assocs.*, 161 Fed. Cl. at 162.  While MSA agrees with the Court concerning the agency's responsibility to resolve disputes "after the awards have been made," MSA argues the 2022 resolicitation does not "provide the offerors with much guidance in how to structure and present their offers to the Agency."  MSA's MJAR Reply at 6.  In particular, MSA argues the 2022 resolicitation makes it unclear "what level of effort must be put forth to constitute full cooperation and to ensure mission success."  *Id.* at 7.  Without "further instructions and guidance, then offerors will likely submit proposals that take a number of divergent approaches to screening the mail and thus make fair comparison of proposals improbable."  *Id.* at 7.

The government contends "MSA's allegations of patent ambiguities involving the need for coordination" between the two service providers are "unfounded and moot" because the "USPS addressed these issues in Amendment 0001 to the [2022] [re]solicitation and MSA did not challenge the amendment in its business disagreement before the SDRO, thus waiving any argument with respect to the revised language."  Gov't's MJAR at 10.  Additionally, contractors "are required to cooperate fully with USPS to resolve any contract administration issues"; there is no requirement for parties to resolve issues amongst each other.  Gov't's MJAR Reply at 7.  The solicitations act independently of the others and any coordination is placed squarely with the agency.  *Id.*  MSA's argument, according to the government, is not "which contractor should perform a given function, but rather . . . how to perform [functions]."  Gov't's MJAR at 21.  The government asserts MSA's complaints do not amount to patent ambiguities but rather issues "experienced contractors should be expected to perform with USPS explaining every possible aspect of the anticipated coordination in advance."  Gov't's MJAR Reply at 7–8.  "The hypothetical examples of coordination . . . do not represent patent ambiguities, but rather differences between the canine detection and alarm resolution functions that do not create patent ambiguities in the respective solicitations."  *Id.*

The Court previously determined the 2022 resolicitation likely contained no ambiguities. *Michael Stapleton Assocs.*, 161 Fed. Cl. at 162–63.  MSA previously argued, as it does now, the solicitations "require the service providers to interact but do not provide 'expected protocols or chain of command' for those interactions.  *Id.* at 162.  The Court finds sophisticated, experienced contractors, like MSA and the other offerors, are able to "coordinate with another contractor on ancillary work without more specific instructions."  *Id.* at 163.  The Court finds the government does not "need to spell out exactly how two contractors should collaborate . . . as hired experts[,]" and therefore no ambiguities exist.  *Id.*  The Court also determines "the solicitations are not ambiguous because they place ultimate responsibility for the program with the Agency." MSA's MJAR Resp. & Reply at 6; *see Michael Stapleton Assocs.*, 161 Fed. Cl. at 163.  The 2022 resolicitation implies the USPS is responsible for the overall program and as such, will resolve any dispute between the awardees, if any.  *See* 2022 AR at 6870 (3PK9 SOW) (requiring the contractor to "[c]ollaborate with USPS, USPIS and alarm resolution provider prior to launch in creating a 3PK9 script and playbook to be used in the event of an alert.").  The Court's determination in its 25 July 2022 decision denying MSA's motion for preliminary injunction remains unwavering, as nothing in the unchanged administrative record or MJAR briefing is persuasive to show patent ambiguities exist.  *See* Tr. at 220:19–221:3; *Michael Stapleton Assocs.*, 161 Fed. Cl. at 162–63.  Accordingly, the Court finds the MSA has not demonstrated patent ambiguities "of significance" rising to the level of arbitrary and capricious agency action.

*E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004); 5 U.S.C. § 706; *see Garufi*, 238 F.3d at 1332.

### C. Whether the Reduction in the Look-Back Period and Equal Treatment of Mail Screening and Cargo Screening Was Arbitrary and Capricious

MSA contends the "USPS provides no rational justification" for reducing the look-back period from 36 to 24 months because the change is not "rationally related to the harm the USPS seeks to mitigate." MSA's Resp. & MJAR Reply at 8–9; MSA's MJAR at 38–39. MSA asserts reduction in the look-back period deprives the USPS of months of test/audit information from offerors which could prove useful in making its decision. MSA's MJAR at 38. "All companies that are TSA certified cargo screeners must submit to regular TSA audits[,]" and, as a result, a reduction in the look-back period was not a rational strategy to mitigate possible advantages from MSA's past performance. *Id.* at 39; MSA's MJAR Resp. & Reply at 8. MSA asserts the Court's determination in its denial of MSA's preliminary injunction "did not rely on evidence in the administrative record." MSA's MJAR Resp. & Reply at 9. MSA further argues the reduction in the lookback period evaluates "the ability of an offeror to meet the TSA's safety standards" which "is a technical specification that the Agency now eliminates without any rational basis." *Id.* at 8. A technical change, according to MSA, requires a heightened standard of rationality and the "USPS provide[d] no rational justification" to the technical change. *Id.* at 9.

The government argues an agency has "broad discretion in how to mitigate potential OCIs" and the agency did mitigate to "deemphasize the past performance that MSA accrued as incumbent." Gov't's MJAR at 23–24. The USPS considered MSA's incumbent advantage without the implemented changes, so the measure had a rational basis. *Id.* at 11. The government disagrees with MSA's assertion the factors were "technical weighting factor[s]" and argues even if they were, the changes "were warranted to remedy the OCI connected with MSA's additional past performance as the incumbent." *Id.* at 25.

An agency must only "provide a reasonable corrective action and adequately explain its reasoning for doing so." *Dell Fed. Sys.*, 906 F.3d at 998 (citation omitted). When mitigating OCIs, the agency need only provide a "rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). As the Court determined in its denial of MSA's preliminary injunction, the record supports a rational basis. *See Michael Stapleton Assocs.*, 161 Fed. Cl. at 163–64. The USPS awarded the 2020 contract to MSA in November 2020, and because proposals for the 2022 resolicitation were due in April 2022, MSA accrued more than twelve months of past performance under the 2020 contract. *Id.* (citing 2022 AR at 6968 (Amendment to Canine Screening Solicitation), ECF No. 48-5; 2022 AR at 5968 (Amendment to Alarm Clearing Solicitation)). The reduction in the look-back period, therefore, is roughly proportional to the period of MSA's incumbency. *Id.* By reducing the look-back period, the government sought to encourage additional offerors who did not have more than 24 months past performance to participate without being penalized. Gov't's MJAR Reply at 8–9. The change, therefore, was not only focused on minimizing "tainted" incumbent advantage but encouraging competition. *Id.* No facts in the administrative record have changed since the Court issued its opinion and order

denying the preliminary injunction. *See* Tr. at 220:19–221:3. The Court finds the USPS provided a rational basis from the administrative record for reducing the look-back period from 36 months to 24 months to mitigate MSA's incumbency advantage and promote fair competition.[26] *See Dell Fed. Sys.*, 906 F.3d at 998; *Bowman*, 419 U.S. at 285.

### D. Whether USPS's Treatment of Mail and Cargo Screening Was Arbitrary and Capricious

MSA contends the USPS's second mitigation strategy in which the CO, under the SDRO's supervision, "revise[d] the 2022 [re]solicitation[] to clarify that past performance involving mail screening would be evaluated as equal to past performance for cargo screening" is not a rational mitigation strategy. *See* MSA's MJAR at 40. MSA asserts "the agency neglected to consider 'an important aspect of the problem,'" mainly mail and cargo are not the same. *Id.* (citing *Ala. Aircraft*, 586 F.3d at 1375). MSA further argues the decision to mitigate MSA's incumbent advantage by treating mail and cargo equally is not supported by the administrative record, and the Court did not consider the administrative record when it issued its decision denying MSA's motion for a preliminary injunction. MSA's MJAR Resp. & Reply at 11. MSA asserts "the Court relied on a statement from counsel for the [g]overnment in which he stated it was his understanding that mail and cargo screening differ only in name." *Id.* (citing *Michael Stapleton Assocs.*, 161 Fed. Cl. at 164).

The government argues an agency has "broad discretion" to mitigate the advantage an offeror accrued as an incumbent. Gov't's MJAR at 23–24. The USPS addressed the incumbent advantage by treating mail and cargo screening equally. *Id.* at 11. The government disagrees the changes were "technical weighting factors[,]" as MSA claims, and argues the changes only needed a rational basis. *Id.* at 25. The USPS's actions "were warranted to remedy the OCI connected with MSA's additional past performance as the incumbent" and therefore the USPS had a rational basis for the change. *Id.*

All that is required from an agency is it "provide a reasonable corrective action and adequately explain its reasoning for doing so." *Dell Fed. Sys.*, 906 F.3d at 998 (citation omitted). As part of the reasoning, the agency must articulate a "rational connection between the facts found and the choice made." *Bowman Transp., Inc.*, 419 U.S. at 285. The record, which has not changed since the Court determined MSA was "unlikely to prove USPS's decision to evaluate cargo screening experience and mail screening experience equivalently was arbitrary and capricious," still supports a rational basis on the part of the USPS. *Michael Stapleton Assocs.*, 161 Fed. Cl. at 164–65; Tr. at 220:19–221:3. The administrative record discusses the distinction between cargo and mail screens. *See* CO Franklin's Report at 3673 ("TSA has set the standards for screening using canine that applies whether the canine is used for screening cargo or mail. The certification process for canine and its handler is the same under the TSA 3PK9 program. The only difference is those 3PK9 teams that screen mail need to be trained in the particular configurations agreed upon between TSA and the USPS."). Accordingly, the USPS found because MSA was the only offeror with mail screening experience due to its incumbency, mail

[26] The Court, however, finds *supra* Section VI.C, despite the connection articulated by USPS, reducing the lookback period only 12 months was insufficient to remove the "taint" of MSA's incumbent advantage. *See Garufi*, 238 F.3d at 1332 (finding the procurement official's decision lacked a rational basis and was thus arbitrary and capricious).

and cargo should be treated the same. Gov't's MJAR at 37. The USPS's explanation meets the rational basis standard as it provides an explanation for the corrective action and connects the facts found with the choice made. *See Dell Fed. Sys.*, 906 F.3d at 998; *Bowman*, 419 U.S. at 285. MSA did not prove the USPS's decision to evaluate cargo screening experience and mail screening experience equivalently to be arbitrary and capricious. *See Dell Fed. Sys.*, 906 F.3d at 998; *Bowman*, 419 U.S. at 285.

MSA requests the same relief it did in its request for preliminary relief, yet the administrative record has not changed since the Court denied MSA's preliminary injunction. Tr. at 220:19–221:3. The Court's analysis concerning success on the merits of the same arguments accordingly does not yield different results.

### E. Whether MSA Is Eligible to Participate in the 2022 Resolicitation

MSA also contends it should not be disqualified from the competition for the 2022 resolicitation because the USPS's "determination that MSA is eligible is rational and well-supported by the record." MSA's MJAR at 41. MSA argues the USPS correctly concluded MSA could compete in the 2022 resolicitation because the USPS completed a thorough review to determine what "OCIs potentially existed after the 2020 procurements and analyzed whether those OCIs still existed with respect to the 2022 procurements." *Id.* at 43. MSA argues the mitigation actions, *supra* Section VI.C, were sufficient and rational. *Id.* MSA also argues the USPS "properly mitigated MSA's OCI stemming from unequal access to information" and "took extensive steps to mitigate any advantage that MSA might have tenuously had in helping to establish program elements and program documents." *Id.* at 45, 49.

The Court, *supra* Section VI, extensively evaluated whether the USPS adequately mitigated MSA's incumbent advantage. The Court finds while the USPS could have further mitigated remaining unequal access to information issues favoring MSA, the USPS could not have removed MSA's advantage stemming from biased ground rules OCIs, and therefore, MSA cannot participate in the 2022 resolicitation. *See supra* Section IX.

## XI. MSA's Various Motions After the Court's 26 October 2022 Order

At the conclusion of oral argument held 21 October 2022, the Court stated it "strives to get a full order out before probably the middle of November" but may need additional information from the USPS to guide its ultimate holding. Tr. at 224:5–6. The Court, accordingly, issued a short order asking the "USPS to offer guidance on the *prospect* of resoliciting or reevaluating the 2022 resolicitation *in the event* the Court's equitable remedy disqualifies MSA from participation[.]" 26 Oct. Order 2022 at 5 (emphasis added); *see supra* Section IX.A. The 26 October 2022 Order does not grant or deny a party's MJAR, order the USPS to act in a certain way, or otherwise impose injunctive relief. *See id.* Rather, as the order expressly states, the Court sought "guidance" "in the event" MSA was disqualified. *Id.* at 5.

While the Court asked the USPS for "guidance on several reevaluation or resolicitation factors to craft an equitable remedy, if any, in the forthcoming, more detailed order," it also allowed any plaintiff an equal opportunity to respond to the USPS's guidance with its own

concerns on a prospective resolicitation or reevaluation of the 2022 resolicitation.  *See id.* at 1.  The USPS filed its supplemental statement with a declaration from CO Baker detailing how the contracts would move forward "in the event" MSA was disqualified.  *Id.* at 5; Gov't's First Resp. to 26 Oct. 2022 Order; Decl. of Jeremiah D. Baker.  GK9 filed its response expressing its concerns with the USPS's proposed plan.  GK9's Resp. to 26 Oct. 2022 Order; *see supra* Section IX.A.  MSA did *not* file a response to the USPS's supplemental statement.

On 4 November 2022, MSA filed a notice of appeal to the Federal Circuit "from the Court's October 26, 2022 Order (ECF No. 69) denying the [MJARs] filed by MSA and . . . the United States, and granting the [MJARs] of [AMK9 and GK9]."  Notice of Appeal at 2, ECF No. 76.  On 16 November 2022, MSA filed a motion for a stay or injunction pending appeal under RCFC 62(d), which states:  "While an *appeal is pending from an interlocutory order or final judgment* that grants, continues, modified, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  MSA's Mot. for a Stay or Inj. Pending Appeal (citing RCFC 62(d)) (emphasis added).  MSA also filed a motion to expedite consideration of its motion for stay pending appeal, ECF No. 80.  GK9 and AMK9, confused by the procedural morass, filed motions for a status conference on 17 November 2022, ECF No. 81, and 22 November 2022, ECF No. 84, respectively.

The procedural confusion is founded in MSA's assertion the Court's 26 October 2022 Order prescribes injunctive relief or renders final judgment.  *See* MSA's Mot. for a Stay or Inj. Pending Appeal at 5.  The Court did not issue injunctive relief or final judgment on 26 October 2022 extricating MSA from the contracts.  26 October Order 2022 at 5.  MSA, citing *Abbott v. Perez*, claims the order amounts to an injunction.  MSA's Mot. for a Stay or Inj. Pending Appeal at 6.  *Abbott v. Perez* relates to "orders of a three-judge court . . . effectively directing the State not to conduct this year's elections using districting plans that the court itself adopted some years earlier."  138 S. Ct. 2305, 2313 (2008).  In other words, the lower court stopped an election districting plan before election day.  In contrast, the Court's order, as quoted by MSA, "*potentially may disqualify* MSA from participation in USPS's . . . 2022 Solicitation."  MSA's Mot. for a Stay or Inj. Pending Appeal at 5 (emphasis added).  MSA confuses "may" with "shall" and "guidance" with "binding authority."  *Perez* is inapposite as the certainty and magnitude of harm is not comparable.  138 S. Ct. at 2313.  The Court's 26 October 2022 Order is not a final judgment.  *See Weed v. Soc. Sec. Admin.*, 571 F.3d 1359, 1361 (Fed. Cir. 2009) (noting an order is final when it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment) (citing *Flanagan v. United States*, 465 U.S. 259, 263–64 (2009) ("The final judgment rule . . . helps preserve the respect due trial judges by minimizing appellate-court interferences . . . [and] reduces the ability of litigates to harass opponents and to clog the courts")).

MSA misconstrues the Court's statements at oral argument and the Court's 26 October Order to characterize the 26 October 2022 Order as a final judgment.  For example, MSA contends, citing the oral argument transcript, "The Court apparently believes that USPS's communications with MSA during the pilot program and immediately following (when a sole source award was contemplated) in part give rise to an unequal access to information OCI."  MSA's Mot. for a Stay or Inj. Pending Appeal at 11 (citing Tr. at 128:14–17 ("THE COURT:

For rollout responsiveness, it's certainly an incumbent advantage to already have canines spread out across the country in the exact locations, correct?"), 131:4–6 ("THE COURT:  Is this level of bias that would always focus them not one of the reasons why they should be inherently disqualified?")).  MSA interprets questions from the Court as its holding.  This conjecture is tenuous at best.  MSA also contends, "[T]he Order appears to apply a *de novo* review[,]" when the Court never stated it will review de novo.  *Id.* at 12.  Indeed, the Court states in its reasoning, the UPSP's decisions were "arbitrary and capricious."  26 Oct. 2022 Order at 5 ("The continued inclusion of [XXXXX] . . . was arbitrary and capricious.").  MSA also asserts "the Court seems to believe that a biased ground rules OCI exists notwithstanding the fact that the USPS, when it conducted its OCI investigation found that none existed."  MSA's Mot. for a Stay or Inj. Pending Appeal at 12.  MSA cites the Court asking during oral argument, "If MSA worked in the pilot program in order to create the mail screening program, is that not inherently baked into the [SOW]?"  Tr. at 148:3–6.  This question from the Court does not give any insight into whether or not the Court would conclude biased ground rules OCIs still existed, but, rather, was the Court seeking to understand the nuisances of the parties' arguments.  MSA also postulates, "[t]he Court apparently believes that the mandatory disqualification provision in FAR 9.505-2 applies to this case."  MSA's Mot. for a Stay or Inj. Pending Appeal at 12.  MSA cites a portion of oral argument where the Court is comparing the language of the FAR to the SP&Ps.  *Id.* (citing Tr. 84:15–86:21 ("THE COURT:  Okay, so what does that mean if the FAR were to apply here? . . . And then how does that read into a provision of the SP&P that should be treated the same?")).  MSA's support for a stay pending appeal draws from imaginary holdings concocted from questions at oral argument and a short order requesting additional information from the USPS.

MSA cannot infer the Court's mindset from questions asked to the parties for the purpose of understanding the parties' arguments.  The questions from the Court were in a hypothetical world to determine what the USPS would prefer for next steps, if the Court were to exclude MSA in a future decision.  Tr. at 193:22–194:2 (emphases added) ("THE COURT:  . . . [W]hat is the process and timeline going forward in order to ensure operations, but then *if the Court finds* to remedy these issues in order to complete a solicitation that does not include MSA?"), 195:24–196:2 ("THE COURT:  So *to the extent* that the outcome is that MSA should not have been on the 2022 contract allowed to bid, what would that mean for the 2022 contract, a complete stop?").  The government asked for guidance so the USPS could proceed with operations without significant harm given the tight timeline and certain treaty obligations.  Tr. at 215:3–8 ("THE COURT:  Would it be helpful to have a short advisory opinion related to where we're going prior to a detailed order?  [THE GOVERNMENT]:  Yeah, if it's guidance, then we, of course, you know, accept whatever guidance the Court is giving."), 216:20–24 ("[THE GOVERNMENT]:  [I]f you issued [a short order], we could come back and we can consult with the clients and find out what time frame we need and what are the complicating factors and, you know, how much time we estimate it will take and what we could do.").  The Court's questions were directed at understanding the parties' concerns.  The Court issued its short order to fully understand the "complicating factors" for all parties and tailor its injunctive relief issued *supra* Section IX.C.4 accordingly.  Tr. at 216:23.

MSA asserts the 26 October 2022 Order has the "practical effect" of an injunction because the USPS "has already begun to implement the strictures of the Order by modifying MSA's contract to amend the rollout schedule."  MSA's Mot. for a Stay or Inj. Pending Appeal

at 6. The USPS, acting on its own accord when the Court did not prescribe any injunctive relief, cannot turn a non-final order into a final judgment. The USPS itself acknowledges "[t]he Court's order requested information *in the event* it disqualified MSA from the 2022 competition[.]" Decl. of Jeremiah D. Baker ¶ 3 (emphasis added); *see id.* ¶¶ 10 ("We estimate that *we could* issue[] awards . . . .") (emphasis added), 13 ("At all times MSA *would need* to continue to provide . . . .") (emphasis added); Tr. at 225:11–16 ("[THE GOVERNMENT]: . . . [T]he Court will provide guidance as to how MSA should be excluded from that evaluation or whatever you want us to do, and then we'll have to look at what options are best to be able to address the Court's concerns and, you know, extricate MSA if that is what is needed."). The USPS acted in its own interest to reduce risk in the event the Court did exclude MSA from participation. It is not the Court's role to micromanage how an agency adapts its contracts to reduce risk. *Motor Vehicle Mfrs. Ass'n*., 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).

As of today, MSA is still included in the rollout schedule, but MSA complains the USPS's amended rollout schedule, which "moves all of MSA's rollouts to the back of the line . . . , depriv[es] MSA of revenue and require[es] layoffs." Decl. of Claudia P. Angel at 4–5, ECF No. 83-1; MSA's Mot. for a Stay or Inj. Pending Appeal at 16. This is the first time MSA complains of the harm the USPS's plan would inflict. MSA's Mot. for a Stay or Inj. Pending Appeal at 3 ("MSA will be irreparably harmed because . . . it will likely be locked out of the 2022 solicitations for good and certainly will be deprived the revenue . . . which will negatively impact its workforce."). MSA's parade of complaints could have been expressed earlier. Indeed, the Court asked the parties to respond to the USPS's plan; MSA did not do so. *See* 26 Oct. 2022 Order at 5. Now, MSA complains of lost revenue. *See* MSA's Mot. for a Stay or Inj. Pending Appeal at 3. MSA's complaints contradict earlier statements made in 2021 when asked if losing the contract would impact MSA: "[MSA]: In terms of lost profits, . . . [i]t would be minimal." *See* 2021 Tr. at 108:1–2. Now, MSA claims it will lose "[XXXXX] in revenue" and "lay off approximately [XXXXXXXXXXXXXXX]" and demands a stay pending appeal. MSA's Mot. for a Stay or Inj. Pending Appeal at 24.

MSA presumes to read the Court's mind to deduce the holdings of a future final judgment without one being issued. *Id.* at 11 ("The Court apparently believes . . ."), 12 ("[T]he Order appears to apply a de novo review . . . ."; "[T]he Court apparently believes that the mandatory disqualification provision in FAR 9.505-2 applies in this case . . . ."). MSA had the opportunity to voice any concerns with the USPS's proposal by submitting a supplemental statement to the Court. *See* 26 Oct. 2022 Order at 5. MSA did not but instead waited weeks until the eve of the Court's final decision to complain about harm in its request to stay the Court from issuing its actual injunctive relief. *Id.* at 3. MSA weighs down the Court with numerous motions and creates a procedural web from an order that was not a final judgment. *See Flanagan*, 465 U.S. at 263–64. Given MSA's motion requests to stay an injunction that was not yet issued, the Court finds the motion moot. *See id.*; *Weed*, 571 F.3d at 1361. Further, the Court finds as moot the motion to expedite reconsideration of MSA's motion for a stay pending appeal. As the motion for stay seeks to delay the injunctive relief the Court issues today, the motion to expedite is moot. Further, GK9's and AMK9's motions for a status conference are moot as MSA's purported appeal is likely baseless at this time as no injunctive relief or final judgment

have been made and therefore jurisdiction remains with this Court.  *See Flanagan*, 465 U.S. 259 at 263–64 ("The final judgment rule . . . helps preserve the respect due trial judges by minimizing appellate-court interferences . . . [and] reduces the ability of litigates to harass opponents and to clog the courts").

## XII.    Conclusion

For the foregoing reasons, the Court **GRANTS** AMK9's motions for judgment on the administrative record, ECF No. 51, **GRANTS IN PART** GK9's motion for judgment on the administrative record, ECF No. 53, **GRANTS IN PART** and **DENIES IN PART** the government's cross-motion for judgment on the administrative record, ECF No. 56, and **DENIES** MSA's motion for judgment on the administrative record, ECF No. 52.  The Court **GRANTS** AMK9's request for injunctive relief, **GRANTS IN PART** GK9's request for injunctive relief, and **DENIES** MSA's request for injunctive relief.  The Court **FINDS as MOOT** MSA's motion for stay pending appeal, ECF No. 79, MSA's motion to expedite, ECF No. 80, and GK9's and AMK9's motions for a status conference, ECF Nos. 81 and 84.  The government **SHALL FILE** additional briefing on or before **30 November 2022** concerning the reevaluation issues noted *supra* Section IX.B.  If desired, any plaintiff may respond on or before **7 December 2022**.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge